IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CASSANDRA LUSTER, INDIVIDUALLY AND A/N/F OF D'ANDRA LUSTER, A MINOR CHILD; DAMON LUSTER; DESMOND LUSTER, JR., BEVERLY DIANA LUSTER, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DESMOND LUSTER, SR. | § § § § § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 3:16-cv-00396-B |
| vs. | § § | |
| CITY OF DALLAS, ET AL. | § § | |
| Defendants. | § | |

**APPENDIX TO DEFENDANT PILOT TRAVEL CENTERS, LLC'S
MOTION FOR SUMMARY JUDGMENT**

**Exhibit A:**   Deposition Excerpts of Aaron Tolerton;

**Exhibit B:**   DPD Officer History for Aaron Tolerton and Supporting Affidavit; and

**Exhibit C:**   Deposition Excerpts of Damon Luster.

# EXHIBIT A

# Condensed Transcript of
## Aaron Tolerton

**Date:** July 17, 2017

**Case:** Cassandra Luster, et al. vs. City of Dallas, et al.

Steven H. Gentry & Associates, Inc.
5115 North Galloway Avenue, Suite 202
Mesquite, Texas 75150

Phone: 214-321-5333
Fax: 214-321-6869
Email: gentrycr@swbell.net
Internet: www.gentrycr.com

Cassandra Luster, et al. vs.
City of Dallas, et al.

1
Aaron Tolerton
7/17/2017

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3

     CASSANDRA LUSTER, et al.,      *
 4                                  *
        Plaintiffs,                 *
 5                                  *
     VS                             *   CIVIL ACTION NO.
 6                                  *   3:16-cv-00396-G
                                    *
 7   CITY OF DALLAS, et al.,        *
                                    *
 8      Defendants.                 *

 9

            ************************************
10             ORAL AND VIDEOTAPED DEPOSITION OF
                       AARON TOLERTON
11                     July 17, 2017
            ************************************
12

13            ANSWERS AND VIDEOTAPED DEPOSITION OF AARON

14   TOLERTON, a witness produced on behalf of the Plaintiffs,

15   taken in the above-styled and -numbered cause on the 17th

16   day of JULY, 2017, before Samantha M. Blair, Certified

17   Court Reporter No. 8028, in and for the State of Texas,

18   taken in the offices of Dallas City Hall, City Attorney's

19   Office, 1500 Marilla Street, Dallas, Texas 75201, County

20   of Dallas, State of Texas, in accordance with the Federal

21   Rules of Civil Procedure and any Stipulations hereinafter

22   set forth.

23            It is further agreed that Rule 30(b)(5) is

24   waived by agreement of the parties.

25
```

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

APP 004

Cassandra Luster, et al. vs.
City of Dallas, et al.

2
Aaron Tolerton
7/17/2017

```
 1                A P P E A R A N C E S
 2
 3
    MR. DON HIGH
 4  Office of Don High
    816 Greylyn Drive
 5  Plano, Texas 75075
    (972) 424-5512
 6  donnhigh@verizon.net
 7  MR. CHARLES A. BENNETT
    Ted B. Lyon & Associates, P.C.
 8  18601 LBJ Freeway
    Suite 525
 9  Mesquite, Texas 75150
    (972) 279-6571
10  cbennett@tedlyon.com
11
         COUNSEL FOR THE PLAINTIFFS
12
13  MR. JASON G. SCHUETTE
    City of Dallas
14  1500 Marilla
    7DN
15  Dallas, Texas 75201
    (214) 670-1236
16  jason.schuette@dallascityhall.com
17       COUNSEL FOR THE DEFENDANTS CITY OF DALLAS AND
         AARON TOLERTON
18
19  MR. MICHAEL B. JONES
    Canterbury Gooch Surratt Shapiro Stein GAswirth & Jones
20  4851 LBJ Freeway
    Suite 301
21  Dallas, Texas 75244
    (972) 239-7493
22
         COUNSEL FOR THE DEFENDANT PILOT TRAVEL CENTERS
23
24  ALSO PRESENT:     Mr. Steven Herrera - Videographer
25
```

APP 005

Cassandra Luster, et al. vs.
City of Dallas, et al.

3
Aaron Tolerton
7/17/2017

```
 1                        I N D E X

 2
     AARON TOLERTON:
 3                                              Page

 4    EXAMINATION
         BY MR. HIGH                              5
 5
      EXAMINATION
 6       BY MR. JONES                           207

 7    FURTHER EXAMINATION
         BY MR. HIGH                            249
 8
      FURTHER EXAMINATION
 9       BY MR. JONES                           262

10

11
     Signature and Changes                      263
12

13   Reporter's Certificate                     265

14

15            REQUESTED DOCUMENTS/INFORMATION

16                       NONE

17

18               CERTIFIED QUESTIONS

19                       NONE

20

21

22

23

24

25
```

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

APP 006

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

16

1    Q.  Okay.  After you graduated from -- well, while
2    you were in school -- while you were in school, where did
3    you work?
4        A.  I worked at two places, University Police
5    Department and Texas Department of Criminal Justice.
6        Q.  And that was the police department for Sam
7    Houston?
8        A.  For the university, yes, sir.
9        Q.  Okay.  How long did you work for them?
10       A.  I want to say a year.
11       Q.  What did you do for them?
12       A.  I checked to make sure things were locked, doors
13   on campus.  They gave me a checklist, I'd go through and
14   that's it.
15       Q.  Okay.  And then who did you work for after that?
16       A.  After the TDCJ?
17       Q.  No, after the University Police Department.
18   When was it that you worked for TDCJ?  And maybe I got
19   you confused.
20       A.  I worked in that, I think, after my first year
21   of college I went into Texas Department of Criminal
22   Justice.
23       Q.  Okay.  And what did you for TDCJ?
24       A.  I was a correctional officer.
25       Q.  And how long did you work as a correctional

17

1    officer?
2        A.  I believe it was three years or just shy of
3    three years.
4        Q.  And did you work inside the prison?
5        A.  Yes, sir.
6        Q.  Okay.  And was it your responsibility to
7    maintain safe decorum inside the?
8        A.  Safe decorum?
9        Q.  Safe decorum, a safe place.
10       A.  Yes, sir.
11       Q.  All right.  Did you have to use restraint on
12   occasion?
13       A.  I have.
14       Q.  Okay.  Do you have a criminal history?
15       A.  Yes, sir.
16       Q.  Okay.  Tell us about your criminal history.
17       A.  I was charged with aggravated assault with a
18   deadly weapon.  And at this moment a DWI.
19       Q.  Okay.  And it's my understanding the aggravated
20   assault has been resolved but the DWI is pending; is that
21   correct?
22       A.  Correct.
23       Q.  Okay.  All right.  Let's -- I want to direct
24   your attention now to the shooting, the shooting that
25   took place on February the 9th of 2015.  And that

18

1    occurred on Bonnie View Road in Dallas, Texas; is that
2    correct?
3        A.  Yes, sir.
4        Q.  Okay.  And the man you shot and killed was in
5    another vehicle and it was driven by Desmond Luster?
6        A.  Correct.
7        Q.  Now, at the time of the shooting you were a
8    licensed police officer, correct?
9        A.  Yes, sir.
10       Q.  Are you still?
11       A.  No, sir.
12       Q.  What happened with your license?
13       A.  I was dismissed from the department after the
14   ag. assault charge.
15       Q.  And that was approximately April of 2015; is
16   that correct?
17       A.  Yes, sir.
18       Q.  In February of 2015 how long had you been a
19   police officer?
20       A.  About six years.
21       Q.  And from looking at your records, it appears you
22   were hired on January the 7th, 2009?
23       A.  Yes, sir.
24       Q.  And what was your badge number?
25       A.  9711.

19

1        Q.  At the time of the shooting, were you dressed in
2    a police uniform?
3        A.  Yes, sir.
4        Q.  And was there anything unusual about that
5    outfit?
6        A.  Compared to what, sir?
7        Q.  It wasn't a regular police uniform.  They call
8    it a Class B uniform.  What's the difference?
9        A.  The difference is the Class A is more -- is a
10   dress uniform.  At one time that was the required one.
11   They allowed Class Bs, I believe it was more tactical.
12   You had more pockets.  You weren't so confined and you
13   didn't have bright buttons going down.
14       Q.  And I guess the reason for that is so that you
15   don't get hung up on things going through doorways or
16   tight spots?
17       A.  I don't know why they said we could have
18   Class Bs.  I was just happy to have lighter weight.
19       Q.  I guess, yeah.  And did you have to have a vest
20   at that time?
21       A.  I always wore the vest, sir.
22       Q.  Man, wear one in July?
23       A.  Yes, sir.
24       Q.  Miserable, right?
25       A.  It's very nice when you take it off when you get

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

7  (Pages 16 to 19)

APP 007

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

## 28

1  authority, didn't you?
2  A. Yes, sir.
3  Q. And you were very used to how that felt, weren't
4  you?
5  A. What do you mean "how it felt"? I was a cop
6  every day, yes, sir.
7  Q. All right. And I know it's not an easy
8  question, but my question is kind of hard to understand.
9  But what I mean by that is when people would see you
10  walking around with your uniform on and wearing that
11  pistol that we just talked about, you were a police
12  officer, right?
13  A. Yes, sir.
14  Q. And you were a person with official authority,
15  weren't you?
16  A. Yes.
17  Q. Have you ever been involved in any other
18  shootings other than the one with Desmond?
19  A. No, sir, that was the first time I was in a
20  shooting.
21  Q. So the answer is, no, no other shootings?
22  A. I have never shot anyone else, no, sir.
23  Q. Do you wear glasses?
24  A. I do occasionally, yes, sir.
25  Q. Okay. And you wear corrective lenses?

## 29

1  A. Yes, sir.
2  Q. Okay. What are you wearing today?
3  A. Nothing, sir.
4  Q. Okay. So you don't have your glasses or
5  corrective lenses on?
6  A. No, sir.
7  Q. Are you having trouble seeing me or have you had
8  some --
9  A. No, it's astigmatism. What it is, is it's
10  mainly readings.
11  Q. So you need readers to read up close?
12  A. No, not readers. Astigmatism, like, I can see
13  the clock, I can see the time, but I can't really make
14  out all the numbers. I know what the numbers are because
15  it's a clock, but a little blurry, but -- I can see the
16  numbers, but a little blurry at times.
17  Q. That sounds like my first year of law school.
18  A. The clock?
19  Q. Yeah, I remember being able to see the
20  blackboard, but I couldn't make out what was on the
21  blackboard anymore. And I was going, what's on here?
22  That's too much reading.
23  All right. So I take it, then, that you can
24  see pretty well from distance, but you could see better
25  if you have some correction?

## 30

1  A. Yes, sir.
2  Q. Okay. And when you drive, for instance, do you
3  drive with correction or...
4  A. With my lenses, yes, sir.
5  Q. Okay. And do you have a prescription for
6  glasses?
7  A. Yes, sir.
8  Q. Do you have a prescription for sunglasses?
9  A. I got -- I had those that tint when you go at
10  night at one time, but usually I just -- they call --
11  friends call them old man glasses because I don't like
12  the feel of sunglasses. But if I absolutely need them, I
13  would have those -- the best thing I can say is -- did
14  your father wear glasses?
15  Q. Oh, yeah. Yeah, my father wore glasses.
16  A. The big ones that would cover the glasses --
17  Q. Yes, I know what you are talking about.
18  A. That's what I would use because it made me more
19  comfortable.
20  Q. Okay. So we are talking about those big ones
21  that you completely cover the apparatus?
22  A. They don't -- they don't leave the car, yes,
23  sir.
24  Q. Okay. And they make you look like an idiot,
25  right?

## 31

1  A. Yes, sir. But in the car I'm by myself, it's
2  okay.
3  Q. All right. All right. So did you have any
4  corrective lenses at the time of the shooting?
5  A. I don't remember. I'm sorry.
6  Q. So you could have, you may not have, you just
7  don't know?
8  A. I can't remember if I had them on, no, sir.
9  Q. Okay. Do you know if you had them with you that
10  day?
11  A. Yes, sir, they are always in my car. If I don't
12  wear them, they are usually in the car.
13  Q. Okay. What's your visual acuity, 20-20? 20-10?
14  Do you know?
15  A. I do not know.
16  Q. When you are qualifying, do you wear your
17  glasses?
18  A. Sometimes.
19  Q. Not all the time?
20  A. No, sir.
21  Q. Were you having any trouble with your vision on
22  February the 9th, 2015?
23  A. I don't believe so. Not that I recall anyway.
24  Q. And I guess the same answer would be for this,
25  were you wearing sunglasses?

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

32

1    A.  No, I don't wear sunglasses outside of the car.
2    Q.  So is it your rule, personal rule, you only wear
3    sunglasses in the car?
4    A.  Yes, sir.  I have an extremely large nose and
5    they kind of vibrate my nose.  For some reason it feels a
6    like they are vibrating my nose.  I don't like sunglasses
7    at all.
8    Q.  Interesting.
9    A.  That's why all this squinting, all this right
10   here (indicating).
11   Q.  They call those crows feet.
12   A.  The age thing is going --
13   Q.  You get used to it.
14   A.  -- to be horrible.
15       MR. SCHUETTE:  I can assure you of that.
16   Q.  (BY MR. HIGH)  You ain't got nothing on me, I
17   assure you.  All right.
18       So sunglasses are not your deal unless you
19   have to -- have to wear them and you wear them in the
20   car; is that fair to say?
21   A.  Yes, sir.
22   Q.  Okay.  When you were out there with Desmond that
23   day, was the sun in your eyes or do you recall?
24   A.  I don't recall where the sun was, sir.
25   Q.  Okay.  The approximate time of the shooting was

33

1    1:30 in the afternoon.  So it's a good likelihood the sun
2    was straight up in the sky.  You don't recall the sun
3    being an issue that day, do you?
4    A.  No, sir.
5    Q.  Not like you are going down a road and the sun
6    is glaring at you and you can't --
7    A.  That's why the sunglasses are in the car, yes,
8    sir.  When driving you never know what it's going to
9    reflect off of.
10   Q.  Very good.  So we didn't have that kind of
11   situation going on where the sun was in your eyes -- I
12   mean, the sun was straight over your head, right?
13   A.  Not that I recall, sir.
14   Q.  Was there anything in the roadway on Bonnie View
15   Road that was blocking your view?
16   A.  No, sir.
17   Q.  Were there any other obstructions on Bonnie View
18   Road, the sidewalk, the grass, that was blocking your
19   view?
20   A.  No, sir.  I don't think there was -- I don't
21   think there's a sidewalk over there at the Flying J.
22   Q.  You don't think there's a sidewalk?
23   A.  No, sir.
24   Q.  But there's no -- there weren't any other
25   obstructions that you can think of?

34

1    A.  Oh, no, sir, not that I can think of.
2    Q.  Now, when you gave your affidavit to Detective
3    Richardson, you didn't mention any obstruction, did you?
4    A.  No, sir.
5    Q.  Okay.  I'm going to show you what I'm going to
6    mark as Exhibit Number 5 and it's --
7        (Exhibit 5 marked.)
8    A.  This is the same thing I already have, correct?
9    Q.  (BY MR. HIGH)  And for the record, that's the
10   same document we talked about earlier?
11   A.  Yes, sir.
12   Q.  Have you compared them just to make sure?
13   A.  I haven't proofread it, but it looks about the
14   same -- it looks the same to me.
15   Q.  Okay.
16   A.  Except it's got a sticker on it.
17   Q.  We are not going to talk about that right now.
18   We are going to come back to that here in a minute.  So
19   don't worry about that.
20   A.  Yes, sir.
21   Q.  On that day, February the 9th, you were working
22   a security job for the Flying J Truck Stop; is that
23   correct?
24   A.  Off-duty officer, yes, sir.
25   Q.  Off-duty officer?

35

1    A.  Yes, sir.
2    Q.  Is there a difference between that and a
3    security job?
4    A.  Yes, sir.  You still have the authority as an
5    officer.
6    Q.  So a security job plus being a Dallas Police
7    Officer?
8    A.  I do the things that they -- if you are
9    asking -- I'm sorry.  You are going to clear it up for
10   me.  I apologize.
11   Q.  I understand.  I realize you are not a lawyer.
12   A.  There's things they want -- they want you to do,
13   but everything is in the -- like, they want you -- they
14   don't to -- they don't want to pay you to sit at the desk
15   and do nothing.  They want you to prevent.  If there's an
16   issue, they want you to go and take care of it and make
17   sure things go smoothly.  That -- just little better for
18   everyone.
19   Q.  Excellent.  And we'll get to that here in just a
20   second.
21   A.  Yes, sir.
22   Q.  So -- so you know, what I -- what I mean when I
23   say, like, a private security guard, those people that
24   are security guards but they are not licensed police
25   officers?

Cassandra Luster, et al. vs.                                      Aaron Tolerton
City of Dallas, et al.                                           7/17/2017

|  | 36 |
|---|---|
| 1 | A. Private security, yes, sir. |
| 2 | Q. They are police officer wannabes? |
| 3 | A. Yeah, I suppose. |
| 4 | Q. You've known guys like that? |
| 5 | A. I've known security officers, yes, sir. |
| 6 | Q. And so those guys are hired to be security |
| 7 | guards or security officers, right? |
| 8 | A. Yes, sir. |
| 9 | Q. In your case, when you were working for the |
| 10 | Flying J, you were that plus more, right? You were a |
| 11 | security guard/security officer plus you were also a |
| 12 | Dallas Police Officer; is that right? |
| 13 | A. When you say "security," different securities |
| 14 | have different kind of measures and what they need to do. |
| 15 | Some -- the security officers that aren't officers do |
| 16 | what they're told by the company. But as an officer, |
| 17 | there's certain things that you can do and there's |
| 18 | certain things that you can say. I can't do this, it's |
| 19 | not in my scope. So it depends on what you mean by |
| 20 | "security" and "officer." |
| 21 | Q. But you were hired to work security, right, for |
| 22 | the Flying J? |
| 23 | A. I was hired as an off-duty officer, yes, sir. |
| 24 | Q. And so the answer is "yes"? You were hired to |
| 25 | work security -- |

|  | 37 |
|---|---|
| 1 | A. Just the security officer thing kind of has |
| 2 | me -- |
| 3 | Q. So you were hired to work security for the |
| 4 | Flying J? |
| 5 | A. I'm there to solve any issues, yes, sir. |
| 6 | Q. How long had you working that -- had you been |
| 7 | working that job? |
| 8 | A. That was my first off-duty job. I want to say |
| 9 | three or four years. |
| 10 | Q. And I've had the benefit of looking at a bunch |
| 11 | of records. I'm showing a hired date of February the 3rd |
| 12 | of 2011. Does that sound about right? |
| 13 | A. Roughly, I suppose so. I don't know. If you -- |
| 14 | if that's what it says, I'll go with it, sir. |
| 15 | Q. Okay. So February the 3rd of 2011, by February |
| 16 | of 2015 you'd been working there about four years; is |
| 17 | that right? |
| 18 | A. Three or four years, yes, sir. |
| 19 | Q. Who placed you in that job? |
| 20 | A. Like, what officer gave me the name for the job? |
| 21 | Q. Yeah. |
| 22 | A. I think it was Morgan. He's a DPS officer now. |
| 23 | Q. Do you remember his first name? |
| 24 | A. I want -- I can't recall his first name. |
| 25 | Q. Okay. |

|  | 38 |
|---|---|
| 1 | A. It's kind of like a sports team, you call them |
| 2 | by their last names. |
| 3 | Q. And did he -- how did that come about? |
| 4 | A. Not many people want to work Flying J off duty. |
| 5 | And he had trouble filling slots. And I was a new |
| 6 | officer that was just able to do extra jobs, so I said |
| 7 | yes, and I started filling the position and I was fine |
| 8 | with it. |
| 9 | Q. And why was it that not many people wanted to |
| 10 | work Flying J? |
| 11 | MR. SCHUETTE: Objection, calls for |
| 12 | speculation. |
| 13 | Go ahead. |
| 14 | A. They -- a lot of things happen in South Oak |
| 15 | Cliff, it's. |
| 16 | Q. (BY MR. HIGH) Kind of a dangerous area? |
| 17 | A. Yes. |
| 18 | Q. And I take it that Morgan would come to recruits |
| 19 | and try to get people to come over and work the Flying J; |
| 20 | is that how that happened? |
| 21 | A. No, it's usually just looking -- once you are |
| 22 | able to do an extra job, it's more income. Yes, you are |
| 23 | working more and, you know, it gets tiresome. But it's |
| 24 | more income so people are willing to do extra jobs. A |
| 25 | lot of officers work at banks. They work at shopping |

|  | 39 |
|---|---|
| 1 | centers, things of that nature. So when they are able |
| 2 | to, they want to go out and look for them. Some are |
| 3 | posted online. |
| 4 | With him, he doesn't go to recruits. |
| 5 | Usually if someone is looking for a job or if one of the |
| 6 | officers that are already working it -- say, I have |
| 7 | someone that says he's looking for a job and they ask him |
| 8 | if it's okay. |
| 9 | Q. So did you find him or did he find you? |
| 10 | A. We worked in the same area, we just -- I |
| 11 | worked -- I worked in that area, right, and -- |
| 12 | Q. South Central? |
| 13 | A. South Central, yes, sir, Channel 7. And I've |
| 14 | come to the Flying J for transports before, things of |
| 15 | that nature, because you don't have a vehicle at the |
| 16 | Flying J, you have your own personal one. As an extra |
| 17 | job, you are able to use your radio. So they call us for |
| 18 | it. |
| 19 | Q. So did you meet Mr. Morgan there at the |
| 20 | Flying J? |
| 21 | A. I believe so, yes, sir. |
| 22 | Q. And he worked there himself? |
| 23 | A. Yes, sir, he worked -- he worked at the Flying J |
| 24 | a lot longer than I did. |
| 25 | Q. And so, I guess, in connection with the pickups |

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

12  (Pages 36 to 39)

APP 010

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

---

**44**

1    Q. And what was it named on the top? Who was --
2    A. The company or me?
3    Q. The company.
4    A. Pilot.
5    Q. It says Pilot Travels on the top?
6    A. I don't actually get a check. It goes in direct
7    deposit. The paper that we filled out was, I believe,
8    Flying J. And then it was bought out and the corporation
9    and all that kind of shifts over, I believe. I'm not --
10   I'm not into business, sir.
11   Q. Sure. And it was directly deposited into the
12   checking account for you?
13   A. Yes, sir.
14   Q. And where do you bank?
15   A. Compass.
16   Q. Were you banking there at that time?
17   A. Yes, sir.
18   Q. And I take it you wouldn't have any of the pay
19   stubs?
20   A. No, sir. You can check everything online. It's
21   a little easier nowadays.
22   Q. Thank you. I've got one or two more questions
23   and we'll take a break.
24   A. Yes, sir.
25   Q. I want to show you what's marked as Exhibit 6.

---

**45**

1    Ready?
2         (Exhibit 6 marked.)
3    A. I believe so.
4    Q. (BY MR. HIGH) Okay. Had a chance to look at
5    Exhibit 6?
6    A. It looks like a tax -- one of my tax numbers.
7    Q. It appears to be a miscellaneous income form or
8    a 1099-MISC; is that correct?
9    A. 1099, yes, sir.
10   Q. And it's dated 2015?
11   A. (Moving head up and down.)
12   Q. In the upper left-hand corner it says, Pilot
13   Travel Centers, LLC, Knoxville, Tennessee, and it says
14   your name there, Aaron Tolerton, 4350 Trinity Mills Road,
15   #8301, Dallas, Texas. That's your name, right?
16   A. Yes, sir.
17   Q. And Box Number 7 says, Nonemployee compensation,
18   $3,417. Is that you?
19   A. That's me.
20   Q. Okay. And this is the document that you got at
21   the end of the year to help you prepare --
22   A. To turn into taxes, yes, sir.
23   Q. Okay. All right. And once again, for the
24   record, Pilot Travel Centers up there in the upper
25   left-hand corner, Pilot Travel Centers, LLC, is the same

---

**46**

1    thing as Flying J, the place where you used to work?
2    A. Yes, sir.
3         MR. HIGH: All right. Okay. Let's go off
4    the record and take a break.
5         THE VIDEOGRAPHER: We are off the record at
6    10:58 a.m.
7         (Break taken from 10:58 a.m. to 11:20 a.m.)
8         THE VIDEOGRAPHER: We are back on the record
9    at 11:20 a.m.
10        MR. HIGH: Thank you.
11   Q. (BY MR. HIGH) All right. Are you the same
12   Aaron Tolerton that was testifying right before we took
13   our break?
14   A. Yes, sir.
15   Q. All right. Great. We were talking about
16   Exhibit 6, which is the 1099 that you received and I
17   think we had pretty well covered that. I take it they
18   provided you with tax information for the other years
19   that you worked there; is that right?
20   A. Each year, yes, sir.
21   Q. For 2011, 2012, 2013 and 2014?
22   A. Yes, sir.
23   Q. Okay. And was it always a 1099 or did they ever
24   issue you a W-2?
25   A. I believe it's always a 1099, contract work,

---

**47**

1    sir.
2    Q. Okay. Well, my question is: Did they ever
3    issue you a W-2?
4    A. I can't recall, sir.
5    Q. They might have, you just don't know?
6    A. Right.
7    Q. Okay. And I suppose if we needed to know that,
8    we'd have to ask them; is that correct?
9    A. Yes, sir.
10   Q. Because you don't have those records?
11   A. No, sir.
12   Q. Earlier we talked about work as a security
13   officer, working a security job, working as an officer as
14   security, et cetera. Have you ever worked a security job
15   where you did not have authority as an officer, police
16   officer?
17   A. With the exception of TDC and UPD, no, sir.
18   Q. Okay. So those were types of security jobs
19   where you did not have police officer authority?
20   A. Correct.
21   Q. You've never worked at another entity, such as
22   the Flying J or a bank or some place like that, where you
23   were just a security guard and not an officer?
24   A. No, sir.
25   Q. All right. Why did you want to work at the

---

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150
14  (Pages 44 to 47)

APP 011

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

52

1   A.  Not at that time.
2   Q.  That was the only one?
3   A.  There were others in the area.
4   Q.  Okay.  And you didn't choose them, you chose
5   this one?
6   A.  Yes, sir.
7   Q.  And a lot of it had to do with that fellow
8   Morgan that you'd been talking to?
9   A.  Correct.
10  Q.  Okay.  What is Mr. Morgan's full name?
11  A.  I can't remember his first name.
12  Q.  Do you remember anything about him?
13  A.  He left Dallas and went to DPS.
14  Q.  You don't remember his first name?
15  A.  Not right now.
16  Q.  You don't remember his badge number or where he
17  was from?
18  A.  No, sir.
19  Q.  Okay.  So you just knew him by Morgan?
20  A.  It's a business relationship, yes, sir.
21  Q.  At the time -- and we've got an address here on
22  your -- Exhibit 6, it's a Trinity Mills address. Did you
23  live there when you were working at the Flying J?
24  A.  Yes, sir.
25  Q.  So that would be a pretty good distance from

53

1   North Dallas down to South Dallas, right?
2   A.  Yes, sir.
3   Q.  It's a 25-minute drive, something like that?
4   A.  Roughly.
5   Q.  30-minute?
6   A.  Yes, sir.
7   Q.  Depending on traffic?
8   A.  Yes, sir.
9   Q.  Okay.  And I believe you've already answered
10  this, this was your regular off-duty job; is that
11  correct?
12  A.  Yes.
13  Q.  And you worked there a lot?
14  A.  Yes, sir.
15  Q.  And what was your hourly rate when you worked
16  there?
17  A.  30, I believe, per hour.
18  Q.  So looking at Statement Number 6, it appears as
19  though you were paid $3,417 that year and if you divide
20  that by 30, that would be approximately 113 hours, 114
21  that you worked that year?
22  A.  Yes, sir.
23       MR. SCHUETTE:  Excuse me.  Can we take a
24  break just long enough for me to quiet him?
25       THE VIDEOGRAPHER:  We are off the record at

54

1   11:29 a.m.
2        (Break taken from 11:28 a.m. to 11:29 a.m.)
3        THE VIDEOGRAPHER:  Back on the record at
4   11:29 a.m.
5        Q.  (BY MR. HIGH)  Okay.  I want to direct your
6   attention back to January or February of 2011, which was,
7   what, eight years ago, seven years ago, something like
8   that, when you first went to work for Flying J.  When you
9   started working there, did you fill out an application?
10  A.  Yes, sir.
11  Q.  Okay.  And do you recall filling it out and
12  turning it in?
13  A.  I believe so, yes, sir.
14  Q.  And who did you turn it in to?
15  A.  I filled it out and gave it to the manager.
16  Q.  Okay.  Who was the manager?
17  A.  I couldn't remember, sir.
18  Q.  Okay.  Was this Mr. Morgan or was this someone
19  else?
20  A.  This was the manager at the location.
21  Q.  At that particular location on I-20 and Bonnie
22  View?
23  A.  Yes, sir.
24  Q.  And do you recall the day that you took it in
25  there?

55

1   A.  No, sir.
2   Q.  Okay.  I mean, just rhetorically, you fill out
3   the application, you drove up there and you turned it in
4   to the manager?
5   A.  I go up there -- they wanted me to go up there
6   and give my information and then they'd tell me when I
7   would start the next time.
8   Q.  Okay.  But you actually turned in an
9   application?
10  A.  I filled out some paperwork.  I believe it was
11  an application, yes, sir.
12  Q.  Okay.  All right.  Did they have you interview
13  for the job?
14  A.  No, sir, not that I recall.
15  Q.  Did anyone ask you questions about your
16  application that you turned in?
17  A.  No, sir.
18  Q.  Did they do a background check on you?
19  A.  I don't know, sir.
20  Q.  Did you have to turn in a criminal history?
21  A.  I didn't have to turn one in, no, sir.
22  Q.  Did they drug test you before going to work
23  there?
24  A.  No, sir.
25  Q.  Did you have to make -- take any other tests,

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

---

100

1      A.  (Witness complies.)
2      Q.  Okay.  Thank you.
3      A.  Yes, sir.
4      Q.  And then also on the northwest -- yeah, the
5    northwest side of this picture is a little white
6    building.  What building is that?
7      A.  That's a church.
8      Q.  Could you write in what that is.
9      A.  (Witness complies.)
10      Q.  Okay.  Now, I should have had you do this
11    earlier, but can you do the same thing with this picture,
12    go back and mark those locations on Exhibit 7?
13      A.  (Witness complies.)
14      Q.  Thank you.
15      A.  Yes, sir.
16      Q.  Let's start with Exhibit 7, and you mentioned
17    that you came from the patio; is that right?
18      A.  Yes, sir.
19      Q.  Can you mark in where the patio is located?
20      A.  (Witness complies.)
21      Q.  You might put a circle around that.  Can you put
22    a circle around the entire word?  I can't quite see --
23      A.  Oh, you want it around the word?  I apologize.
24    I thought you wanted it --
25      Q.  That's fine.  Just put the -- so that's the

---

101

1    approximate location of the patio.  All right.  So on the
2    diagram you've drawn in a circle, you've written the word
3    "patio," and that's the approximate location; is that
4    right?
5      A.  Yes, sir.
6      Q.  Can we see that on 7A?
7      A.  No, sir.
8      Q.  Great.  So we used the right picture.  Let me
9    have it just a moment.  Thank you.
10      A.  Yes, sir.
11      Q.  Tell you what, there's a pen in case you need
12    it.
13      A.  Thank you.
14      Q.  When -- do you remember a conversation with John
15    Blue that day?  He was a Flying J employee.
16      A.  Yes, sir.
17      Q.  And in fact --
18          THE REPORTER:  I'm sorry?
19          THE WITNESS:  Yes, sir.
20      Q.  (BY MR. HIGH)  In fact, I believe it's mentioned
21    in your affidavit, isn't it?
22      A.  Yes, sir.
23      Q.  Okay.
24      A.  Sixth line down, four -- four words over.
25      Q.  Excellent.  And if in your affidavit it says, A

---

102

1    maintenance employee named John Blue came over the
2    Flying J radio and asked me if I heard the pops.  I
3    replied that I did hear them and I thought it was caused
4    by the truck driver with the flat tire.  Mr. Blue was
5    adamant that the sound was gunfire.
6          Okay.  Do you remember that conversation?
7      A.  Yes, sir, over the little radio.
8      Q.  Okay.  And you had a radio there that the
9    Flying J gave to you?
10      A.  Yes, sir.
11      Q.  Okay.  Was it a walkie-talkie?  What was it?
12      A.  Yes, sir, walkie-talkie.
13      Q.  Okay.  So you got a walkie-talkie.  Who else
14    there at the Flying J had walkie-talkies?
15      A.  I want to say the manager and the people
16    outside.
17      Q.  And the people outside would be?
18      A.  The maintenance.
19      Q.  Other employees?
20      A.  Yes, sir.
21      Q.  Maintenance employees?
22      A.  Yes, sir.
23      Q.  Thank you.
24          And your reply to him was you thought it was
25    caused by the truck driver with the flat tire.  And he

---

103

1    said, No, it's gunfire.  You're -- you are used to
2    hearing flat tires, you are used to hearing popping
3    noises, aren't you?
4      A.  I'm used to gunshots, yes, sir.
5      Q.  Well -- strike that.
6          What I mean by -- when a tire explodes, you
7    are used to hearing that, aren't you?
8      A.  I've only heard it on my car, sir.
9      Q.  Oh, okay.  So you never heard popping tires at a
10    truck stop?
11      A.  No, sir.
12      Q.  Okay.  So why would you respond to him that you
13    thought it was popping tires?
14      A.  Not popping tires, that he was trying to move
15    the truck that had a flat tire in a very tight place
16    where two trucks are supposed to get by.  So I wanted him
17    to try to move it the best he could or get the tire
18    fixed.  And he said it would take a few hours.
19      Q.  And so you thought that was the popping noise?
20      A.  I was hoping when he moved it that that's what
21    the sound was.
22      Q.  Okay.  But you weren't sure?
23      A.  Yes, sir.
24      Q.  Okay.  And he -- he was adamant that the sound
25    was gunfire.  And then the next sentence says, I walked

---

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150
28  (Pages 100 to 103)

APP 013

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

104

1  towards the spot where I last saw the truck driver with
2  the flat tire; is that correct?
3     A.  Yes.
4     Q.  So was that leaving the patio to go to the
5  truck, or did you go from the truck to the patio?
6     A.  Patio to the truck.
7     Q.  Okay.  So where was the truck located, if you
8  could mark on the diagram?
9     A.  (Witness complies.)  Do you want a circle?
10    Q.  Yeah.
11    A.  Okay.
12    Q.  All right.  And if you don't mind, just
13  putting -- put an X through that circle you just drew.
14    A.  (Witness complies.)
15    Q.  Excellent.  So that was the location of the
16  truck and you walked from the patio location to the truck
17  location?
18    A.  Yes, sir.
19    Q.  Okay.  And what happened when you got there?
20    A.  I think it's in the affidavit.  I went to talk
21  to him and he told me that it wasn't him, that he heard
22  gunshots and pointed towards the back corner.
23    Q.  All right.
24    A.  Pointed that way (indicating).
25    Q.  And so you are motioning to the diagram, you are

105

1  pointing northbound on Bonnie View Road?
2     A.  Towards Bonnie View, yes, sir.
3     Q.  And actually you are pointing in a northeasterly
4  direction?
5     A.  Yes, sir.
6     Q.  All right.  And so you guys are standing there.
7  You are standing there with the truck driver?
8     A.  I'm there with the truck driver.  He's in the
9  cab.
10    Q.  Okay.  And he says he's heard the gunshots and
11  he's pointing this way?
12    A.  Towards Bonnie View.
13    Q.  Okay.  And --
14    A.  He just said, Over there or something to that
15  nature.
16    Q.  So now you've heard it from John Blue and you've
17  heard it from this truck driver?
18    A.  Yes.
19    Q.  Okay.  What did you do at that point?
20    A.  I continued walking.
21    Q.  Okay.  Where did you walk?
22    A.  Towards this way (indicating).
23    Q.  Okay.  If you could take your pen and put a
24  dotted line the direction that you walked?
25    A.  (Witness complies.)

106

1     Q.  And the dotted line shows you to still be in the
2  parking lot area; is that correct?
3     A.  Yes, sir.
4     Q.  Okay.  And what did you do at that point?  Did
5  you stop at that point?
6     A.  It says that's when the dispatcher called out an
7  armed encounter at Bonnie View and Tioga.  The dispatcher
8  reported that a man in a dark blue pickup truck was
9  firing a gun at some -- at someone.  I walked to the east
10  edge of the Flying J property towards Bonnie View Road.
11  When I got near the edge of the property, another witness
12  pointed to the north and said that there was a guy
13  shooting at the -- shooting at somebody.
14    Q.  Okay.  So you are reading from the affidavit --
15  you just read from the affidavit, correct?
16    A.  Yes, sir.
17    Q.  Okay.  And now you are marking on the diagram;
18  is that correct?
19    A.  Yes, sir.  So I said that, and with the gunshots
20  I went out the side to here (indicating).
21    Q.  Okay.  And it looks like you stopped short of
22  the line, the line that you drew; is that correct?
23    A.  Yes, sir.  And motioned it to this field area
24  right here (indicating).
25    Q.  Okay.  Now, at that point you are standing on

107

1  the eastern edge of the Flying J property; is that
2  correct?
3     A.  Yes, sir.
4     Q.  Okay.  And I take it you are watching the action
5  on Bonnie View; is that correct?
6     A.  Watching the action on Bonnie View?
7     Q.  Seeing what was going on Bonnie View Road.
8     A.  Looking to see if I saw the pickup that was on
9  the...
10    Q.  Right.  You knew Bonnie View and Tioga, right?
11    A.  Yes, sir.
12    Q.  And Tioga is on the -- way far off that map.
13  It's further to the north; is that correct?
14    A.  Yes, sir.  It's at the first stoplight.
15    Q.  Okay.  And that's not displayed on that map?
16    A.  No, sir.
17    Q.  All right.  In fact, this street right here
18  where you drew in the little church, this is called
19  Riverside; is that correct?
20    A.  Yes, sir.
21    Q.  And if we look on the Exhibit 7A once again,
22  this is that little street called Riverside.  Could you
23  mark this in for me, Riverside, Riverside and Riverside?
24  Is that one already marked?
25    A.  Yes, sir.

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

29  (Pages 104 to 107)

APP 014

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

---

**108**

1  Q.  That one is marked.  If you could just write
2  that in right there (indicating).
3  A.  (Witness complies.)
4  Q.  Okay.  Now, if you are standing at that
5  particular location that you marked earlier -- and if you
6  don't mind, if I can put a circle around that right at
7  the edge of Bonnie View.  I tell you what, why don't you
8  do that?  Why don't you do that?
9  A.  Where, right here (indicating)?
10  Q.  Yeah.
11  A.  (Witness complies.)
12  Q.  I take it you stood there for a while?
13  A.  There were trucks over here that told me that --
14  they pointed up north saying someone was shooting.
15  Q.  Okay.  So you pointed to the other side of the
16  street, right?
17  A.  North of Bonnie View.
18  Q.  Okay.  Show me once again where the trucks were
19  that you just talked about.
20  A.  (Witness complies.)  They make a line, come
21  through here and they back up right -- do -- this is an
22  entire line of trucks and they go out to the street.
23  Q.  Okay.  And I think I can help you with that.
24  They are waiting to get into the truck wash facility,
25  right?

---

**109**

1  A.  Yes, sir.
2  Q.  And they tend to back up because they take up a
3  lot of room, right?
4  A.  Yes, sir.
5  Q.  Okay.  So is that what you are talking about,
6  those backed-up trucks that are trying to get into the
7  truck wash facility?
8  A.  Yes, sir.
9  Q.  Okay.  And so you -- why don't you draw in a few
10  of them for us?
11  A.  (Witness complies.)
12  Q.  Okay.  And there's also some on this curved
13  driveway.  Would you agree with that?
14  A.  Yes, sir, I'll draw some.
15  Q.  Great.  Okay.  And I realize it's been a while
16  since you've been out there and you've looked at this
17  stuff, so I apologize.  I looked at it yesterday.  I have
18  an advantage.
19  A.  Yes, sir.
20  Q.  Okay.  So -- so you were here at this circular
21  spot?
22  A.  Yes, sir.
23  Q.  And you say these folks over -- these trucks
24  that you've just drawn in were pointing northbound on
25  Bonnie View?

---

**110**

1  A.  Yes, sir.
2  Q.  Okay.  And what else were they doing?  Were they
3  hollering at you?  Were they motioning to you?  What were
4  they doing?
5  A.  They were pointing north and one of the guys in
6  the trucks on the road was pointing saying, He's shooting
7  at someone or somebody out of his window.
8  Q.  Okay.  And who was it -- which witness told you
9  that?
10  A.  I can't remember his name.
11  Q.  Was it a -- one of those guys in the trucks?
12  A.  Yes, sir.
13  Q.  Okay.  And do you know if that witness was ever
14  identified later?
15  A.  I do not.
16  Q.  Are you also familiar with this area we talked
17  about earlier called the Chrome Shop?
18  A.  Yes, sir.
19  Q.  And really they kind of all run together.  The
20  Chrome Shop is here, then you've got this field, and then
21  you've got the truck wash.  Sometimes some folks, they
22  are together, but they're really not, are they?
23  MR. SCHUETTE:  Objection, calls for
24  speculation.
25  A.  I don't understand what you mean.

---

**111**

1  Q.  (BY MR. HIGH)  All right.  So this is the Chrome
2  Shop right here (indicating).
3  A.  Yes, sir.
4  Q.  And this is the Chrome Shop parking lot; is that
5  right?
6  A.  Yes, sir.
7  Q.  Okay.  Were there people out in the Chrome Shop
8  parking lot?
9  A.  I don't remember.
10  Q.  You don't remember?
11  A.  I don't remember if people were out in the
12  Chrome Shop.
13  Q.  Did you -- did you look over there at the Chrome
14  Shop parking lot?
15  A.  No, sir.
16  Q.  You never looked over there?
17  A.  No, sir.
18  Q.  Is it your testimony under oath that you never
19  saw Desmond over in the Chrome Shop parking lot?
20  A.  I never saw -- I never looked over at the Chrome
21  Shop.
22  Q.  Okay.  So that's your testimony under oath?
23  A.  Yes, sir.
24  Q.  Okay.  You've walked that area many times, I
25  take it?

---

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

128

1    squad car, correct?
2    A.  You adjust to the best of your ability if you
3    don't have a squad car.
4    Q.  Okay.  So you would follow that same procedure
5    just without the squad car?
6    A.  Yes, sir.
7    Q.  Okay.  What if the driver gets out of the
8    vehicle unarmed, is it -- did the Dallas Police
9    Department train you on how to use deadly force?
10   A.  Unarmed?
11   Q.  Right.
12   A.  No, sir.
13   Q.  They never trained you on that?
14   A.  Not on an unarmed person, no, sir.
15   Q.  I apologize.  This is kind of a difficult
16   subject.  I know my questions probably aren't the
17   greatest.
18        But there's the issue of when you use deadly
19   force, we've talked about that.  There's the issue of how
20   you use deadly force.  That may be gun, arrow, bomb,
21   whatever it is you've got, I suppose.  And I guess
22   there's also the question of how long do you use it,
23   right?  Like, qualitatively, how long do I continue to
24   use deadly force?  Do you understand the difference?
25   A.  When the threat is stopped.

129

1    Q.  Okay.  Is it fair to say that when the overt
2    act, the threat to you, is over with, then your ability
3    to use deadly force ceases, your right to use it ceases?
4             MR. SCHUETTE:  Objection, calls for a legal
5    conclusion.  Vague and ambiguous.
6    A.  Sorry.  Say it one more time.
7    Q.  (BY MR. HIGH)  Okay.  Once again, is it -- is
8    it -- is it your testimony and according to your training
9    at DPD that when the threat to you is over what you
10   perceive to be the overt act that was threatening you is
11   over, does your ability to use deadly force cease at that
12   point?
13            MR. SCHUETTE:  Objection, vague and
14   ambiguous.
15   A.  This is the part where he comes out unarmed?
16   Q.  (BY MR. HIGH)  No, I'm just talking about the
17   overt acts ceases, whether it's --
18   A.  Of the initial incident when it's --
19   Q.  Right.
20   A.  Yes, it would cease.
21   Q.  Okay.  All right.  Okay.  Thank you.
22   A.  Yes, sir.
23   Q.  All right.  So let's talk about the specific
24   shooting.  You agree that it wasn't raining that day?
25   A.  Yes, sir.

130

1    Q.  And it was clear, correct?
2    A.  Yes, sir.
3    Q.  You would agree that the road conditions were
4    good?
5    A.  Yes, sir.
6    Q.  And when you wrote the affidavit three days
7    later, you tried to include everything in it you could
8    possibly remember, right?
9    A.  Yes, sir.
10   Q.  And you -- your intent was to make sure it was
11   complete and accurate, correct?
12   A.  Yes, sir.
13   Q.  And you had the opportunity to review it for
14   accuracy prior to signing it?
15   A.  Yes, sir.
16   Q.  And you had the opportunity to make changes to
17   it, if necessary, and you didn't make any changes, did
18   you?
19   A.  No, sir.
20   Q.  Okay.  Because in your mind it was true and
21   correct?
22   A.  Yes, sir.
23   Q.  All right.  All right.  And then you swore to it
24   in front of Detective Richardson as being fact; is that
25   correct?

131

1    A.  Yes, sir.
2    Q.  Okay.  And what's contained in Exhibit Number 5
3    is everything you know about this event?
4    A.  This is 5?  I just have to find it.  This is
5    just the copy I had earlier.
6    Q.  You might want to keep that out.
7    A.  I'll keep it out.
8    Q.  All right.  So I'm going to direct your
9    attention now to basically paragraph 6, which is the
10   bottom paragraph of the first page.  And it starts with,
11   "Not knowing what was going on."  Do you see that
12   paragraph?
13   A.  Yes, sir.
14   Q.  Can you go ahead and read that out loud, that
15   first sentence?
16   A.  Not knowing what was going on, I ordered the
17   individual running directly toward me to the ground.
18   Q.  Okay.  And that's not entirely accurate because
19   you were listening to the police radio at that time,
20   correct?
21   A.  Yes, sir.
22   Q.  So you kind of had an idea a little bit more
23   what was going on than what this sentence represents,
24   knew a little bit more, didn't you?
25   A.  About what?

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

**132**

1  Q.  You knew there was a guy shooting.  You knew he
2  was in a blue truck.  You knew that he had been coming
3  and going --
4      A.  The armed encounter --
5      Q.  You thought there were gunshots.  I mean, you
6  knew a little bit more than what this sentence says.
7      A.  I asked for more information on the radio, yes,
8  sir.
9      Q.  And on that radio you were hearing about the guy
10  shooting out of a blue truck, correct?
11      A.  Yes, sir.
12      Q.  Then it says as you were listening to this you
13  knew it was your area, so you made your way to the
14  street --
15      A.  We are not on this paragraph any longer?
16      Q.  Yeah, I've kind of gone away from it.  I'll come
17  back to that.
18      A.  Yes, sir.
19      Q.  Don't look at it for right now.  I'll tell you
20  when to go back and look at it.
21      A.  All right.
22      Q.  Just look at me.  As you were listening to the
23  police radio and talking to people like John Blue and
24  truckers, you knew it was your area where you were
25  assigned to, Flying J, and so you made your way

**133**

1  eastbound, like you just talked about, to the edge of the
2  property, right?
3      A.  Yes, sir.
4      Q.  Okay.  And I take it -- I'm assuming now you
5  were somewhat excited because this stuff doesn't happen
6  every day, right?
7      A.  When I got to the edge?
8      Q.  I mean, we are talking about a guy shooting out
9  of a truck, gunshots, you were excited?
10      A.  Not over gunshots, no, sir.
11      Q.  Did you have a heightened awareness?  Some
12  people call it adrenaline.  Were you feeling kind of an
13  adrenaline rush?
14      A.  I had the adrenaline when I had the kid running
15  towards me, yes, sir.
16      Q.  Okay.  So it didn't happen until the kid ran
17  towards you?
18      A.  When I saw -- when I saw that he was running
19  towards me, I amped up, yes, sir.
20      Q.  Okay.  Now, let's go back to the affidavit.  The
21  second sentence there in that paragraph, it says, I had
22  my head on a swivel looking back and forth between the
23  guy I had on the ground and the suspect.
24      A.  Yes, sir.
25      Q.  And the guy you had on the ground is the kid we

**134**

1  are talking about?
2      A.  Yes, sir.
3      Q.  Okay.  Do you normally use that term, "I had my
4  head on a swivel"?
5      A.  Yes, sir.
6      Q.  That's your words, not anybody else's?
7      A.  That's what they told us in the academy, keep
8  your head on a swivel.
9      Q.  Okay.  So where was this kid on the ground?
10      A.  In the field on the side of the -- I started
11  walking towards and I got him on the field 'round about
12  here (indicating).  I just can't remember exactly the
13  area -- exactly where right here.
14      Q.  So we are looking at Exhibit 7A and you just
15  pointed to a grassy area in the left-hand side.
16      A.  This side those are bushes, so I want to say
17  right about here.  I'm not really 100 percent sure.  I
18  haven't been there in a minute.
19      Q.  Tell you what, could you draw me a little stick
20  figure of a kid in the field?
21      A.  (Witness complies.)  I guess right about here.
22      Q.  Okay.  Great.  You've drawn that on Exhibit 7A
23  and that's on a grassy area, okay.  Great.  And can you
24  describe that kid for us?
25      A.  Black male about 14 to 18.  I'm not sure.

**135**

1  Teenager of some sort.  I can't really remember.
2      Q.  Clothing?
3      A.  That's what I was trying to think.  I can't
4  remember really what he was wearing.  I think he had a
5  backpack.
6      Q.  Anything else?
7      A.  I'm not recalling anything.  I'm sorry about
8  that.
9      Q.  And he was running at you, correct?
10      A.  Yes, sir.
11      Q.  And you told him to get on the ground?
12      A.  Yes, sir.
13      Q.  And you had him at gunpoint, didn't you?
14      A.  Not at first, no, sir.
15      Q.  But you did later, right?
16      A.  Yes, sir.
17      Q.  Where were you in relation to that kid when you
18  told him to get on the ground?
19      A.  Right about here (indicating).
20      Q.  Okay.  So why don't you put an A where you were.
21  And A stands for Aaron.
22      A.  Yes, sir.
23      Q.  Okay.  And it looks like you are to the side of
24  one of the trees, basically?
25      A.  Yes, sir.

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

136

1    Q.  Okay.  Now, go back to your affidavit.  It says,
2    Had my head on a swivel, looking back and forth between
3    the guy I had on the ground -- that's the kid, right --
4    and the suspect?
5    A.  Yes, sir.
6    Q.  And the suspect is who?
7    A.  That was Mr. Luster.
8    Q.  Okay.  So when you say "suspect" in this
9    affidavit, you are referring to Mr. Luster?
10   A.  The man in the truck, yes, sir.
11   Q.  Okay.  Where was Mr. Luster at that point in
12   time?
13   A.  He was shooting from right here on the edge of
14   the house and his truck was parked right there.
15   Q.  Okay.  And I tell you what, why don't you -- why
16   don't you mark L1 -- just put L1.  That's the first time
17   you saw him, right?
18   A.  Yes, sir.
19   Q.  Okay.  And you say that his truck was parked
20   right there?
21   A.  He was by his truck, yes, sir.
22   Q.  Which direction was his truck going?
23   A.  Facing -- facing that way (indicating).
24   Q.  Okay.  So it was facing eastbound?
25   A.  This is the front, yes, sir.

137

1    Q.  And -- and was he inside or outside of the
2    truck?
3    A.  Outside of the truck.
4    Q.  And where was he in relation to the truck?
5    A.  On the passenger side.
6    Q.  So he had walked around the passenger side of
7    the truck?
8    A.  I don't know if he had walked around like that.
9    He was -- he was right here.  His truck was right here
10   (indicating).  I didn't see him get out of the truck.
11   Q.  Okay.  So he was already out of the truck?
12   A.  When I saw him, yes, sir.
13   Q.  Okay.  And he was on the passenger side?
14   A.  Yes, sir.
15   Q.  And is it your testimony he was shooting?
16   A.  Yes, sir.
17   Q.  Okay.  You heard the gunshots?
18   A.  I saw him shoot, yes, sir.
19   Q.  Okay.  And at this time you were looking back
20   and forth to the kid and Mr. Luster, right?
21   A.  No, sir.
22   Q.  Well, I guess I misunderstood you.  You had your
23   head on a swivel and were looking back and forth between
24   the guy you had on the ground and the suspect, right?
25   A.  Yes, sir.

138

1    Q.  So you were looking back and forth between him
2    and Mr. Luster, weren't you?
3    A.  No, not when he was out shooting, sir.
4    Q.  So did you see the -- him shooting out of the
5    truck at an earlier point in time?
6    A.  No, sir, he wasn't shooting out of the truck.
7    Q.  Did you -- did you see him shooting at this
8    location --
9    A.  From this location, yes, sir.
10   Q.  -- at an earlier point in time?
11   A.  No, right here (indicating).  Like I came, these
12   kids were running, he was shooting.
13   Q.  All right.  So let's back up.
14   A.  All right.
15   Q.  I'm looking at your affidavit --
16   A.  Okay.
17   Q.  -- the affidavit that you gave and it says, Not
18   knowing what was going on, I ordered the individual
19   running directly toward me to the ground.
20        Okay.  Had you seen Mr. Luster shooting at
21   this point when you ordered this individual to the
22   ground, this kid?
23   A.  Yes, sir.  In the paragraph before that, As I
24   made it to the edge of the property, I observed a black
25   male standing on the passenger side of a dark blue pickup

139

1    shooting at two individuals that were running away.
2    Q.  Okay.  So you had seen him shooting?
3    A.  Yes, sir.
4    Q.  And in this paragraph you ordered this -- these
5    kids -- this kid to the ground?
6    A.  In the next paragraph, yes, sir.
7    Q.  Okay.  And then it says you had your head on a
8    swivel looking back and forth between the guy you had on
9    the ground and the suspect?
10   A.  Yes, sir.
11   Q.  And was he still shooting when you had your head
12   on a swivel?
13   A.  No, sir, he'd gotten into the truck.
14   Q.  He'd gotten into the truck.  'Cause the next
15   sentence says, The suspect had gotten back into the dark
16   blue truck, turned around and began speeding right at me
17   and the individual; is that correct?
18   A.  Yes, sir.
19   Q.  Okay.  Let's talk about that sentence, The
20   suspect jumped -- the suspect had gotten back into the
21   dark blue truck, turned around and began speeding right
22   at me and the individual.  There's a lot in that
23   sentence, isn't there?
24   A.  Yes, sir.
25   Q.  So during that period of time he would have to,

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

37  (Pages 136 to 139)

APP 018

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

---

**140**

1  number one, get back in his truck, right?
2  A. Yes, sir.
3  Q. He'd have to turn around, right?
4  A. Yes, sir.
5  Q. He would have had to turn left on Bonnie View to
6  come towards you, right?
7  A. That's not what he did, sir.
8  Q. What did he do?
9  A. U-turned. I put that out on the radio.
10  Q. Okay. So when I say turning around, I mean the
11  U-turn. So let's back up. So number one, Desmond got
12  back into his truck; number two, he U-turned; is that
13  correct?
14  A. On Bonnie View.
15  Q. On Riverside.
16  A. No, on Bonnie View.
17  Q. Okay. So -- so this is Riverside, because
18  you've testified --
19  A. That's Riverside.
20  Q. You testified earlier that the truck was pointed
21  this way?
22  A. Yes, sir.
23  Q. Okay. So if the truck is pointed this way, are
24  you saying that he U-turned out here or did he U-turn on
25  Riverside?

---

**141**

1  A. I said he was heading northbound over the radio,
2  U-turned.
3  Q. So this truck was positioned northbound?
4  A. Facing this way (indicating), backed out, went
5  northbound. I put that out on the radio and he U-turned
6  while I was taking -- putting the kid in handcuffs.
7  Q. All right.
8  MR. HIGH: Do you have a different colored
9  pen?
10  Q. (BY MR. HIGH) All right. If you don't mind, if
11  you could take that red pen, draw in the first position
12  of his truck and then draw in his direction of travel
13  with that U-turn?
14  A. Back up -- how do you want that line?
15  Q. Just put me -- put me a square, a red square
16  first.
17  A. (Witness complies.)
18  Q. Okay. Then just draw me a dotted line of how he
19  backed up. Okay. Then what happened, went forward?
20  A. Went forward.
21  Q. Okay. Draw that in.
22  A. Want a solid line?
23  Q. No, just put a dotted line. Okay. And then
24  where -- where did he U-turn?
25  A. At the next turn in he U-turned right around

---

**142**

1  here. I can't remember if it was before the median or
2  after the median.
3  Q. So Exhibit 7A doesn't show the spot of the turn?
4  A. Correct.
5  Q. Okay.
6  A. Wait -- unless -- I can't remember if it was
7  before the median or after the median, but it was
8  somewhere in here (indicating).
9  Q. Okay. So take a closer look at 7.
10  A. All right.
11  Q. Okay. Do you think you know where it was he
12  turned?
13  A. No, sir, I can't remember if it was before or
14  after this median.
15  Q. Okay. So on Exhibit 7 draw the median in for
16  us.
17  A. (Witness complies.)
18  Q. And you've drawn the median then in red. So he
19  either U-turned before this median or after this median?
20  A. Unless this breaks and I can't see it.
21  Q. Okay. And then -- let's go back to Exhibit 7A.
22  What was his direction of travel then?
23  A. When he -- when he turned -- after he U-turned?
24  Q. When he turned.
25  A. (Witness complies.)

---

**143**

1  Q. Okay. All right. So let me make sure I
2  understand this. So he's parked going eastbound, he
3  backed up, he drove north, he U-turned and came
4  southbound?
5  A. Yes, sir.
6  Q. Okay. And so let me get back to my question
7  here. So -- so when we are at that sentence in your
8  affidavit that says, The suspect got back in the dark
9  blue truck, turned around and began speeding right at me
10  and the individual, that would mean he had to get back in
11  his truck, number one; he had to back up, number two; he
12  had to drive north, which is number three; he had to
13  U-turn, which is number four; and he had to drive south,
14  number five, which would then be speeding toward you; and
15  number six, he'd have to point his vehicle at you; is
16  that correct?
17  A. It sounds -- yes.
18  Q. Okay.
19  MR. HIGH: Why don't we go off the record.
20  I need to take a short break. We've got something we've
21  got to put together for the next section.
22  MR. SCHUETTE: Okay.
23  THE VIDEOGRAPHER: We are off the record at
24  2:26 p.m.
25  (Break taken from 2:26 p.m. to 2:38 p.m.)

---

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150
38  (Pages 140 to 143)

APP 019

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

148

1        (Exhibit 8 marked.)
2    Q.  (BY MR. HIGH)  All right.  So, Aaron, when we
3    broke, we had just listened to that tape.  And -- but
4    before that we had talked about the fact that when you
5    were watching Desmond, he had to get back in his truck,
6    he had to back up, he had to go north, he had to U-turn,
7    he had to drive, and then he had to point his vehicle at
8    you, all those things before he got to you; is that
9    correct?
10   A.  Yes, sir.
11   Q.  And you would agree that would take some time,
12   wouldn't it?
13   A.  It would take a short amount of time, yes, sir.
14   Q.  If we review the tape, there's a
15   statement that you make where you say, He's moving, he's
16   U-turning, I've got one of the complainants.  And
17   according to the tape it's at 13:34:05.  When you made
18   that statement was that contemporaneous at the time you
19   were viewing it?
20   A.  Can I get a definition of contemporaneous,
21   please.
22   Q.  Well, basically, in realtime.  You know, when
23   you see it are you dictating what you are seeing or did
24   you say that later?
25   A.  When I was seeing it.

150

1    A.  No, not -- not the time.  The entire statement,
2    please.
3    Q.  Okay.  Well, you stated, Shots fired, shots
4    fired at 13:34:20, correct?
5    A.  Yes, sir.
6    Q.  Okay.  And he -- you watched him turn around at
7    13:34:05; is that correct?
8    A.  Yes, sir.
9    Q.  So we have a time elapse of 15 seconds there; is
10   that right?
11   A.  Yes, sir.
12   Q.  Okay.  And all of that stuff we talked about
13   earlier, him turning around, doing all that stuff and you
14   shooting, it all happened in 15 seconds; is that fair to
15   say?
16   A.  Sounds about right, yes, sir.
17   Q.  Okay.  Now, that's more than just instantly,
18   isn't it?
19   A.  Instantly?
20   Q.  More than just a second or two?
21   A.  Yes, sir.  It's more than a second or two.
22   Q.  Okay.  All right.  Let's go back to your
23   affidavit.  Make sure you find that.  Why don't you use
24   that one.  Thank you.
25        Okay.  Let's go back to paragraph 6 and

149

1    Q.  Okay.  So -- and that's what we mean when we say
2    "contemporaneous," at the same time?
3    A.  Yes, sir.
4    Q.  So if I understand what you are saying, when you
5    are saying he's moving, he's U-turning, I've got one of
6    the complainants, you are actually seeing that in
7    realtime?
8    A.  Yes, sir.
9    Q.  All right.  And the statement you make shortly
10   after that, Shots fired, shots fired, that occurred at
11   13:34 and 20 seconds.  You remember that?
12   A.  That's when he got through, yes, sir.
13   Q.  Okay.  And if you deduct 13:34:20 from 13:34:05,
14   that was 15 seconds.  Would you agree with that?
15   A.  Yes, sir.
16   Q.  Okay.  And when you say, Shots fired, shots
17   fired, you had already fired your weapon, correct?
18   A.  Yes, sir.
19   Q.  Okay.  Were you still firing?
20   A.  No, sir.
21   Q.  Okay.  So there was 15 seconds that elapsed
22   between when you watched him turning around until the
23   action was complete; is that correct?
24   A.  Say that again, sir.
25   Q.  15 seconds?

151

1    let's go to the third line and all the way to the end
2    there you start a new sentence.  It says, The suspect
3    jumped.  You see that?
4    A.  Yes, sir.
5    Q.  Okay.  Could you read that out loud?
6    A.  The suspect jumped the curb and was speeding
7    right towards us.
8    Q.  Okay.  And when he jumped the curb, had you
9    already begun shooting?
10   A.  No, sir.
11   Q.  One of the witnesses said you were in the
12   drop-down position.  That's not in your affidavit.
13        Do you know what the drop-down position is?
14   A.  No, sir.
15   Q.  That's as if you have your gun and you bend at
16   the knees and you go lower to where you are closer to the
17   ground?
18   A.  Yes, sir.
19   Q.  I guess some folks call that the drop-down
20   position.  I don't know that I do.  Do you call it that?
21   A.  I call it having my knee on my complainant.
22   Q.  Well, but I mean you didn't -- I don't mean
23   having a knee on a complainant.  I mean just shooting
24   from a lower position.  If you go to a lower position to
25   shoot, that's what I understand to be the drop-down

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150
40  (Pages 148 to 151)

APP 020

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

**152**

1    position.
2          Did you go to a lower position to shoot at
3    the truck?
4    A. I can't remember.
5    Q. You don't remember?
6    A. Was this when I had the complainant on the
7    ground --
8    Q. Well --
9    A. -- or is this after I backed up?
10   Q. We were at the point -- looking at your
11   affidavit it says, The suspect jumped the curb and was
12   speeding right toward us. I screamed at the individual
13   on the ground to run.
14         So apparently, according to your affidavit,
15   he wasn't at you yet?
16   A. Sorry?
17   Q. The kid hadn't gotten to you yet.
18   A. No, the kid had gotten to me.
19   Q. Okay. Let's go back to the affidavit. It says,
20   I screamed at the individual on the ground to run?
21   A. Uh-huh.
22   Q. Was that an individual on the ground in your
23   custody?
24   A. No, he wasn't in handcuffs yet.
25   Q. Okay. Did you already have your knee on him?

**153**

1    A. Yes, sir.
2    Q. Okay. So if I understand it, then, you tell me,
3    did you drop down on top of the individual with your knee
4    on top of the individual, the kid, shooting, is that what
5    you were doing?
6    A. No, sir.
7    Q. You tell me.
8    A. No, sir. What it was is I have my gun out
9    because the threat -- the possible threat is still there.
10   I don't know what's going on. All I know is I've seen
11   him shooting. I have the complainant down, not
12   handcuffed because I have my gun, okay. I'm looking back
13   and once he was out of sight, I go in to handcuff.
14   Q. Okay. So you had the complainant down and you
15   are showing with your left hand?
16   A. My left hand. There --
17   Q. Left hand, right?
18   A. -- left knee.
19   Q. And were you -- were you crouched down?
20   A. I was on -- I was -- my knee was on his lower
21   back.
22   Q. Okay. So -- I apologize for having to be so
23   specific. Your left knee was on his back?
24   A. I believe it was my left knee.
25   Q. And you were helping with your left arm?

**154**

1    A. Yes, lower back, right hand, because I didn't
2    want any movement from him while I'm waiting to see if
3    the threat is gone or not.
4    Q. Okay. And you were reaching for your gun at
5    that point?
6    A. I had my gun out.
7    Q. Oh, you had your gun out of the holster?
8    A. Yes.
9    Q. Okay. And if I'm understanding what you are
10   saying, you weren't standing completely erect, you
11   were -- you were lower?
12   A. Yes.
13   Q. You were lower?
14   A. At that time, yes, sir.
15   Q. Okay. Got it. Okay. I'm a little confused
16   because -- we get back to your affidavit here. I
17   screamed at the individual on the ground to run. Then it
18   says, The individual was able to get up and run a few
19   feet towards me, but the suspect continued to speed right
20   at us.
21         So how was he able to do that if you already
22   had him on the ground?
23   A. Because when he jumped the curb, I got off and
24   told him to run and I kept backing up.
25   Q. So according to this, though, it says, The

**155**

1    individual was able to get up and run a few feet towards
2    me?
3    A. Uh-huh.
4    Q. But you had him on the ground. How could he run
5    towards you?
6    A. Because I got up first and started backing away.
7    Q. So it's your testimony that you had him on the
8    ground with your knee and your left arm holding him, you
9    had your gun out and you saw the car coming, so you let
10   him up and you backed up at that point --
11   A. Yes, sir.
12   Q. -- back pedaling?
13   A. Yes, sir.
14   Q. And according to you in your affidavit, this
15   individual is running towards you?
16   A. Yes, sir.
17   Q. This individual you've just attempted to
18   apprehend; is that right?
19   A. Yes, sir.
20   Q. If we go back to your affidavit it says, I made
21   eye contact with the suspect and was able to yell "stop"
22   one time.
23         And this truck is speeding at you in broad
24   daylight, correct?
25   A. Yes, sir.

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150
41  (Pages 152 to 155)

APP 021

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

---

156

1    Q. Did it have any glare on the windshield?
2    A. Not that I recall.
3    Q. Are you telling us that you were able to see
4  through the windshield and make eye contact with him?
5    A. Yes, sir.
6    Q. You realize that sounds a little preposterous?
7        MR. SCHUETTE: Objection to the sidebar.
8    Q. (BY MR. HIGH)  Is that -- is that your
9  testimony?
10    A. That is my testimony.
11    Q. Okay. When you made this eye contact with him,
12  what did you see?
13    A. He motioned down with right shoulder, I think.
14  Let me see.
15    Q. Let's talk about the eye contact.  I want to
16  know about the eye contact.  You made eye contact with
17  him.
18    A. Yes, sir.
19    Q. So how was he looking?
20    A. I don't know what kind of answer -- with his
21  eyes.
22    Q. Okay. So he saw you and you saw him?
23    A. I saw him.
24    Q. Yeah.
25    A. Yes, sir.

---

157

1    Q. And -- and he was -- he was looking at you?
2    A. Yes, sir.
3    Q. You had eye contact with him?
4    A. Yes, sir.
5    Q. Okay. And I take it you had your gun out?
6    A. Yes, sir.
7    Q. Did you have your gun pointed at him?
8    A. Yes, sir.
9    Q. Okay. So he saw you standing there with a gun,
10  correct?
11    A. Yes, sir.
12    Q. And you yell "stop," right?
13    A. Yes, sir.
14    Q. And I take it he didn't stop?
15    A. Correct.
16    Q. Okay. And then you say the suspect was
17  determined to run the individual and me over, correct?
18    A. Yes, sir.
19    Q. Okay. And, look, you don't know what Desmond
20  was thinking at that time, do you?
21    A. No, sir. That statement was based on his
22  actions.
23        MR. HIGH: Object as nonresponsive.
24    Q. (BY MR. HIGH) You don't know what Desmond was
25  thinking at that time --

---

158

1    A. No, sir.
2    Q. -- do you, sir?
3    A. No, sir.
4    Q. Okay. That's pure speculation on your part,
5  isn't it?
6    A. Okay.
7    Q. It is, right?
8    A. Yes, sir.
9    Q. Okay. Then you say, I fired my pistol at the
10  suspect to stop him from killing me and the other
11  individual.
12    A. Yes, sir.
13    Q. And that would be your standard issue
14  semiautomatic SIG Sauer 9 millimeter?
15    A. Correct.
16    Q. Your duty pistol?
17    A. Yes, sir.
18    Q. And if you did that, at that point you had made
19  the decision to use deadly force, correct?
20    A. Yes, sir.
21    Q. And according to your affidavit, the only
22  justification you express is that he was trying to run
23  you and the individual over; is that correct?
24    A. Yes, sir.
25    Q. You do not articulate any other justification

---

159

1  for using deadly force other than that, because after
2  all, you don't mention it in your affidavit, do you?
3    A. No, sir.
4    Q. Okay. So you would agree with me the only
5  justification you had for using deadly force at that
6  point was because the overt act you observed was him
7  trying to run you over with his truck, correct?
8    A. Yes, sir.
9    Q. Okay. Then you say, As I fired my pistol, the
10  suspect -- are you there yet?  I don't mean to get ahead
11  of you.
12        It says, As I fired my pistol, the suspect
13  continued to bear down on us.
14    A. Yes, sir.
15    Q. And then you also say, I observed the suspect
16  reaching towards the floor of the truck.
17    A. Yes, sir.
18    Q. And that's what you were talking about earlier,
19  you saw his head kind of go to the right?
20    A. Yes, sir.
21    Q. Okay. What else did you see?
22    A. That's what I saw.
23    Q. Okay. Which direction was he reaching?
24    A. The right side.
25    Q. Okay. And if you could show us kind of what you

---

APP 022

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

---

160

1   saw?
2       A.   (Indicating).
3       Q.   So you are leaning your right shoulder to the
4   right, okay.  Now, if I were firing my gun at you, would
5   you lean to the right?
6       A.   I would try to dodge them, yes, sir.
7       Q.   Would you lean to the left?
8       A.   No, sir, there's a door there.
9       Q.   But leaning is consistent with trying to avoid
10  being hit by a bullet, would you agree with that?
11      A.   Could be, yes, sir.
12      Q.   Okay.  How much of Desmond could you see at that
13  point?
14      A.   His head and left shoulder, part of his torso.
15      Q.   Did you see inside the cab at all?
16      A.   No, sir.
17      Q.   Did you see what color the interior was of the
18  truck?
19      A.   No, sir, I was focussed on him.
20      Q.   And with him leaning over, you can't be sure
21  whether he was reaching or just ducking, can you?
22      A.   No, sir.
23      Q.   Okay.  I mean, you are firing your gun at him,
24  right?
25      A.   Yes, sir.

---

161

1       Q.   A reasonable person would be ducking, wouldn't
2   they?
3            MR. SCHUETTE:  Objection, calls for
4   speculation.
5       A.   I believe so.
6       Q.   (BY MR. HIGH)  If I were firing my gun at you
7   and you were coming at me in your truck, you would duck,
8   wouldn't you?
9       A.   I would, yes, sir.
10      Q.   If we go back to the affidavit it says -- it
11  says, I was just barely.  Do you see that?
12      A.   I was just barely able to get out of the path of
13  the speeding suspect.
14      Q.   Okay.  Now, there's a measurement out there
15  where he jumped the curb.  Are you familiar with that
16  measurement?
17      A.   No, sir.
18      Q.   Do you have any reason to disagree with the fact
19  that it's 153.5 feet from the start of the tire skid mark
20  to the left rear tire of the blue Dodge truck where it
21  came to rest?  Do you have any reason to disagree with
22  that?
23      A.   I do -- I have no reason to.  I don't know.
24      Q.   Then you say in your affidavit, The suspect
25  crashed into the fence, correct?

---

162

1       A.   Yes, sir.
2       Q.   And then you say, I cautiously approached the
3   suspect at gunpoint and ordered him to show me his hands,
4   right?
5       A.   Yes, sir.
6       Q.   And he did show you his hands, didn't he?
7       A.   Yes, sir.
8       Q.   In fact, the window was down on his truck.  Do
9   you recall that window being down?
10      A.   Yes, sir.
11      Q.   So it was easy for him to show you his hands.  I
12  mean, the window is down, right?
13      A.   He showed me his left hand, yes, sir.
14      Q.   What about his right hand?  He didn't show you
15  his right hand?
16      A.   I don't think he could move his right hand.
17      Q.   Do you recall him motioning with his hands?
18  Say, over there, kind of like pointing towards something?
19      A.   No, sir.
20      Q.   So all you saw was the left hand; you didn't see
21  the right hand?
22      A.   No, sir.
23      Q.   Left hand didn't have a weapon in it, did it?
24      A.   No, sir.
25      Q.   Okay.  And you didn't see the right hand, but

---

163

1   you certainly don't refer to a weapon in your affidavit,
2   do you?
3       A.   No, sir, I did not see a weapon in his hands.
4       Q.   So he didn't pull a weapon on you right then,
5   did he?
6       A.   No, sir.
7       Q.   All right.  Let's keep going.  It says, The
8   suspect complied -- excuse me.  Let's back up.
9            I cautiously approached the suspect at
10  gunpoint, ordered him to show me his hands -- he showed
11  you the left hand -- the suspect complied.
12           So does that mean that in your mind he was
13  complying with your instructions?
14      A.   Yes, sir.  That he showed me his left hand, yes,
15  sir, he complied.
16      Q.   Okay.  And it says, I grabbed one of his hands.
17  Which hand did you grab?
18      A.   The left hand.
19      Q.   Okay.  Was the door open or closed at this
20  point?
21      A.   It was closed.
22      Q.   So you are grabbing the left hand through the
23  window?
24      A.   Yes, sir.
25      Q.   And you told him to get to the ground?

---

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

43  (Pages 160 to 163)

APP 023

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

212

1    Q.  Yes?
2    A.  Yes, sir.
3    Q.  Okay.  When you respond to that threat, you are
4    taking your Flying J hat off, would you agree with me?
5         MR. HIGH:  Objection, legal conclusion.
6    Calls for the witness to speculate.  Witness not
7    qualified to answer that question.
8    Q.  (BY MR. JONES)  Go ahead.
9    A.  Yes, I would react as an officer.
10   Q.  Just the same as if you were off duty and
11   grocery shopping, correct?
12   A.  Yes, sir.
13   Q.  Did the Flying J at any time you ever worked
14   there ask you to respond to an imminent threat that was
15   originating outside of its property?
16   A.  No, sir.
17   Q.  Would you agree with me in this case that the
18   threat that you perceived originated outside of the
19   Flying J property?
20   A.  Yes, sir.
21   Q.  Okay.  Please identify that threat for me.
22   A.  Someone shooting at two kids.
23   Q.  And that person was Mr. Luster?
24   A.  Yes, sir.
25   Q.  And Mr. Luster, at the time you saw him shooting

213

1    a gun, was outside of the Pilot premises, correct?
2    A.  Yes, sir.
3    Q.  How about the individuals that you saw running
4    towards you?  Did you see two individuals running towards
5    you or just one?
6         THE WITNESS:  May I use your map?
7    Q.  (BY MR. JONES)  You can refer to the exhibits if
8    you need to.  Look at 7 and 7A.
9    A.  Okay.  I have them.  I'm very sorry to do this
10   to you.  Could you repeat the question.
11   Q.  Sure.  Sure.  You mentioned earlier that you saw
12   someone running at you at some point, and I was unclear
13   if it was two individuals or one individual?
14   A.  One was on the side that I was on, one that was
15   on this side so they were running southbound.
16        MR. JONES:  I have to object to
17   nonresponsive.
18   Q.  (BY MR. JONES)  Okay.  So there were two
19   individuals running southbound towards you?
20   A.  Yes, sir.
21   Q.  And were they running away from Mr. Luster?
22   A.  Yes, sir.
23   Q.  At least that's what you perceived at the time?
24   A.  Yes, sir.
25   Q.  Okay.  Were they running southbound on Bonnie

214

1    View Road?
2    A.  On -- on each side of them.
3    Q.  Okay.  Be specific.  What do mean "on each
4    side"?
5    A.  In the grass on -- on the east side of Bonnie
6    and in the grass on the west side of Bonnie View.
7    Q.  When you first saw those individuals running,
8    were they both outside and off the Flying J property?
9         MR. HIGH:  Object, calls for speculation.
10   Witness does not know the nature and extent of the
11   Flying J property and calls for a legal conclusion.
12   Q.  (BY MR. JONES)  You can answer.
13   A.  Yes, sir.
14   Q.  Okay.  Let me ask it a different way.  Can you
15   specify for us where you saw the -- where you first saw
16   the two individuals that were running towards you.  Where
17   were they located?
18   A.  The church (indicating).
19   Q.  And you are referring to Exhibit --
20   A.  Right here.
21   Q.  All right.  Let's look at Exhibit 7A, can you
22   hold up for the videographer Exhibit 7A.  I'll hold it
23   for you, actually.  And can you point to the location
24   where you saw -- first saw the two individuals running
25   towards you?  Where were they?

215

1    A.  (Indicating).
2    Q.  And for the record you are referring to the
3    church that you previously have identified on Exhibit 7A,
4    which is near the intersection of Riverside and Bonnie
5    View; is that correct?
6    A.  Yes, sir.
7    Q.  All right.  And you believe that that's outside
8    of the Pilot property, correct?
9         MR. HIGH:  Object, calls for speculation.
10   Witness is not qualified.  He has not reviewed the plot
11   or the platted area.  It calls entirely for speculation.
12   The witness is not qualified to answer this question.
13   A.  Yes, sir.
14   Q.  (BY MR. JONES)  Okay.  So you mentioned earlier
15   that some of your job duties were to patrol the Pilot --
16   or the Flying J facility, correct?
17   A.  Yes, sir.
18   Q.  Okay.  Did you ever patrol up here by the church
19   at Riverside and Bonnie View?
20   A.  No, sir.
21   Q.  Okay.  Why did you never patrol up here?
22   A.  I was just on the lot.
23   Q.  On the Flying J lot?
24   A.  Yes, sir.
25   Q.  Did anyone from Flying J ever ask you to patrol

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

56  (Pages 212 to 215)

APP 024

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

216

1  up at Riverside and Bonnie View?
2     A.  No, sir.
3     Q.  You believe that was because that was outside
4  Pilot/Flying J's property?
5          MR. HIGH:  Objection, calls for hearsay.
6  Also calls for speculation.
7     A.  Yes, sir.
8     Q.  (BY MR. JONES)  And so just to be clear, Mr. --
9  when you saw Mr. Luster firing his weapon, he was up near
10  the intersection of Riverside and Bonnie View, correct?
11     A.  Yes, sir.
12     Q.  And when you saw those two individuals running
13  at you, they were running from that intersection at
14  Riverside and Bonnie View, correct?
15     A.  Yes, sir.
16     Q.  Would you agree with me, then, that based upon
17  what you previously told us, that the threat that you
18  perceived to you and to the other individual that you
19  asked to get on the ground originated outside the Flying
20  J's property?
21          MR. HIGH:  Same objection. Witness is not
22  qualified to answer that question. He's not reviewed the
23  deed records or the plat, does not know the boundaries of
24  the Flying J's property. Calls for speculation. Calls
25  for legal conclusions.

217

1     Q.  (BY MR. JONES)  You can answer.
2     A.  Yes, sir.
3     Q.  Okay. Could you thumb through that pile real
4  quick, Mr. Tolerton, and look at Exhibit 6 for me,
5  please. It's the copy of your 1099.
6     A.  Is that one of the first ones, sir?
7     Q.  Are they in order?
8     A.  They're in order. I just --
9          MR. HIGH:  Let me help you, if you don't
10  mind.
11     A.  Okay. I can put these back in order.
12          THE WITNESS:  Do you want 7A before 7?
13     Q.  (BY MR. JONES)  Do you have Exhibit 6 in front
14  of you?
15     A.  I do, sir.
16     Q.  Okay. You've already been asked a couple
17  questions about this, but I want to follow up.
18          THE VIDEOGRAPHER:  Counsel?
19          MR. JONES:  Thank you.
20     Q.  (BY MR. JONES)  This appears to be a copy of a
21  1099 tax form that was sent to you by Pilot Travel
22  Centers for the year 2015. Would you agree?
23     A.  Yes.
24     Q.  Do you specifically recall receiving this tax
25  form?

218

1     A.  No, sir.
2     Q.  Does the payment of $3,417 in nonemployee
3  compensation seem correct to you for the year 2015?
4     A.  Yes, sir.
5     Q.  And just to be clear, this accident happened on
6  February 9th of 2015, correct?
7     A.  Yes, sir.
8     Q.  And you never came back to work at the Flying J
9  after the accident, right?
10     A.  No, sir.
11     Q.  All right. So this $3,417 constitutes your work
12  for January and through the first week of February of
13  2015, right?
14     A.  This was for two months?
15     Q.  Well, it's for 2015, correct?
16     A.  Yes, sir.
17     Q.  Okay. And you understand that you get these tax
18  forms at the end of the year, right?
19     A.  Yes, sir.
20     Q.  All right. So does that seem about right to you
21  that you would have worked enough to receive $3,417 in
22  compensation for five or six weeks of work?
23     A.  Yes, sir.
24     Q.  All right. What was your average, if you can
25  average it for us, hours per week working at the Flying J

219

1  in the year leading up to this incident?
2     A.  I don't remember the number of hours.
3     Q.  I did a little bit of math and you said you got
4  paid $30 an hour?
5     A.  Yes, sir.
6     Q.  If you divide 3,417 --
7     A.  Oh, he already did that.
8     Q.  Oh, he did?
9     A.  116-something hours.
10     Q.  Okay. All right. Does that seem about right?
11     A.  Yes, sir.
12     Q.  Okay. So you're averaging a little bit over
13  25 hours a week?
14     A.  Yes, sir.
15     Q.  Okay. And did you work every day of the week or
16  just certain days of the week or did it -- or did it just
17  depend?
18     A.  It depends.
19     Q.  Did you work a certain number of hours per
20  shift?
21     A.  Yes, sir.
22     Q.  How many hours were each shift?
23     A.  Usually four -- four to eight hours.
24     Q.  And were there other DPD officers working that
25  location with you?

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

57 (Pages 216 to 219)

APP 025

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

220

```
 1     A.  No, sir.
 2     Q.  You were the only DPD officer?
 3     A.  Each day.
 4     Q.  Okay.
 5     A.  Each -- time I worked there was only one
 6  person there.
 7     Q.  My question is:  Were there other officers who
 8  were taking other shifts at the Flying J?
 9     A.  Yes, sir.
10     Q.  How many other officers in the month of --
11  months of January and February 2015 were rotating through
12  the shifts at Flying J, if you know?
13     A.  I couldn't tell you, sir.
14     Q.  More than ten?
15     A.  I -- I know of at least eight.
16     Q.  At least eight at that time?
17     A.  I believe so.
18     Q.  Okay.  And you said that Officer Murphy was the
19  one who was organizing these shifts; is that correct?
20     A.  No.  Mr. Morgan -- Trooper Morgan.
21     Q.  He was the one who would set up who was going to
22  cover which shift?
23     A.  Yes, sir.  He did -- he was the scheduling
24  person.
25     Q.  Okay.  And do you know how he became the
```

221

```
 1  scheduling person?
 2     A.  No, sir.
 3     Q.  He never talked to you about that?
 4     A.  No, sir.
 5     Q.  Okay.  Again, back to Exhibit 6.  You'll notice
 6  that on a 1099 there isn't any indication that any taxes
 7  were taken out of your check; is that correct?
 8     A.  That's correct, sir.
 9     Q.  Okay.  These types of forms are generally given
10  to folks who we refer to as independent contractors.  Did
11  you believe you were working as an independent contractor
12  for Flying J?
13          MR. HIGH:  I have to object.  Calls for
14  speculation.  Calls for legal conclusion.  Take the
15  witness on voir dire.
16          THE WITNESS:  What's voir dire?
17          MR. HIGH:  Can I take the witness on voir
18  dire?
19          MR. JONES:  I haven't even got an answer to
20  my question yet.  I don't think we are going to do that.
21          MR. HIGH:  Okay.  Well, I'm going to have to
22  object, unless I can take this witness on voir dire.  I
23  don't think he's got the foundational knowledge to answer
24  that question.
25     Q.  (BY MR. JONES)  Okay.  Do you have an answer for
```

222

```
 1  me?
 2     A.  I just -- they told me it would be contract
 3  work.
 4     Q.  That's -- let me ask it another way, then.  Did
 5  Flying J tell you that you were going to be doing
 6  contract work for them?
 7          MR. HIGH:  I have to object.  Calls for a
 8  legal conclusion.
 9          MR. JONES:  He's talking about something
10  somebody told him.
11          MR. HIGH:  Calls for hearsay.
12          MR. JONES:  That's fine.  You can make that
13  objection.
14     Q.  (BY MR. JONES)  Did somebody at the Flying J
15  tell you that you were going to be doing contract work
16  for them?
17          MR. HIGH:  Objection, hearsay.
18     A.  Yes, sir.
19     Q.  (BY MR. JONES)  Did you understand that Flying J
20  was not going to take any taxes out of your check?
21     A.  Yes, sir.
22     Q.  Okay.  Did Flying J offer you any type of
23  insurance, like health insurance?
24     A.  No, sir.
25     Q.  Did Flying J ever offer to have you participate
```

223

```
 1  in any kind of 401(k) or retirement plan?
 2     A.  No, sir.
 3     Q.  Did the Flying J ever offer you any kind of paid
 4  vacations?
 5     A.  No, sir.
 6     Q.  How about any other kind of fringe benefits?
 7  Did Flying J ever offer you any of those?
 8     A.  No, sir.
 9     Q.  Let's talk about DPD.  Did DPD offer you the
10  ability to participate in a retirement plan?
11     A.  Yes, sir.
12     Q.  Did DPD offer you health insurance?
13     A.  Yes, sir.
14     Q.  Did you take them up on that?
15     A.  Yes, sir.
16     Q.  Okay.  Did DPD offer you paid vacation days?
17     A.  Yes, sir.
18     Q.  Okay.  Mr. High has a couple times in talking
19  with you used the word "employee."  Did you believe you
20  were an employee of DPD?
21          MR. HIGH:  Objection, calls for speculation.
22     A.  Yes, sir.
23     Q.  (BY MR. JONES)  Okay.
24     A.  You were asking if I was an officer, right?
25     Q.  Right.
```

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

58  (Pages 220 to 223)
APP 026

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

224

1    A.  Yes.  Sorry.  Yes, sir.
2    Q.  But Flying J wasn't offering you all these other
3    things like DPD was, correct?
4    A.  No, sir.  I mean, no, they weren't offering
5    them.
6    Q.  Did DPD pay you a salary, a yearly salary?
7    A.  Yes, sir.
8    Q.  And were you paid weekly or monthly?  How often
9    did you get paychecks from DPD?
10   A.  I can't remember if this means biweekly or
11   bimonthly, but every two weeks.
12   Q.  But it was a certain salary for the year and you
13   got paid some portion of it every two weeks?
14   A.  Yes, sir.
15   Q.  But you got paid by the hour at the Flying J,
16   correct?
17   A.  Yes, sir.
18   Q.  Will you look at Exhibit 5, please, your
19   affidavit.  You got it?
20   A.  Yes, sir.
21   Q.  Mr. Tolerton, it's been represented to us that
22   this is your summary or recitation soon after the
23   accident of what you remembered about what occurred; is
24   that accurate?
25   A.  Recitation, please.

225

1    Q.  Sorry.  This is a summary of your recollection
2    of how things happened in this incident; is that correct?
3    A.  Yes, sir.
4    Q.  Is it accurate?
5    A.  Yes, sir.
6    Q.  Is it truthful?
7    A.  Yes, sir.
8    Q.  Okay.  Will you please tell me at what point in
9    this statement did you take off your Flying J hat?
10   MR. HIGH:  I have to object.  It calls
11   for -- it's argumentative, first of all.  It also calls
12   for speculation.  It calls for a legal conclusion.  This
13   witness does not have the foundational expertise to
14   decide when he's an employee for the Flying J and when
15   he's an officer for Dallas PD.
16   Q.  (BY MR. JONES)  You can answer.
17   A.  When did I become an officer?
18   Q.  Well, we talked earlier about having on your
19   officer hat and then having on your Flying J hat --
20   A.  When you work as an officer and when you work
21   at -- when you are working for Flying J?
22   Q.  Right.
23   A.  Yes, sir.
24   Q.  And would you agree with me at some point in the
25   moments leading up to this shooting, you stopped doing

226

1    any duties for Flying J and you were doing duties solely
2    for DPD; is that true?
3    MR. HIGH:  I have to object.  First of all,
4    it calls -- it's argumentative.  Secondly, it assumes
5    facts not in evidence.  Thirdly, it calls for speculation
6    on the part of this witness.  Fourthly, this witness does
7    not have the foundational knowledge to make that
8    determination.
9    Q.  (BY MR. JONES)  You can answer.
10   A.  Yes, sir.
11   Q.  Okay.  At what point did you turn to -- turn
12   solely to your duties as a DPD and turn away from your
13   duties as a Flying J off-duty officer?
14   MR. HIGH:  It's -- same
15   objections as I just articulated moments ago.
16   Q.  (BY MR. JONES)  You can answer.
17   A.  At the time when I needed to investigate an
18   incident.
19   Q.  Okay.  And looking specifically at Exhibit 5,
20   when in this -- when in this description of facts did
21   that happen?
22   MR. HIGH:  I object.  Same objections as I
23   just articulated.
24   A.  I guess when I had to investigate the shots.
25   Q.  (BY MR. JONES)  And can you point to me in this

227

1    statement where that statement occurs?
2    A.  Statement?
3    Q.  When you went to investigate the shots.
4    MR. HIGH:  I renew my objections I just
5    made.
6    A.  After I spoke with the man that didn't move the
7    truck and recognized it wasn't him, then I was looking
8    for someone shooting.
9    Q.  (BY MR. JONES)  Okay.  That's the moment when
10   you started looking for someone who was shooting?
11   A.  Yes, sir.
12   Q.  Okay.  And did you learn soon after that that
13   the shooting was coming from outside of the facility?
14   MR. HIGH:  Object, calls for a legal
15   conclusion.  Witness has not looked at the deed records
16   or studied the plat.  He's not familiar with the
17   property.  He cannot opine on where the property ends for
18   the Flying J and where it begins.
19   Q.  (BY MR. JONES)  What did you hear on the radio,
20   on your police radio about where the shooting was coming
21   from?
22   MR. HIGH:  Objection, that calls for
23   hearsay.
24   A.  Tioga and Bonnie View.
25   Q.  (BY MR. JONES)  And that's actually where you

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

59  (Pages 224 to 227)

APP 027

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

228

1    saw Mr. Luster shooting from, correct, Tioga and Bonnie
2    View?
3        A.  No, sir.
4        Q.  Sorry.  Go ahead.  Where did you see Mr. Luster
5    shooting?
6        A.  Riverside and Bonnie View.
7        Q.  Okay.  Thank you.
8            And so that's when your investigation of the
9    shooting occurred, when you talked to the man who had his
10   truck disabled and you began your movements toward the
11   exit of the facility; is that correct?
12       A.  Yes, sir.
13       Q.  Yes?
14       A.  Yes, sir.
15       Q.  Okay.  At that moment you considered yourself
16   acting solely as a Dallas Police officer; is that true?
17           MR. HIGH:  I have to object to that, same
18   objections.
19           MR. JONES:  I'm asking what he thought at
20   the time.
21           MR. HIGH:  I understand, but it's redundant.
22   It's been asked and answered.  It's -- it also assumes
23   facts not in evidence.  He does not have the foundational
24   qualifications to decide when he's an employee of
25   Flying J or when he's an employee of the City of Dallas.

229

1        Q.  (BY MR. JONES)  You can answer.
2        A.  You'll have to repeat the question for me,
3    please.
4        Q.  Sure.  When you spoke to the truck driver who
5    had the disabled truck and you made your movements
6    towards the exit of the facility to investigate the
7    gunshots, is that the moment when you believed that you
8    were acting solely as a DPD officer going to investigate
9    a shooting?
10           MR. HIGH:  Same objections.  Asked and
11   answered.  Redundant.  Asking him for a legal conclusion.
12   This witness does not have the ability or the expertise
13   to opine on when he changes from being an employee to a
14   Dallas Police officer.
15           MR. JONES:  Madam Court Reporter, did you
16   get the answer?
17           THE REPORTER:  No.
18       Q.  (BY MR. JONES)  What was your answer to that
19   question?
20       A.  Yes, sir.
21       Q.  Mr. Tolerton, Mr. High talked to you a little
22   bit about your job duties while working at the Flying J.
23   Do you recall that testimony?
24       A.  Yes, sir.
25       Q.  Okay.  I wrote this down as he was asking you

230

1    these questions.  You said that your duties were, number
2    one, to check the parking lot -- check the parking lot
3    every hour; is that correct?
4        A.  Yes, sir.  That's what Leonard told me to do.
5        Q.  And, again, Leonard is the Dallas Police Officer
6    who trained you, correct?
7        A.  Yes, sir.
8        Q.  Number two, he told you to sit in the store and
9    if there's an issue, handle it, calm things down, reduce
10   shrinkage and maintain -- maintain safety; is that
11   correct?
12       A.  Yes, sir.
13       Q.  Is that it, are those your -- the two job
14   responsibilities or duties working for the Flying J that
15   you were familiar with?
16       A.  Unless there's an incident that happens.
17       Q.  Okay.  And what happens if there's an incident?
18       A.  I investigate.
19       Q.  Okay.  If it is a -- someone -- let's say
20   there's a shooting inside the facility, okay, did that
21   ever happen when you were there?
22       A.  No, sir.
23       Q.  Okay.  If there -- someone gets shot inside the
24   facility and you are on duty, are you going to
25   investigate that?

231

1        A.  Yes, sir.
2        Q.  Okay.  Is your investigation going to be
3    directed by Flying J or going to be directed by DPD?
4        A.  DPD.
5        Q.  Okay.  Why is that?
6            MR. HIGH:  I'm going to have to object.
7    Calls for speculation.  Calls for facts not in evidence.
8    It's an improper hypothetical.  It also calls for a legal
9    conclusion and this witness does not have the
10   foundational expertise to opine on that question.
11       Q.  (BY MR. JONES)  You can answer.
12       A.  I'd be working as an officer.
13       Q.  Dallas Police Officer?
14       A.  Yes, sir.
15       Q.  All right.  Any other job responsibilities while
16   you were working at the Flying J as an off-duty officer?
17       A.  Just to be seen and protect the law.
18       Q.  Any others?
19       A.  No, sir, not that I can recall.
20       Q.  Okay.  You mentioned that one of the roles that
21   you serve, I believe, when you are working off duty at
22   the Flying J is to be seen and act as a deterrent to
23   those who might be thinking about breaking the law on the
24   property; is that true?
25       A.  Yes, sir.

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

232

1   Q.  Okay.  And that's -- and because that's true,
2   it's important that you are on the property, correct?
3   A.  Yes, sir.
4   Q.  It's hard to serve as a deterrent if an armed
5   officer is off investigating things outside of the
6   property, correct?
7   A.  Yes, sir.
8   Q.  Okay.  Do you think that's one of the reasons
9   why Flying J never asked you to patrol outside the
10  property?
11       MR. HIGH:  Objection, calls for speculation.
12  Also calls for hearsay.
13  A.  I don't -- I don't know.
14  Q.  (BY MR. JONES)  Okay.  And, again, Flying J
15  never asked you to patrol outside the property, correct?
16  A.  No, sir.
17  Q.  Okay.  You mentioned with Mr. High about
18  sometimes going across the street to deal with somebody
19  who had been accused of criminal trespass.  Do you recall
20  that testimony?
21  A.  Yes, sir.
22  Q.  And as I understood your description, the
23  occasions where you would go across the street would be
24  when you see someone who already is -- has a criminal
25  trespass warning, right, a CTW?

233

1   A.  Yes, sir.
2   Q.  You see them on the Flying J property where they
3   are not supposed to be, right?
4   A.  Yes, sir.
5   Q.  And then you see them go back over across the
6   street; is that correct?
7   A.  Yes, sir.
8   Q.  So those occasions when you would go across the
9   street was after you saw this criminal trespass person on
10  our property without permission; is that true?
11  A.  Yes, sir.
12  Q.  So the -- the act that gave rise to you going
13  across the street was something that happened on the
14  Flying J property, correct?
15  A.  Yes, sir.
16  Q.  All right.  You also mentioned -- and I think
17  this testimony got a little bit confusing -- but you
18  mentioned there were occasions, other occasions when you
19  left the property while you were working at the Flying J?
20  A.  Yes, sir.
21  Q.  And one of those was to go help other officers.
22  Do you remember saying that?
23  A.  Yes, sir.
24  Q.  Okay.  The Flying J wouldn't send you to go help
25  other officers, correct?

234

1   A.  No, sir.  I -- sorry.
2   Q.  All right.  That would be you acting as a DPD
3   officer to go help your fellow officer, correct?
4   A.  Yes, sir.
5       MR. HIGH:  I have to object to that.  Excuse
6   me.  I have to object.  Calls for speculation.  Calls for
7   a legal conclusion on the part of this witness.  This
8   witness does not have the foundation, expert foundation
9   to opine on a legal conclusion such as that.
10       MR. JONES:  Did you get his answer?
11       THE REPORTER:  No.
12  Q.  (BY MR. JONES)  Was your answer yes?
13  A.  Yes, sir.
14  Q.  So you also mentioned there might be fights
15  outside the property that you need to respond to.  Would
16  that be another example of you going to assist another
17  DPD officer?
18  A.  Yes, sir.
19  Q.  Okay.  Would Flying J ever tell you to go
20  respond to a fight outside the property?
21       MR. HIGH:  I have to object.  It's an
22  improper hypothetical.  It's assuming facts not in
23  evidence.  It's -- calls for speculation.
24  Q.  (BY MR. JONES)  You can answer.
25  A.  No, sir.

235

1   Q.  Did you believe you were acting in your official
2   capacity as a DPD officer when you first began to
3   investigate what you believed to be gunshots?
4       MR. HIGH:  Object, calls for a legal
5   conclusion.  This witness does not have the foundational
6   expertise to determine whether he was an employee of the
7   Flying J or acting as a DPD officer.
8       THE REPORTER:  What was your answer?
9       THE WITNESS:  Yes, sir.
10       MR. JONES:  Don, if you want, I'll let you
11  make that objection if you just want to say "same
12  objection," you don't need to read the whole thing into
13  the record.
14       MR. HIGH:  Fair enough.
15  Q.  (BY MR. JONES)  What about when you ordered the
16  young man to get on the ground, did you believe you were
17  doing that in your official capacity as a DPD officer?
18       MR. HIGH:  Same objection.
19  A.  Yes, sir.
20       MR. HIGH:  If you could give me just a
21  second to object.
22       THE WITNESS:  Oh, certainly.  I apologize.
23  Q.  (BY MR. JONES)  How about when you removed your
24  pistol from -- how about when you removed your pistol
25  from the holster, did you believe at that moment you were

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

236

1   doing that in your official capacity as a DPD officer?
2              MR. HIGH:  Same objection.
3       A.  Yes, sir.
4       Q.  (BY MR. JONES)  And when you fired the shots
5   that eventually killed Mr. Luster, did you believe you
6   were doing that in your official capacity as a DPD
7   officer?
8              MR. HIGH:  Same objection.
9       A.  Yes, sir.
10      Q.  (BY MR. JONES)  Did anyone from Flying J ever
11  actually give you any training, other than the officer
12  that you've already told us about?
13      A.  No, sir.
14      Q.  Anyone from Flying J ever give you any training
15  on how to -- how to perceive an imminent threat?
16      A.  No, sir.
17      Q.  Anyone from Flying J ever give you any training
18  on how to discharge and when to discharge your firearm?
19      A.  No, sir.
20      Q.  How about training on use of deadly or lethal
21  force, did they ever train you on that?
22      A.  No, sir.
23      Q.  You may not know the date exactly, but when did
24  you first become a Licensed Peace Officer in Texas?
25      A.  I can only go by the hiring date that it was

237

1   on -- January 7th, 2009,
2       Q.  January 7th of 2009?
3       A.  Yes, sir.
4       Q.  Okay.  And you were a Licensed Peace Officer on
5   the day this incident occurred, February 9th, 2015,
6   correct?
7       A.  Yes, sir.
8       Q.  You were employed by the City of Dallas on the
9   date of this incident, correct?
10      A.  Yes, sir.
11      Q.  Dallas Police Department, excuse me.
12      A.  Yes, sir.
13      Q.  Okay.  The Flying J facility is within the city
14  of Dallas, to your knowledge?
15      A.  Yes, sir.
16      Q.  DPD -- you guys went through this earlier, but
17  DPD provided you with a uniform, correct?
18      A.  Yes, sir.
19      Q.  Provided you with a gun, TASER, radio, mace
20  canister, cups, the badges on your vest, all those
21  things, correct?
22      A.  Yes, sir.
23      Q.  Did you consider those the tools of your trade?
24      A.  Yes, sir.
25      Q.  Did Flying J ever provide you with any kind of

238

1   tools?
2       A.  No, sir.
3       Q.  Let's be fair.  How about the walkie-talkie that
4   you testified about earlier, did they give you a
5   walkie-talkie to use while you were doing your job at the
6   Flying J?
7       A.  Yes, sir.  They told me I had to wear it, yes,
8   sir.
9       Q.  Okay.  Did you ever use it?
10      A.  Yes, sir.
11      Q.  Did you leave the walkie-talkie there at the
12  Flying J when your shift was over?
13      A.  Yes, sir.
14      Q.  Was it the same walkie-talkie that was used by
15  whichever officer was working there that day, if you
16  know?
17      A.  It's whatever is charged.  They have a charger
18  with them all.
19      Q.  Okay.  Other than the walkie-talkie, did
20  Flying J ever give you any kind of uniform or tools to
21  use while you were doing that job?
22      A.  No, sir.
23             THE WITNESS:  May I a get a water out of
24  this thing?
25             MR. JONES:  Sure.  Let's take a quick break.

239

1              THE VIDEOGRAPHER:  We are off the record at
2   5:27 p.m.
3              (Break taken from 5:27 p.m. to 5:42 p.m.)
4              THE VIDEOGRAPHER:  We are back on the record
5   at 5:42 p.m.
6       Q.  (BY MR. JONES)  Mr. Tolerton, we are back from a
7   quick break.  Are you okay to proceed?
8       A.  Yes, sir.
9       Q.  I just have a few more questions for you.  At
10  any point after you heard the gunshots, did you have any
11  further communications with anyone from Flying J?
12      A.  No, sir.
13      Q.  Did Flying J -- anyone from Flying J direct you
14  to go investigate these gunshots?
15      A.  No, sir.
16      Q.  You did that on your own?
17      A.  Yes, sir.
18      Q.  Okay.  Did you ask permission from anyone at
19  Flying J to go conduct this investigation?
20      A.  No, sir.
21      Q.  Did you ever take breaks when you were on your
22  shift at Flying J?
23      A.  Like restroom breaks.
24      Q.  Sometimes when you have a -- somebody working
25  there, if someone is working for you, maybe they have a

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

62  (Pages 236 to 239)

APP 030

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

240

1    ten-minute span of time every hour where they can go use
2    the bathroom or take a smoke break, whatever. Did you
3    have that kind of schedule with them or were you just on
4    for the entire four or eight hours?
5        A.  I never clocked out for a break.
6        Q.  Okay.
7        A.  I just...
8        Q.  And that's how you clocked in -- is that how you
9    announced your arrival at the Flying J for your shift, to
10   clock in?
11       A.  Old time card, yes, sir.
12       Q.  And did the same thing when you clocked out,
13   correct?
14       A.  Yes, sir.
15       Q.  All right. Were Mr. Luster or the two
16   individuals that you saw running that afternoon customers
17   of the Flying J?
18            MR. HIGH:  Objection, calls for speculation.
19   I don't know that the witness would know that.
20       A.  Not that I know of, sir.
21       Q.  (BY MR. JONES) Okay. Had you seen Mr. Luster
22   or those two individuals that came running at you at the
23   Flying J facility at any time before the shooting?
24       A.  Not to my recollection.
25       Q.  Okay. As you began your investigation of the

241

1    gunshots, did you witness any crimes being committed?
2        A.  Yes, sir.
3        Q.  Can you list those for me?
4        A.  We had -- he tried to run over me with a truck.
5        Q.  Okay. Any others?
6        A.  Not that I can think of.
7        Q.  What about Mr. Luster just discharging his
8    firearm, is that a crime?
9        A.  It's a crime, but he didn't shoot nobody. In a
10   municipality, I suppose that would be a B, yes, sir.
11       Q.  Okay. Yes, that is -- that would be a crime?
12       A.  That is a crime, yes, sir.
13       Q.  And, obviously, him trying to run you guys over
14   or so you thought, correct?
15       A.  Yes, sir.
16       Q.  Any other crimes that you witnessed that day?
17       A.  That was my main concern that day.
18       Q.  Okay. And if you could go back to your
19   affidavit real quick, which is Exhibit 5, in the last
20   paragraph -- one, two, three, four, five -- six lines
21   down -- and you've read this before with Mr. High -- you
22   indicate, The suspect was determined to run the
23   individual and me over. Do you see that?
24       A.  Yes, sir.
25       Q.  Okay. So at that point in time were the only

242

1    people that you believed that were in danger of imminent
2    harm you and this other individual, were those the only
3    two at the time?
4        A.  Yes, sir.
5        Q.  Okay. Were there any other Pilot -- sorry --
6    Flying J employees or customers who were in imminent
7    peril at that point in time?
8        A.  No, sir.
9        Q.  So when you were taking the actions that you
10   took that day, you were attempting to protect yourself
11   and the individual who had run at you, correct?
12       A.  Yes, sir.
13       Q.  Were you trying to protect anybody -- any other
14   customer or employee of Flying J?
15       A.  No, sir.
16       Q.  Okay. Two lines down from that you indicate
17   that the suspect crashed into the fence; is that correct?
18       A.  Yes, sir.
19       Q.  Is that a fence surrounding the outside of the
20   Flying J property?
21            MR. HIGH:  I have to object to that. He's
22   not aware -- he hasn't reviewed the plat or the deed
23   records. He's not familiar with the outlines of the
24   property. It calls for a legal conclusion. It's also
25   speculation on this part.

243

1        Q.  (BY MR. JONES) Let me ask --
2        A.  Yes.
3        Q.  Let me ask a different question. The fence that
4    the suspect crashed into, is it on the Flying J property?
5        A.  Yes, sir.
6        Q.  Okay. Did all of the activities -- let me ask a
7    better question.
8            When you saw Mr. Luster shooting his gun,
9    was that outside this fence line?
10       A.  Yes, sir.
11       Q.  When you saw the two individuals running at you,
12   were they outside of the fence line?
13       A.  Yes, sir.
14       Q.  When you -- when you shot Mr. Luster, was that
15   outside of the fence line?
16       A.  Yes, sir.
17       Q.  Okay. Were you ever asked by Pilot to patrol
18   outside of the fence line?
19       A.  No, sir.
20       Q.  All of the protective duties -- and safety
21   duties that you've described to us previously, all of
22   those were done inside the fence line, correct?
23       A.  Yes, sir.
24       Q.  If there was an active shooter on Bonnie View
25   Road in Dallas, Texas, it was DPD's responsibility to

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

63  (Pages 240 to 243)

APP 031

Cassandra Luster, et al. vs.
City of Dallas, et al.

Aaron Tolerton
7/17/2017

244

1  respond, correct?
2        MR. HIGH:  I have to object to that.  Calls
3  for a legal conclusion.
4        A.  Yes, sir.
5        Q.  (BY MR. JONES)  Or any other Texas Certified
6  Police Officer who might be in the area?
7        MR. HIGH:  Same objection.
8        A.  Yes, sir.
9        Q.  (BY MR. JONES)  And just to be clear, you've
10  spoken previously and mentioned in your statement that
11  you were receiving some information about the shooter on
12  your radio.  That was your DPD radio, correct?
13        A.  Yes, sir.
14        Q.  That wasn't your Flying J walkie-talkie, right?
15        A.  No, sir.
16        Q.  Okay.  Mr. High was asking you a series of
17  questions about whether you did your job that day as far
18  as what happened during the shooting?
19        A.  Yes, sir.
20        Q.  When you made that statement that you did your
21  job, did you mean your job as a Dallas Police Officer?
22        MR. HIGH:  I have to object as calling for
23  him to compare testimony.
24        Q.  (BY MR. JONES)  Just asking about your previous
25  testimony.  Did you mean you did your job as a Dallas

245

1  Police Officer?
2        A.  Yes, sir.
3        MR. HIGH:  I have to object.  It calls for a
4  legal conclusion.  Calls for him to compare testimony.
5  Calls for him to opine on a question which he's not
6  qualified to answer.
7        Q.  (BY MR. JONES)  A couple more, Mr. Tolerton.
8  Mr. High spoke with you about this incident in November
9  of 2014 where you were injured while working at the
10  Flying J.  Do you recall that testimony?
11        A.  Yes, sir.
12        Q.  You said that you and an individual were
13  fighting; is that correct?
14        A.  Yes, sir.  Yes, sir.  I fell on the curb.
15        Q.  Okay.  Can you give us a little bit more detail
16  about what gave rise to that altercation?
17        A.  I remember he ran from me, grabbed me, started
18  fighting me.  And when we fell, he was a larger set man,
19  and I had crushed myself between him and the curb and
20  gave it a wrong angle or something -- it's never right to
21  fall, but at a wrong angle on the curb.  That's what -- I
22  can't recall what the initial incident was.
23        Q.  Okay.  You don't remember why you originally
24  approached him?
25        A.  No, I can't recall.

246

1        Q.  And you said you remember him running from you?
2        A.  Yes, sir.
3        Q.  Is that a crime?
4        A.  To evade -- yes, sir.
5        Q.  To run from a police officer when you've been
6  told not to?
7        A.  Yes, sir.
8        Q.  Okay.  Was that individual arrested, to your
9  knowledge?
10        A.  Yes.
11        Q.  For what?
12        A.  I can't -- evading and assault on a public
13  servant.
14        Q.  Okay.  You were that public servant?
15        A.  Yes, sir.
16        Q.  Okay.  So when that altercation was going on,
17  you were acting as a licensed peace officer, correct?
18        A.  Yes, sir.
19        MR. HIGH:  I have to object.  Once again
20  calls for legal conclusion.  Calls for this witness to
21  opine on something that he's not qualified to make that
22  decision.
23        A.  Yes, sir.
24        Q.  (BY MR. JONES)  Did you make that arrest or did
25  someone else?

247

1        A.  Did I do the report?
2        Q.  Sure.  Did you do the report?
3        A.  I can't recall if I done the report or had to
4  have it dictated.
5        Q.  Okay.  Are you -- do you recall any other
6  incidents, other than this one in December of 2014, where
7  you were involved in any kind of physical altercation
8  with someone while working at the Flying J?
9        A.  Yes, sir.
10        Q.  What are those other incidents?
11        A.  Mr. Regan was trying to steal --
12        Q.  Mr. Who?
13        A.  Regan.
14        Q.  Okay.  Can you spell that for me?
15        A.  R-E-G-A-N, possibly.
16        Q.  Okay.  And did you know this individual
17  beforehand?
18        A.  Yes, sir.
19        Q.  Okay.  Go ahead.
20        A.  He's a known BMV gentleman.
21        Q.  He's a known what?
22        A.  BMV gentleman.
23        Q.  What does that mean?
24        A.  Burglary of a motor vehicle.
25        Q.  Okay.

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

64  (Pages 244 to 247)
APP 032

Cassandra Luster, et al. vs.
City of Dallas, et al.

```
 1   one question.
 2                     FURTHER EXAMINATION
 3   BY MR. JONES:
 4      Q.   Did you take anything that John Blue said to you
 5   that day as an instruction or direction from
 6   Pilot/Flying J to go investigate this incident?
 7      A.   No, sir.
 8              MR. JONES:  No further questions.
 9              MR. SCHUETTE:  As before, the City of Dallas
10   and Aaron Tolerton will reserve their questions for the
11   time of trial.  Pass the witness.
12              THE VIDEOGRAPHER:  We are off the record at
13   6:10 p.m. --
14              MR. SCHUETTE:  Wait a minute.  Pursuant to
15   Rule 30(E)(1), the defendant City of Dallas and Aaron
16   Tolerton request the opportunity to review the deposition
17   and ask to whom it should be returned.  To the court
18   reporter, to --
19              MR. BENNETT:  To the court reporter is fine.
20   And how long do you want to review?
21              MR. SCHUETTE:  Thirty days, please.  Per the
22   Rule is fine.  Thank you.
23              THE VIDEOGRAPHER:  We are off the record at
24   6:10 p.m.
25              (End of proceedings at 6:10 p.m.)
```

STEVEN H. GENTRY & ASSOCIATES, INC.  (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

APP 033

# EXHIBIT B

## AFFIDAVIT OF CATHY GRAY

STATE OF TEXAS       §
                            §
COUNTY OF DALLAS     §

Before me, the undersigned notary, on this day personally appeared Cathy Gray, the affiant, whose identity is known to me. After I administered an oath, the affiant testified as follows:

1.       My name is Cathy Gray. I am over 18 years of age, of sound mind, have never been convicted of a felony or a crime of moral turpitude, and I am competent to make this affidavit. I am a Records Manager for the City of Dallas / Dallas Police Department, and am assigned to the Internal Affairs Division. The facts stated herein are within my personal knowledge and are true and correct.

2.       I am a custodian of records for the Dallas Police Department's Internal Affairs Division. Attached to this affidavit are seven (7) pages of records from the Internal Affairs Division. These records were: (1) made by, or from information transmitted by, a person with knowledge of the events or conditions recorded; (2) made at or near the time of the events or conditions recorded; and (3) made and kept in the regular course of the City of Dallas' business. The records are the originals or exact duplicates of the originals, with the exception of former officer Aaron Tolerton's City of Dallas Employee Number, which has been redacted.

3.       The attached records reflect the entirety of Aaron Tolerton's Officer History, including all disciplinary actions and commendations, during the time that he was employed by the City of Dallas.

THE REMAINDER OF THIS PAGE IS BLANK

FURTHER AFFIANT SAYETH NOT.

*Cathy Gray*

Printed Name: *Cathy Gray*

Title: *Records Manager*

    SUBSCRIBED, SWORN TO AND ACKNOWLEDGED BEFORE ME by the said Cathy Gray on the 7th day of December, 2017, to certify which, witness my hand and seal of office.

*CTopher Bush*

Notary Public, State of Texas
My Commission Expires: *June 12, 2021*

CHRISTINE DREHER BUSH
Notary Public
STATE OF TEXAS
ID#12943853-5
My Comm. Exp. June 12, 2021

APP 036



# DALLAS POLICE DEPARTMENT

## INTERNAL AFFAIRS DIVISION
## OFFICER'S RESUME



CITY OF DALLAS

Police Officer Aaron Tolerton [9711 ▉▉▉]

### Part I - Personal Information

Name:  Police Officer Aaron  Tolerton
Employee Number: ▉▉▉▉   Badge No: 9711   Hire Dt: 01/07/2009
Employee number: ▉▉▉▉
Division:  Southeast Patrol Div
Watch:  2
Sector:

### Part II - Personal Commendations and Awards

|            | Internal | Professionalism-The 5th Annual 10k Trinity River Levee Run. |
|------------|----------|------------|
| 04/08/2009 | External | Assistance to Law Enforcement-TLEEAA 2009 STATE COMPETITION |
| 11/27/2009 | Internal | Dedication to Duty |
| 04/29/2010 | Internal | Exceptional Arrest |
| 07/12/2010 | Internal | Quick Response |
| 12/04/2010 | Internal | Job Well Done |
| 02/27/2011 | Internal | Quick Response |
| 06/16/2011 | Internal | Attention to Duty |
| 08/19/2011 | Internal | Job Well Done |
| 10/07/2011 | Internal | Dedication to Duty |
| 10/14/2011 | Internal | Dedication to Duty |
| 11/04/2011 | Internal | Professionalism |
| 01/13/2012 | Internal | Team Effort |
| 01/28/2012 | Internal | Team Effort |
| 02/03/2012 | Internal | Diligence to Duty |
| 04/20/2012 | Internal | Observation Skills |
| 04/21/2012 | Internal | Quick Response |
| 11/29/2012 | Award    | Job Well Done |
| 12/31/2012 | Award    | Dedication to Duty |
| 05/06/2013 | Award    | Certificate of Merit |

### Part III - Sustained Complaints/Corrective Actions

Control number: CN2015-100
Received date: Mar 29, 2015        Occurred date:  Mar 28, 2015
Classification: Adverse Conduct
Allegation(s):
        Disturbance, Escalating Or Participating - Sustained Apr 29, 2015
           Code of Conduct 4.4
        Conduct Discrediting Department - Sustained Apr 29, 2015
           Code of Conduct 4.3
        Untruthfulness when conducting Police Business - Sustained Apr 29, 2015
           Code of Conduct 8.3
        Weapon Violation - Sustained Apr 29, 2015
           General Order 418.07 (D)
Disciplinary action(s)
        Terminated Apr 29, 2015   Days/hrs suspended:

**Please note:**
There is a possibility that cases with summary discipline older than 36 months
have been removed from this section of this report.

---

Part IV - Officer Involved Shootings

---

<None>

Printed: Dec 07, 2017 11:21   By: CIVIL Cathy Gray

APP 038

Concise Officer History

Police Officer Aaron Tolerton [9711/███████]

Employee Number: ██████ Hire date: Jan 07, 2009
Current assignment(s):
    Division: Southeast Patrol Div
    Watch: 2
    Sector:

**Involved Officer: Summary discipline**    IA No: SD2011-134    Received: Apr 01, 2011

    Allegations:

      AWOL, Court - City - General Order 420.01 (B) 2b - Sustained - Apr 08, 2011

    Actions taken:

      : Apr 08, 2011 - Documented Counseling

**Involved Officer: Investigation**    IA No: DR2011-168    Received: Aug 15, 2011

    Allegations:

      Use of profane or indecent language - - Not Sustained - Sep 14, 2011
      Inappropriate or Unnecessary Use of Force - - Exonerated - Sep 14, 2011

**Involved Officer: Investigation**    IA No: CN2012-232    Received: Jun 25, 2012

    Allegations:

      Racial Profiling - - Not Sustained - Dec 03, 2012
      Inappropriate or Unnecessary Use of Force - - Not Sustained - Dec 03, 2012

**Involved Officer: Investigation**    IA No: CN2012-327    Received: Aug 10, 2012

    Allegations:

      Inappropriate or Unnecessary Use of Force - - Not Sustained - Dec 21, 2012

**Involved Officer: Firearm discharge**    IA No: CN2012-449    Received: Dec 04, 2012

                             Service Numbe291975-Z

    Allegations:

      Emergency Vehicle Operation Violation - - Rescinded - Mar 07, 2014

**Involved Officer: Commendation/Award**    IA No: C/A2013-0005    Received: Jan 06, 2013

    Actions taken:

      Job Well Done: Jan 16, 2013 - Commendation

**Involved Officer: Investigation**    IA No: CN2013-115    Received: Apr 02, 2013

    Allegations:

      Inappropriate or Unnecessary Use of Force - - Exonerated - Oct 09, 2013
      Use of profane or indecent language - Code of Conduct 4.15 - Sustained - Oct 09, 2013

    Actions taken:

: Oct 09, 2013 - Advice & Counseling

     by Ch. Lawrence.

**Involved Officer: Summary discipline**     IA No:  SD2013-108
**Received: Apr 29, 2013**

     Service Numbe291975Z

     Allegations:

     Emergency Vehicle Operation Violation - General Order 301.03 (A)(B)
- Sustained - May 16, 2013

     Actions taken:

     : May 16, 2013 - Documented Counseling

**Involved Officer: Commendation/Award**     IA No:  C/A2013-0583
**Received: May 02, 2013**

     Service Numbe107685A

     Actions taken:

     Job Well Done: May 16, 2013 - Commendation

**Involved Officer: Division Referral**     IA No:  DR2013-130
**Received: Jun 20, 2013**

     Service Numbe128317A

     Allegations:

     Search, Illegal or improper -  - Exonerated - Oct 02, 2013

**Involved Officer: Commendation/Award**     IA No:  C/A2013-0990
**Received: Jul 14, 2013**

     Service Numbe177656A

     Actions taken:

     Job Well Done: Aug 01, 2013 - Commendation

**Involved Officer: Investigation**     IA No:  CN2013-293
**Received: Aug 27, 2013**

     Service Numbe163814A

     Allegations:

     Use Of Racial Slur Or Epithet -  - Not Sustained - Dec 27, 2013
     Inappropriate or Unnecessary Use of Force -  - Not Sustained - Dec 27,
2013
     Forgery / Fraud -  - Not Sustained - Dec 27, 2013
     Improper Conduct -  - Not Sustained - Dec 27, 2013
     Report, Incomplete / Erroneous -  - Rescinded - Dec 27, 2013

**Involved Officer: Commendation/Award**     IA No:  C/A2013-1207
**Received: Sep 11, 2013**

     Service Numbe232775A

     Actions taken:

     Job Well Done: Sep 16, 2013 - Commendation

**Involved Officer: Commendation/Award**     IA No:  C/A2013-1403
**Received: Sep 16, 2013**

     Service Numbe234645A

Actions taken:

    Job Well Done: Oct 23, 2013 - Commendation

**Involved Officer: Investigation**         IA No:  CN2013-333
**Received: Sep 18, 2013**

                                              Service Numbe232768A

    Allegations:

      Inappropriate or Unnecessary Use of Force -  - Exonerated - Jan 24, 2014

**Involved Officer: Commendation/Award**     IA No:  C/A2013-1489
**Received: Nov 07, 2013**

Actions taken:

    Job Well Done: Nov 08, 2013 - Commendation

**Involved Officer: Commendation**        IA No:  C/A2014-0357
**Received: Feb 18, 2014**

                                              Service Numbe38389B

Actions taken:

    Professionalism: Mar 17, 2014 - Commendation

**Involved Officer: Commendation**        IA No:  C/A2014-0443
**Received: Mar 24, 2014**

                                              Service Numbe66425B

Actions taken:

    Job Well Done: Apr 03, 2014 - Commendation

**Involved Officer: Division Referral**      IA No:  DR2014-078
**Received: Mar 24, 2014**

                                              Service Numbe0068059-b

    Allegations:

      Discourtesy/Unprofessionalism -  - Not Sustained - Dec 14, 2015
      Search, Illegal or improper -  - Exonerated - Dec 14, 2015

**Involved Officer: Investigation**         IA No:  CN2014-276
**Received: Aug 22, 2014**

                                              Service Numbe190686-2014

    Allegations:

      Inappropriate or Unnecessary Use of Force -   - Not Sustained - Jun 24, 2015
      Improper Action -  - Not Sustained - Jun 24, 2015

**Involved Officer: Commendation**        IA No:  C/A2014-1435
**Received: Oct 30, 2014**

                                              Service Numbe249590-2014

Actions taken:

    Professionalism: Nov 19, 2014 - Commendation

**Involved Officer: Investigation**         IA No:  CN2015-040
**Received: Feb 09, 2015**

                                              Service Numbe028415-2015

Allegations:

    Improper Action -  - Exonerated - Jun 06, 2016

**Involved Officer: Firearm discharge**        IA No:  CN2015-058
**Received: Mar 02, 2015**

                                         Service Numbe031347-2015

Allegations:

    Shooting, Officer Involved -  - Complete - Sep 30, 2016

**Involved Officer: Investigation**          IA No:  CN2015-100
**Received: Mar 29, 2015**

Allegations:

    Disturbance, Escalating Or Participating - Code of Conduct 4.4 -
Sustained - Apr 29, 2015
        Conduct Discrediting Department - Code of Conduct 4.3 - Sustained -
Apr 29, 2015
        Untruthfulness when conducting Police Business - Code of Conduct 8.3
- Sustained - Apr 29, 2015
        Weapon Violation - General Order 418.07 (D) - Sustained - Apr 29, 2015

Actions taken:

    : Apr 29, 2015 - Terminated

        by Ch. Brown.


Report summary: totals by incident type:

| Incident type | Received |
|---|---|
| Accidental discharge | 0 |
| Commendation | 3 |
| Commendation/Award | 6 |
| Departmental Award | 0 |
| Discretionary arrest | 0 |
| Division Referral | 2 |
| Drug test | 0 |
| Employee Support Referral | 0 |
| External | 0 |
| Firearm discharge | 2 |
| Forced entry | 0 |
| Formal investigation | 0 |
| Historical | 0 |
| Inquiry | 0 |
| Integrity test | 0 |
| Internal | 0 |
| Inv. of Adverse Conduct | 0 |
| Inv. of Force | 0 |
| Investigation | 9 |
| K9 Utilization | 0 |
| Mediation Referral | 0 |
| No Investigation | 0 |
| Personnel Development Alert | 0 |
| Phy Abuse/Ex Force | 0 |
| Preliminary investigation | 0 |
| Probation Failure | 0 |
| Request for Control Number | 0 |
| Shooting | 0 |
| Show of force | 0 |
| Stop | 0 |
| Summary discipline | 2 |
| Traffic Violation | 0 |
| Vehicle accident | 0 |

APP 042

Total                          24

Printed: Dec 07, 2017 11:24   By: CIVIL Cathy Gray

# EXHIBIT C

Damon Luster                                                                    1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                    NORTHERN DISTRICT OF TEXAS

 3                          DALLAS DIVISION

 4   CASSANDRA LUSTER,          )
     INDIVIDUALLY AND A/N/F     )
 5   OF _____, A MINOR CHILD;)
     DAMON LUSTER; DESMOND      )
 6   LUSTER, JR., BEVERLY DIANA)
     LUSTER, INDIVIDUALLY AND   )
 7   AS ADMINISTRATOR OF THE    )
     ESTATE OF DESMOND          )
 8   LUSTER, SR.,               )    CASE NO.:  3:16-cv-00396-B
                                )
 9        Plaintiffs,           )
                                )
10   VS.                        )
                                )
11   CITY OF DALLAS, et al,     )
                                )
12        Defendants.           )
            _____
13             ORAL AND VIDEOTAPED DEPOSITION OF

14                          DAMON LUSTER

15                        NOVEMBER 17, 2017

16          _____

17             ORAL DEPOSITION OF DAMON LUSTER, produced as

18   a witness at the instance of the Defendant, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on November 17, 2017, from 4:17 p.m. to 5:30 p.m.,

21   before Ashley Gattenby, CSR, RPR in and for the State

22   of Texas, reported by machine shorthand, at Ted B. Lyon

23   & Associates, P.C., 18601 LBJ Freeway, Suite 525,

24   Mesquite, Texas 75150, pursuant to the Federal Rules of

25   Civil Procedure.
```

                                                              APP 045

Damon Luster
2

```
 1                 A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         Mr. Charles Bennett
           TED B. LYON & ASSOCIATES, P.C.
 4         18601 LBJ Freeway, Suite 525
           Mesquite, Texas 75150
 5         (972)279-6571
           (972)279-3021 Fax
 6         cbennett@tedlyon.com

 7    and

 8         Mr. Don High
           ATTORNEY AT LAW
 9         816 Greylyn Drive
           Plano, Texas 75075
10         (214)499-5677

11    FOR THE DEFENDANT, PILOT TRAVEL CENTERS, LLC:

12         Mr. Michael B. Jones
           CANTERBURY, GOOCH, SURRATT, SHAPIRO, STEIN,
13         GASWIRTH & JONES
           4851 LBJ Freeway, Suite 301
14         Dallas, Texas 75244
           (972)239-7493
15         (972)490-7739 Fax
           mjones@canterburylaw.com
16
      FOR THE DEFENDANTS, CITY OF DALLAS AND AARON TOLERTON:
17
           Mr. Jason G. Schuette
18         Ms. Stefani Williams
           DALLAS CITY ATTORNEY'S OFFICE
19         1500 Marilla Street, Suite 7DN
           Dallas, Texas 75201
20         (214)670-1236
           (214)670-0622 Fax
21         jason.schuette@dallascityhall.com
           stefani.williams@dallascityhall.com
22
      ALSO PRESENT:
23
           David Guerra, Videographer
24

25
```

```
 1                              INDEX

 2                                                    PAGE

 3    Appearances                                       2

 4    DAMON LUSTER
          Examination by Mr. Schuette                   4
 5
      Reporter's Certificate                           61
 6

 7                            EXHIBITS
      NO.            DESCRIPTION                       PAGE
 8
```

```
      Exhibit 1........................................    5
 9        Notice of Deposition
      Exhibit 2........................................   16
10        Photograph of truck
      Exhibit 3........................................   20
11        Photograph of gun and magazine
      Exhibit 4........................................   21
12        Photograph of gun and magazine
      Exhibit 5........................................   21
13        Photograph of gun
      Exhibit 6........................................   39
14        Photograph of truck
      Exhibit 7........................................   45
15        Photograph of truck
      Exhibit 8........................................   48
16        Photograph of truck
      Exhibit 9........................................   49
17        Photographs of inside of vehicle
      Exhibit 10.......................................   49
18        Photograph of gun
      Exhibit 11.......................................   51
19        Photograph of bullets
      Exhibit 12.......................................   52
20        Photograph of case, bullets and cash
```

```
21

22

23

24

25
```

APP 047

## Page 9

1  I promise you I will ask you at least one question you
2  will not understand, that's my fault, it's not yours,
3  but let me know that you don't understand my question.
4  Will you do that?
5  **A.  Yes, I will.**
6  Q.  Okay.  You agree that it's fair that if you
7  don't tell us that you don't understand the question
8  that we can all assume that you understood it and
9  answered appropriately?
10  **A.  Yes, I understand.**
11  Q.  Okay.  Also, it is perfectly acceptable to
12  tell me that you do not know the answer to my question,
13  or that you don't remember the answer to my question.
14  All right?
15  **A.  Yes, I understand.**
16  Q.  Okay.  Good.  Did you look at any anything to
17  prepare for the deposition today?
18  **A.  No, not -- nothing today.**
19  Q.  Okay.  Well, perhaps I asked the question
20  badly.  Did you look at anything to get ready for the
21  deposition?
22  **A.  As far as today is concerned?**
23  Q.  Yes, whether you looked at it last week or
24  yesterday or whenever to get ready for today.
25  **A.  It's been over two months.**

## Page 10

1  Q.  Okay.  What did you look at?
2  **A.  Sat with my lawyers.**
3  Q.  Okay.  And I don't want you to tell me what
4  your lawyers and you discussed.
5  **A.  I didn't say -- no, sir.**
6  Q.  I just want to cut you off before you do
7  that.
8  **A.  No.**
9  Q.  Okay.  But you did discuss with your lawyer
10  to get ready for today?
11  **A.  Yes, I did.**
12  Q.  Okay.  Is there anyone else you spoke to
13  other than your lawyers?
14  **A.  No I hadn't.**
15  Q.  Okay.  I want to go through some names to
16  make sure I have everything correct.  You're obviously
17  the brother of Desmond Luster?
18  **A.  I am.**
19  Q.  And for convenience sake, is it all right
20  with you if I refer to Desmond Luster just as Desmond?
21  **A.  Yes.**
22  Q.  Okay.  I understand that your mother is
23  Beverly Diana Luster?
24  **A.  Yes.**
25  Q.  She's your natural mother, your birth mother?

## Page 11

1  **A.  Yes.**
2  Q.  Cassandra Luster is -- was your
3  sister-in-law?
4  **A.  Yes.**
5  Q.  Maybe you still consider her to be your
6  sister-in-law.
7  **A.  Yes.**
8  Q.  D'Andra Luster would be your niece?
9  **A.  Yes, it is.**
10  Q.  And Desmond Luster, Jr. would be your nephew?
11  **A.  Yes, he is.**
12  Q.  And those are the only children of Desmond
13  Luster?
14  **A.  Yes.**
15  Q.  You have a daughter.
16  **A.  Desiree Luster.**
17  Q.  Desiree.  Thank you.  I lost that.
18  **A.  Uh-huh.**
19  Q.  Desiree.  Do you have any other children?
20  **A.  No, I do not.**
21  Q.  Prior to the 9th of February of 2015, had you
22  ever met Aaron Tolerton before?
23  **A.  No, I hadn't.**
24  Q.  Okay.  Do you remember -- and I'm -- in the
25  interest of time, I'm just cutting right towards some

## Page 12

1  things.
2     After your brother was shot, you were
3  taken to the Dallas Police Department headquarters.  Do
4  you recall that?
5  **A.  Yes.**
6  Q.  And do you remember being interviewed at the
7  police department headquarters?
8  **A.  Yes.**
9  Q.  Do you remember being placed in a -- in an
10  interview room and various times detectives coming in
11  to talk with you and at one point someone came in and
12  took samples, swabbings from your hands?  Do you
13  remember that?
14  **A.  Yes.**
15  Q.  Okay.  Do you remember the Miranda warnings
16  were given to you in that interview?
17  **A.  No, I don't.**
18  Q.  Okay.  I will tell you it is on the video
19  that you were given Miranda warnings.
20  **A.  Okay.**
21  Q.  Okay.  So if it's on the video, you wouldn't
22  dispute that it happened?
23  **A.  No, I'm not.**
24  Q.  Okay.  Since you don't remember being given
25  Miranda warnings, I suppose you don't remember waiving

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3   CASSANDRA LUSTER,          )
     INDIVIDUALLY AND A/N/F     )
 4   OF _____, A MINOR CHILD;)
     DAMON LUSTER; DESMOND      )
 5   LUSTER, JR., BEVERLY DIANA )
     LUSTER, INDIVIDUALLY AND   )
 6   AS ADMINISTRATOR OF THE    )
     ESTATE OF DESMOND          )
 7   LUSTER, SR.,               )  CASE NO.:  3:16-cv-00396-B
                                )
 8        Plaintiffs,           )
                                )
 9   VS.                        )
                                )
10   CITY OF DALLAS, et al,     )
                                )
11        Defendants.           )

12              REPORTER'S CERTIFICATION

13             DEPOSITION OF DAMON LUSTER

14                 NOVEMBER 17, 2017

15

16        I, Ashley Gattenby, Certified Shorthand Reporter

17   in and for the State of Texas, hereby certify to the

18   following:

19        That the witness, DAMON LUSTER, was duly sworn by

20   the officer and that the transcript of the oral

21   deposition is a true record of the testimony given by

22   the witness;

23        I further certify that pursuant to the FRCP Rule

24   30(f)(1) that the signature of the deponent:

25        __X__ was requested by the deponent or a party
```

APP 049

1  before the completion of the deposition and returned

2  within 30 days from date of receipt of the transcript.

3  If returned, the attached Changes and Signature Page

4  contains any changes and the reasons therefor;

5       ____ was not requested by the deponent or a party

6  before the completion of the deposition.

7       I further certify that I am neither attorney nor

8  counsel for, related to, nor employed by any of the

9  parties to the action in which this testimony was

10 taken.

11      Further, I am not relative or employee of any

12 attorney of record in this case, nor do I have a

13 financial interest in the action.

14      Subscribed and sworn to on this 4th day of

15 December, 2017.

16

17                          _____
                            Ashley Gattenby, CSR, RPR
18                          Texas CSR #8347
                            Expiration Date:  12/31/2018
19                          Lexitas - Dallas
                            Firm Registration No. 459
20                          6500 Greenville Avenue, Suite 445
                            Dallas, Texas 75206
21                          (214)373-4977

22

23

24

25