# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS    §

COUNTY OF DALLAS    §

BEFORE ME, <u>Detective Dale Richardson #6361</u>, on this day personally appeared <u>Officer Aaron Tolerton #9711</u>, who, after being by me duly sworn, on oath deposes and says:

My name is Aaron Tolerton #9711. I have been a Dallas police officer for approximately 6 years. I am currently assigned to the Southeast Patrol Division – 4th watch. My duty hours are 7P-5A.

On February 9, 2015, I was working my off duty job at the Flying J in the 7400 block of Bonnie View Road. I was wearing my full Dallas police uniform with a badge patch on the left chest, my metal badge on my belt, and the words DALLAS POLICE in big bold letters on my back. I was not wearing a body cam. Around 1:30PM, I was walking around the property making my routine rounds. As I was making my rounds, I noticed a truck driver with a flat tire. I had a brief conversation with the driver and continued my rounds. A few moments later I heard a series of loud pops. A maintenance employee named John Blue came over the Flying J radio and asked me if I heard the pops. I replied that I did hear them and I thought it was caused by the truck driver with the flat tire. Mr. Blue was adamant that the sound was gunfire. I walked towards the spot where I last saw the truck driver with a flat tire. As I approached him, he informed me that he just heard gunshots and pointed towards the north.

Just about this time, I heard the police dispatcher call out an armed encounter at Bonnie View and Tioga. The dispatcher reported that a man in a dark blue pickup truck was firing a gun at someone.

I walked towards the east edge of the Flying J property towards Bonnie View Road. When I got near the edge of the property another witness pointed to the north and said that there was a guy shooting at somebody.

As I made it to the east edge of the property I observed a black male standing on the passenger side of a dark blue pickup truck shooting at two individuals as they were running away. The pickup truck was parked on Riverside Road and was facing east, just east of Bonnie View. I observed one of the individuals running across Bonnie View Road towards me and another was running south in the field towards the truck wash.

Not knowing what was going on, I ordered the individual running directly toward me to the ground. I had my head on a swivel looking back and forth between the guy I had on the ground and the suspect. The suspect had gotten back into the dark blue truck, turned around, and began speeding right at me and the individual. The suspect jumped the curb and was speeding right toward us. I screamed at the individual on the ground to run. The individual was able to get up and run a few feet towards me, but the suspect continued to speed right at us. I made eye contact with the suspect and was able to yell "STOP!" one time. The suspect was determined to run the individual and me over. I fired my pistol at the suspect to stop him from killing me and the other individual. As I fired my pistol the suspect continued to bear down on us. I also observed the suspect reaching for something towards the floor of the truck. I was just barely able to get out of the path of the speeding suspect. The suspect crashed into the fence. I cautiously approached the suspect at gunpoint and ordered him to show me his hands. The suspect complied and I grabbed one of his hands and told him to get on the ground. As I was bring the suspect out of the truck he was yelling something at me, but I cannot remember exactly what he was saying. He went to the ground. I asked him repeatedly where his gun was. As I was handcuffing the suspect, another black male driving a black pickup, jumped the curb and was driving towards us. The driver stopped and got out of the truck and started yelling at me. I ordered the second pickup driver to show me his hands and to get on the ground. He complied.

The suspect became unresponsive.  Other officers arrived and assisted me in rendering first aid.  I continued to give the suspect first aid until other officers relieved me.  I then removed myself from the immediate scene and waited for investigators.

I was unaware of any burglary that had taken place in the nearby neighborhood.

Affiant

"I, Detective Dale Richardson, Badge Number #6361 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS 12th DAY OF February A.D. 2015

Officer's Signature

2

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS      §

COUNTY OF DALLAS      §

BEFORE ME, <u>Scott Sayers #7157</u>, on this day personally appeared <u>Cathy Blanchard #7999</u> Who, after being by me duly sworn, on oath deposes and says:

I, Senir Coporal Cathy Blanchard #7999, was working as element B721 on 2-9-15. At approximately 1:36 pm on 2-9-15, a Disturbance Active Shooter call came out at the given location of Bonnieview Rd and Tioga St. The comments indicated that two black males in their 30's were shooting at two juveniles with backpacks. As I was en route, I heard Officer A Tolerton #9711 get on the radio and ask about the call as he was working at the Flying J truckstop south of the call location. Officer Tolerton also stated he heard a shot fired. Officer Tolerton then requested an assist and stated a shot was fired and that he had a Susp detained. As I approached the scene at 7800 Bonnieview Rd, I observed Officer Tolerton with Mr Desmond Luster Sr who was handcuffed and on his stomach near a blue pickup truck. Officer L Moody #9291 was standing next to another black male who was proned out on the ground by a black pickup truck. I asked Officer Tolerton if he wanted me to handcuff the proned out black male. He replied, "Yes" at which time I placed handcuffs on the black male and had him sit up. The black male was yelling at Officer Tolerton asking if the young males suspected of burglarizing his relative's home at 6756 Shadow Creek had gone free. I left the black male with Officer Tolerton and went over to Officer Tolerton who was rolling Mr Desmond Luster Sr on his side. I asked Officer Tolerton where the male had been shot. Officer Tolerton said on the side. I observed blood on the shirt near Mr Desmond Luster Sr's lower back. I instructed Officer Tolerton to find a squad car, sit in it, and not speak to anyone. Mr Desmond Luster Sr did not appear to be responsive. I insttructed Officer D Landeros, who was now next to me, to advise dispatch that we were starting CPR. I began chest compressions on Mr Desmond Luster Sr. I stopped when I observed his tongue moving. When Mr Desmond Luster Sr began to appear unresponsive, Officer Landeros and I continued CPR until DFR arrived. The black male I handcuffed was placed in my squad car #120080 which is equipped with a cage. The in car video system was turned on. When the black male asked if I would turn off his black pickup, I used a glove to turn the ignition off and observed a .40 caliber gun with the slide locked back and the magazine out laying on the middle armrest/console. I asked dispatch to check the gun for stolen; the gun was clear. I then asked Officer S Vanegas to remain with the black pickup due to the gun being in plain view and then went back to my squad car where I remained with the black male until he was transported to headquarters by Officer Vanegas.  I would assume that PES collected the gun because we were told to leave the interior crime scene.

2

"I, <u>Scott Sayers</u>, Badge Number 7157 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS <u>09 </u>DAY OF <u>February</u> A.D. <u>2015</u>

Officer's Signature

2

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS       §

COUNTY OF DALLAS       §

BEFORE ME, Michael A. Mendez #4587, on this day personally appeared Dallas Police Officer Larry Moody #9291 and I am assigned to South Central Patrol, 2nd watch.

Who, after being by me duly sworn, on oath deposes and says:

I Dallas Police Officer Larry Moody #9291 was responding to a call involving a disturbance active shooter inside a dark blue truck. I was driving vehicle #130135. I was the first cover officer on the scene. My dash camera was activated. Upon my arrival to the call, it was changed to an Officer Assist. I observed Officer Tolerton #9711 standing in a grassy shoulder area flagging me down. As I pulled up I observed a blue pickup matching the call sheet's description and a black pickup in the grassy shoulder where Officer A. Tolerton was standing. I observed Officer Tolerton handcuffing a black male lying on the ground next to the blue pickup truck. I also observed another black male lying on the ground next to a black truck which was located approximately 15ft from the blue pickup truck. Officer Blanchard arrived on scene and handcuffed the black male that was lying next to the black pickup. Responding cover units then began to arrive on scene. I did not witness the shooting. I talked to Officer Tolerton and asked him if he wanted me to contact his association attorney. I did not have a body camera.

#9291

_____
Affiant's Signature

"I, Michael A. Mendez, Badge Number 4587, a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS 9th DAY OF February A.D. 2015

#4587

_____
Officer's Signature

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS       §

COUNTY OF DALLAS       §

BEFORE ME, R. Duggan #5971, on this day personally appeared John Rogers #9609
Who, after being by me duly sworn, on oath deposes and says:

  I was operating a marked police vehicle #100336 as B725 and responded Code 3 to a Signal 15/OIS. I arrived on the scene and observed Offc Moody standing near a BM who was handcuffed and seated next to a Pickup. I approached Offc Moody and then saw SC Blanchard performing CPR on a BM that was lying in the grass. Offc Moody informed me that he needed to place a city issued shotgun in his squad car and so I waited there with the ind who was sitting in the grass. During that time if I recall correctly the ind who was seated and handcuffed indicated that a weapon was in the vehicle behind me and I looked into the driver front window and saw a black semi automatic pistol on the center console to the right of the driver seat. At that time, due to the dynamics of the scene and the number of individuals that weren't accounted for, I retrieved the gun and dropped the magazine and cycled the slide, locking it to the rear to safe the pistol and then placed it back on the center console. The chamber was empty during the cycling operation. At that time Sgt Butler tasked me with securing the scene and i left with Offc Knutson and SC Cunningham to place crime scene tape around the perimeter of the area. I left the area and eventually ended up securing shell casings located in a secondary crime scene, north of the original call location. Body Worn Camera recording was in progress with me during the event and will be available in accordance with interim General Orders. I had no contact with the involved officer.

_____ 9609
               Affiant

"I, R. Duggan, Badge Number 5971 , a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS  09 DAY OF February A.D. 2015

_____ 5971
             Officer's Signature

# Incident Report

| | | | Case Number | | | CAD Incident # |
|---|---|---|---|---|---|---|
| | | | 031347-2015 | | | 15-0261493 |
| | | | Report Type | | | |
| | | | Incident Supplement | | | Page 1 of 4 |
| | | | Date / Time Occurred | | | Date / Time Reported |
| | | | 2/9/2015 13:30 to 2/9/2015 13:31 | | | 2/9/2015 13:32 |

| Arrested Suspects | Additional Suspects | Unknown Suspects | Victims | Other Persons | Vehicles | Items | Evidence Count | Leoka Count | Related Case # |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 031405-2015 |

| ☐ Hate Crime | ☐ Arson Related | Arson Code | | Damage Value | Cargo Theft |
|---|---|---|---|---|---|
| | | | | | NO |

| Incident Details |
|---|
| Location Given By Dispatcher |
| Unit Number    H118 |

| Clearance Disposition | Clearance by Exception | Exceptional Clearance Date |
|---|---|---|
| OPEN | | |

| Special Event | Case Status |
|---|---|
| | OPEN |

| Incident Address |
|---|

| House No. | Prefix | Street Name | Unit No. |
|---|---|---|---|
| 7300 | | BONNIE VIEW RD | |

| City | State | Zip | County | Beat |
|---|---|---|---|---|
| DALLAS | TEXAS | 75241 | Dallas | 736 |

| Administrative Info |
|---|

| Reporting Officer 1 | Reporting Officer 1 | Reporting Officer 2 | Reporting Officer 2 Employee Number |
|---|---|---|---|
| ROSENBERG,SETH NATHANIEL | 8070 | | |

**Narrative Information**

ON MONDAY, FEBRUARY 9, 2015 AT ABOUT 2:28PM CSRS DET'S/ ANALYST  S. ROSENBERG#8070, D. ANDREE#6937 AND D. ENGLAND#T109 WERE DISPATCHED TO 7300 BONNIEVIEW REGARDING AN OFFICER INVOLVED SHOOTING. DET'S MET OFFICERS/DETECTIVES RISSE#9624, MOODY#9291, MAXWELL#8936, LEWIS#6781, GONZALEZ#8348, CHILDS#6976, LANDEROS#9965, BLANCHARD#7999, THOMAS#8952, MCINNIS#9916, WEBSTER#9913, HARRELL#9655, VANEGAS#8736, JACOBS#6607, BUTLER#6913, DOTSON#9753, MCCARTHY#9659, HUTCHINS#9486, WHITMIRE#9439, JAMES#9136, BRANCH#6009, BROOKS#10788, ROGERS#9609, MANIS#8083, JAMES#5547, EDWARDS#7458, HARRIS#4362, BABLES#6800, CORDERO#7445, WILLIAMS#10053, KNUTSON#10676, MASSEY#8465, TOLERTON#9711, COLEMAN#9925, CRUZ#8310, WILLIAMS#10806, SAYERS#7157, RICHARDSON#6361, IBARRA#6759, GARZA#5952 AND CASTRO#7488 AT THE LOCATION.

OBSERVATIONS:

1ST LOCATION- 6756 SHADOW CREEK
THIS LOCATION IS A TWO STORY RESIDENCE FACING WESTBOUND. THE FIRST FLOOR CONSISTS OF A KITCHEN, DINING ROOM, LIVING ROOM AND GAME ROOM. THE REAR WINDOW ON THE SOUTH SIDE NEAR THE DINING ROOM WAS SHATTERED. IN THE DINING ROOM THERE WAS A BRICK ON THE FLOOR USED TO SHATTER THE WINDOW. IN THE LIVING ROOM NEAR THE BACK DOOR ARE TWO HALVES OF A BRICK ON THE FLOOR USED TO SHATTER THE WINDOW. THE LIVING ROOM IS IN THE NORTH EAST CORNER OF THE FIRST FLOOR OF THE RESIDENCE. THERE ARE SEVERAL SHOES IN THE MIDDLE OF THE LIVING ROOM ALONG WITH VIDEO GAMES AND AN XBOX 360. THE GAME ROOM IS IN THE NORTH WEST CORNER OF THE RESIDENCE ON THE FIRST FLOOR. ON THE SECOND FLOOR OF THE RESIDENCE THERE ARE THREE BEDROOMS AND A GAME ROOM. ALL THE BEDROOMS AND GAME ROOMS HAD BEEN RUMMAGED THROUGH. IN THE BACK YARD THE EAST SIDE FENCE WAS KNOCKED DOWN. THERE IS A MOWED AREA THAT FOLLOWS THE ELECTRICAL LINES BEHIND THE FENCE. IN THE MOWED AREA NEAR THE SOUTH EAST CORNER OF THE KNOCKED DOWN FENCE WERE SEVEN FIRED CARTRIDGES, THREE FIRED CARTRIDGES HAVE HEAD STAMPS OF WIN 40 S&W AND FOUR FIRED CARTRIDGES HAVE HEAD STAMPS OF FEDERAL 40 S&W. THERE WAS ANOTHER VIDEO GAME IN THE BUSHES NEAR THE SOUTH EAST CORNER OF THE FENCE.

2ND LOCATION- 4300 RIVERSIDE
THERE IS A WHITE CHURCH AT THE SOUTHEAST CORNER OF RIVERSIDE AND BONNIEVIEW. ON THE RIVERSIDE SIDEWALK IN FRONT OF THE CHURCH ARE THREE FIRED CARTRIDGES WITH HEAD STAMPS OF WIN 40 S&W. NEAR THE SAME INTERSECTION ON 7000 BONNIEVIEW IN THE SOUTH BOUND LANE, MIDDLE ROW, IS A FIRED BULLET FRAGMENT.

3RD LOCATION-7300 BONNIEVIEW
ON THE SOUTHBOUND GRASS MEDIAN THERE WAS A BLUE DODGE RAM WITH A TEXAS LICENSE PLATE AH61405 THAT IS STUCK IN A CHAIN LINK FENCE. THE VEHICLE HAD SEVERAL DEFECTS, CONSISTENT WITH BULLET IMPACTS. THERE WAS THREE IN THE FRONT HOOD, ONE IN THE FRONT LEFT FENDER, TWO IN THE FRONT LEFT DOOR AND TWO IN THE REAR LEFT DOOR. IN THE GRASSY AREA BEHIND THE VEHICLE THERE WERE TIRE TRACKS THAT LEAD TO THE STREET. THERE WERE TWO SCUFF MARKS THAT APPEARED TO BE FROM TIRES ON THE CURB THAT LINED UP WITH THE TIRE TRACKS ON THE GRASS. INSIDE THE BLUE DODGE RAM THERE WERE SEVERAL ITEMS; A SPRINGFIELD 40 CAL. SERIAL#MG269455 WITH ONE CARTRIDGE IN THE CHAMBER AND FIFTEEN CARTRIDGES IN THE MAGAZINE. ON THE FRONT LEFT SEAT IS A WINCHESTER BOX AND PILL BOTTLE. ON THE FRONT RIGHT FLOORBOARD THERE WAS A HARD GUN CASE CONTAINING LOCKS, GRIPS AND MAGAZINE HOLDERS. ON THE FRONT LEFT FLOOR BOARD THERE WAS A RADIO FACE PLATE. NORTH OF THE BLUE DODGE RAM ON THE GRASS MEDIAN IS A BLACK DODGE HEMI SPORT WITH A TEXAS LICENSE PLATE BRD4061. INSIDE THE BLACK DODGE ON TOP OF THE CENTER CONSOLE THERE WAS A TAURUS 40 CAL PISTOL SERIAL#SDR52805. THE TAURUS HAD SIX CARTRIDGES IN THE MAGAZINE. BESIDE THE PISTOL THERE WAS A SOFT GUN CASE IN THE DRIVERS SEAT CONTAINING ELEVEN CARTRIDGES AND A HUNDRED DOLLAR BILL. IN FRONT OF THE BLACK DODGE AND TO THE LEFT OF THE BLUE DODGE ARE THIRTEEN FIRED CARTRIDGES, A POCKET KNIFE, FIRST AID KIT AND TWO SHIRTS

**Incident Report**

| Case Number | | CAD Incident # |
|---|---|---|
| 031347-2015 | | 15-0261493 |
| Report Type | | |
| Incident Supplement | | Page 2 of 4 |
| Date / Time Occurred | | Date / Time Reported |
| 2/9/2015 13:30   to   2/9/2015 13:31 | | 2/9/2015 13:32 |

WITH POSSIBLE BLOOD.

4TH LOCATION- 1400 S. LAMAR

ON THE FIFTH FLOOR OF HEADQUARTERS IN THE HOMICIDE INTERVIEW ROOM DET RICHARDSON#6361 REQUESTED A GSR KIT DONE ON WITNESS LUSTER, DAMON. DET ROSENBERG#8070 PERFORMED A GSR KIT ON LUSTER, DAMON. DET ALSO COLLECTED LUSTER, DAMON WHITE SHIRT AND THREE CARTRIDGES. DET COLLECTED EVIDENCE FROM HOMICIDE DET SAYERS#7157 AND WAS GIVEN A CHAIN OF CUSTODY FORM. THE ITEMS COLLECTED WERE FROM THE COMPLAINANTS POCKETS AT BAYLOR HOSPITAL. THESE ITEMS ARE A RAVEN 25 CAL. PISTOL WITH A SERAL#904448 CONTAINING A MAGAZINE WITH SIX CARTRIDGES, TWELVE CARTRIDGES, WALLET CONTAINING MONEY AND CARDS, WATCH, POCKET KNIFE AND IPHONE.

MEASUREMENTS WERE TAKEN AT THE SCENE BY TRAFFIC DIVISION.

DIGITAL PHOTOGRAPHS WERE TAKEN AND PROCESSED IN ACCORDANCE WITH SECTION SOP AND ATTACHED TO THIS SUPPLEMENT.

COLLECTED ITEMS AT 6756 SHADOW CREEK WITH THE YELLOW MARKERS:
1) THREE BRICKS WERE COLLECTED FROM 6756 SHADOW CREEK, ONE ON THE KITCHEN FLOOR AND TWO FROM THE LIVING ROOM FLOOR
2) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER
3) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER
4) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER
5) A FIRED CARTRIDGE WITH A HEAD STAMP OF FEDERAL 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER
6) A FIRED CARTRIDGE WITH A HEAD STAMP OF FEDERAL 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER
7) A FIRED CARTRIDGE WITH A HEAD STAMP OF FEDERAL 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER
8) A FIRED CARTRIDGE WITH A HEAD STAMP OF FEDERAL 40 S&W WERE COLLECTED FROM THE MOWED AREA BEHIND THE FENCE NEAR THE SOUTH EAST CORNER

COLLECTED ITEMS AT 7300 BONNIEVIEW WITH THE WHITE MARKERS:
1) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
2) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
3) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
4) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
5) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
6) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
7) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
8) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
9) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
10) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
11) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
12) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE
13) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 9MM LUGER WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND

**Incident Report**

| Case Number | | CAD Incident # |
|---|---|---|
| 031347-2015 | | 15-0261493 |
| Report Type | | |
| Incident Supplement | | Page 3 of 4 |
| Date / Time Occurred | | Date / Time Reported |
| 2/9/2015 13:30 to 2/9/2015 13:31 | | 2/9/2015 13:32 |

LEFT OF THE BLUE DODGE

14) A POCKET KNIFE WITH POSSIBLE BLOOD ON IT WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE

15) A FIRST AID KIT WAS COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE

16) A WHITE AND BLACK SHIRT BUNDLED TOGETHER WITH POSSIBLE BLOOD WERE COLLECTED FROM THE GRASS IN FRONT OF THE BLACK DODGE AND LEFT OF THE BLUE DODGE

17) A SPRINGFIELD 40 CAL. PISTOL WITH A SERIAL#MG269455 WAS COLLECTED FROM THE FRONT LEFT SEAT OF THE BLUE DODGE WITH A TEXAS LICENSE PLATE OF AH61405

17A) A CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WAS COLLECTED FROM THE CHAMBER OF THE SPRINGFIELD 40 CAL. PISTOL WITH A SERIAL#MG269455

17B) 15 CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WERE COLLECTED FROM THE MAGAZINE OF THE SPRINGFIELD 40 CAL. PISTOL WITH A SERIAL#MG269455

17C) A MAGAZINE WAS COLLECTED FROM THE FRONT LEFT SEAT NEXT TO THE SPRINGFIELD 40 CAL. PISTOL WITH A SERIAL#MG269455

17D) AN EMPTY BOX ON WINCHESTER 40 CAL WAS COLLECTED FROM THE FRONT LEFT SEAT

17E) AN EMPTY 40 CAL. CARTRIDGE HOLDER FOR A BOX OF WINCHESTER 40 CAL WAS COLLECTED FROM THE FRONT RIGHT SEAT

18) THE RADIO FACE PLATE WAS COLLECTED FROM THE FRONT LEFT FLOOR BOARD OF THE BLUE DODGE

19) A MEDICINE BOTTLE WAS COLLECTED FROM THE FRONT MIDDLE SEAT OF THE BLUE DODGE

20) A HARD GUN CASE FOR A SPRINGFIELD PISTOL CONTAINING A LOCK, GRIPS AND MAGAZINE HOLDER WERE COLLECTED FROM THE FRONT RIGHT FLOORBOARD OF THE BLUE DODGE

21) A TAURUS 40 CAL. WITH A SERIAL#SDR52805 WAS COLLECTED FROM ON TOP OF THE CENTER CONSOLE IN THE BLACK DODGE HEMI SPORT WITH A TEXAS LP:BRD4061

21A) 6-CARTRIDGES WITH A HEAD STAMP OF FEDERAL 40 S&W WAS COLLECTED FROM THE MAGAZINE OF THE TAURUS PISTOL

21B) A MAGAZINE BELONGING TO THE TAURUS PISTOL WAS COLLECTED FROM THE CENTER CONSOLE IN THE BLACK DODGE HEMI SPORT

21C) A SOFT PISTOL CASE WAS COLLECTED FROM THE FRONT LEFT SEAT OF THE BLACK DODGE

21D) 11 CARTRIDGES WITH HEAD STAMPS OF FEDERAL 40 S&W WERE COLLECTED FROM THE POCKET OF THE SOFT PISTOL CASE

21E) A HUNDRED DOLLAR BILL WAS COLLECTED FROM THE POCKET OF THE SOFT PISTOL CASE

COLLECTED ITEMS AT 4300 RIVERSIDE AND 7000 BONNIEVIEW WITH THE WHITE MARKERS:

22) A BULLET FRAGMENT WAS COLLECTED FROM THE SOUTHBOUND MIDDLE LANE OF THE 7000 BLOCK OF BONNIEVIEW

23) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WAS COLLECTED FROM THE 4300 BLOCK OF RIVERSIDE IN FRONT OF THE WHITE CHURCH ON THE SOUTH EAST CORNER

24) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WAS COLLECTED FROM THE 4300 BLOCK OF RIVERSIDE IN FRONT OF THE WHITE CHURCH ON THE SOUTH EAST CORNER

25) A FIRED CARTRIDGE WITH A HEAD STAMP OF WIN 40 S&W WAS COLLECTED FROM THE 4300 BLOCK OF RIVERSIDE IN FRONT OF THE WHITE CHURCH ON THE SOUTH EAST CORNER
.

COLLECTED ITEMS FROM HEADQUARTERS WITHOUT NUMBERS BY DET S. ROSENBERG#8070:

1) A WHITE SHIRT WAS COLLECTED FROM LUSTER, DAMON IN THE INTERVIEW ROOM IN HOMICIDE

2) THREE CARTRIDGES WITH A HEAD STAMP OF FEDERAL 40 S&W WERE COLLECTED FROM THE INTERVIEW ROOM TABLE THAT LUSTER, DAMON WAS LOCATED

3) A RAVEN 25 CAL PISTOL WITH A SERIAL#904448 WAS COLLECTED FROM HOMICIDE DET S. SAYERS#7157

3A) 1 MAGAZINE WAS COLLECTED FROM HOMICIDE DET S. SAYERS#7157

3B) 5 CARTRIDGES WITH HEADSTAMPS NCCIR 25 AUTO AND 1 CARTRIDGE WITH A HEAD STAMP OF WIN 25 AUTO WAS COLLECTED FROM THE MAGAZINE

4) 12 CARTRIDGES WITH HEAD STAMPS WIN 40 S&W WERE COLLECTED FROM HOMICIDE DET S. SAYERS#7157

5) A WALLET WAS COLLECTED FROM HOMICIDE DET S. SAYERS#7157

5A) $91.01 US CURRANCY WAS COLLECTED FROM THE WALLET

5B) 33 CARDS WERE COLLECTED FROM THE WALLET

5C) 1 PICTURE WAS COLLECTED FROM THE WALLET

6) POCKET KNIFE WAS COLLECTED FROM HOMICIDE DET S. SAYERS#7157

7) A WATCH WAS COLLECTED FROM HOMICIDE DET S. SAYERS#7157

8) AN IPHONE WAS COLLECTED FROM HOMICIDE DET S. SAYERS#7157

GSR KIT WAS COLLECTED FROM WITNESS LUSTER, DAMON
.

ITEMS#21, 21A, 21B, AND 21D MARKED BY THE WHITE MARKERS AND ITEM#2 COLLECTED BY DET ROSENBERG#8070 WERE PLACED ON GUN TAG#156297G AND SENT TO SWIFS. ITEMS#2, 3, 4, 5, 6, 7 AND 8 MARKED BY THE YELLOW MARKERS AND ITEM#17, 17A, 17B, 17C, 22, 23, 24 AND 25 MARKED BY THE WHITE MARKERS WERE PLACED ON GUN TAG#156295G AND SENT TO SWIFS. ITEM#21E MARKED BY THE WHITE

# Incident Report

| Case Number | | CAD Incident # |
|---|---|---|
| 031347-2015 | | 15-0261493 |
| Report Type | | |
| Incident Supplement | | |
| Date / Time Occurred | | Page  4  of  4 |
| 2/9/2015 13:30    to    2/9/2015 13:31 | Date / Time Reported | |
| | 2/9/2015 13:32 | |

MARKERS WAS PLACED IN THE PROPERTY ROOM ON MONEY TAG#7226M. ITEM#1 MARKED BY THE YELLOW MARKERS AND ITEM#14, 15, 17d, 17e, 18, 19, 20 AND 21C MARKED WITH THE WHITE MARKERS WERE PLACED IN THE PROPERTY ROOM ON PROPERTY TAG#115785B. ITEMS# 5, 5B, 5C, 6 AND 8 THAT WERE COLLECTED BY DET ROSENBERG#8070 WERE PLACED ON PROPERTY TAG#115829B AND PLACED IN THE PROPERTY ROOM. ITEM#7 COLLECTED BY DET S. ROSENBERG#8070 WAS PLACED IN THE PROPERTY ROOM ON PROPERTY TAG#115830B. ITEM#1 AND 9 THAT WERE COLLECTED BY DET S. ROSENBERG#8070 WERE PLACED ON PROPERTY TAG#115832B AND SENT TO SWIFS. ITEMS# 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 AND 13 MARKED BY THE WHITE MARKERS WERE PLACED ON PROPERTY TAG#115831B AND SENT TO SWIFS. ITEMS#3, 3A, 3b AND 4 THAT WERE COLLECTED BY DET S. ROSENBERG#8070 WERE PLACED ON GUN TAG#156298G AND SENT TO SWIFS. ITEM#5A THAT WAS COLLECTED BY DET S. ROSENBERG#8070 WAS PLACED ON MONEY TAG#7227M AND PLACED IN THE PROPERTY ROOM. ITEMS#16 MARKED BY THE WHITE MARKERS WERE PLACED IN THE PROPERTY ROOM ON PROPERTY TAG#115787B. CONTACT HOMICIDE DET D. RICHARDSON#6361 AT (214) 283-4854 FOR FURTHER INFORMATION.

.

LATENT PROCESSING:

DET PROCESSED THE FOLLOWING ITEMS FOR LATENT PRINTS AT 6756 SHADOW CREEK; SECOND FLOOR BEDROOM- SHOE BOXES, SECOND FLOOR MASTER BEDROOM-JEWELRY BOXES AND DRAWERS, CONTAINERS IN CLOSETS; FIRST FLOOR LIVING ROOM- VIDEO GAME CASES, XBOX360, FIRST FLOOR DINING ROOM/KITCHEN BEATS BOX, SHATTERED GLASS, OUTSIDE BY WINDOW- SHATTERED GLASS, MOWED AREA FIRED CARTRIDGES, VIDEO GAME CASE IN BUSHES. ITEMS AT 7300 BONNIEVIEW; ALL FIRED CARTRIDGES, MAGAZINES AND CARTRIDGE BOX. DET LIFTED PRINTS FROM BEATS BOX, KINECT SPORTS CASE XBOX 360, BEJEWELED 3 CASE XBOX 360, ON TOP OF FOUR DIFFERENT NIKE SHOE BOXES IN CLOSET, BOTTOM OF NIKE SHOE BOX IN CLOSET, UNDERNEATH JEWELRY BOX DRAWER AND SHATTERED GLASS IN KITCHEN. DET SUBMITTED THE PRINTS TO AFIS.

.

NFI...

**PLACEHOLDER:  ENVELOPE  FOR**

**COMPUTER  AUDIO  DISC**



United States District Court
Northern District of Texas
Dallas Division
Cassandra Luster et al. v. City of Dallas et al.
No. 3:16-cv-0396-B

L16-0172

City & Tolerton
MSJ Appx. 012











EXHIBIT
7
11-17-17  D. Luster



EXHIBIT

8

11-17-17 D. Luster



EXHIBIT

9

11-17-17   D. Luster



EXHIBIT
10
D. Lester
11-17-17

Damon Luster

1               IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF TEXAS

3                     DALLAS DIVISION

4 CASSANDRA LUSTER,       )
  INDIVIDUALLY AND A/N/F   )

5 OF _____, A MINOR CHILD;)
  DAMON LUSTER; DESMOND    )

6 LUSTER, JR., BEVERLY DIANA)
  LUSTER, INDIVIDUALLY AND  )

7 AS ADMINISTRATOR OF THE   )
  ESTATE OF DESMOND        )

8 LUSTER, SR.,           )  CASE NO.:  3:16-cv-00396-B
                     )

9       Plaintiffs,      )
                     )

10 VS.                   )
                     )

11 CITY OF DALLAS, et al,   )
                     )

12       Defendants.      )

13          _____
          ORAL AND VIDEOTAPED DEPOSITION OF

14                  DAMON LUSTER

15                NOVEMBER 17, 2017

16          _____

17        ORAL DEPOSITION OF DAMON LUSTER, produced as

18 a witness at the instance of the Defendant, and duly

19 sworn, was taken in the above-styled and numbered cause

20 on November 17, 2017, from 4:17 p.m. to 5:30 p.m.,

21 before Ashley Gattenby, CSR, RPR in and for the State

22 of Texas, reported by machine shorthand, at Ted B. Lyon

23 & Associates, P.C., 18601 LBJ Freeway, Suite 525,

24 Mesquite, Texas 75150, pursuant to the Federal Rules of

25 Civil Procedure.

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         Mr. Charles Bennett
           TED B. LYON & ASSOCIATES, P.C.
 4         18601 LBJ Freeway, Suite 525
           Mesquite, Texas 75150
 5         (972)279-6571
           (972)279-3021 Fax
 6         cbennett@tedlyon.com

 7    and

 8         Mr. Don High
           ATTORNEY AT LAW
 9         816 Greylyn Drive
           Plano, Texas 75075
10         (214)499-5677

11    FOR THE DEFENDANT, PILOT TRAVEL CENTERS, LLC:

12         Mr. Michael B. Jones
           CANTERBURY, GOOCH, SURRATT, SHAPIRO, STEIN,
13         GASWIRTH & JONES
           4851 LBJ Freeway, Suite 301
14         Dallas, Texas 75244
           (972)239-7493
15         (972)490-7739 Fax
           mjones@canterburylaw.com
16
      FOR THE DEFENDANTS, CITY OF DALLAS AND AARON TOLERTON:
17
           Mr. Jason G. Schuette
18         Ms. Stefani Williams
           DALLAS CITY ATTORNEY'S OFFICE
19         1500 Marilla Street, Suite 7DN
           Dallas, Texas 75201
20         (214)670-1236
           (214)670-0622 Fax
21         jason.schuette@dallascityhall.com
           stefani.williams@dallascityhall.com
22
      ALSO PRESENT:
23
           David Guerra, Videographer
24

25
```

COD & Tolerton MSJ Appx. 022

```
 1                              INDEX

 2                                                        PAGE

 3   Appearances                                             2

 4   DAMON LUSTER
          Examination by Mr. Schuette                        4
 5
     Reporter's Certificate                                 61
 6

 7                            EXHIBITS
     NO.            DESCRIPTION                            PAGE
 8
     Exhibit 1........................................    5
 9        Notice of Deposition
     Exhibit 2........................................   16
10        Photograph of truck
     Exhibit 3........................................   20
11        Photograph of gun and magazine
     Exhibit 4........................................   21
12        Photograph of gun and magazine
     Exhibit 5........................................   21
13        Photograph of gun
     Exhibit 6........................................   39
14        Photograph of truck
     Exhibit 7........................................   45
15        Photograph of truck
     Exhibit 8........................................   48
16        Photograph of truck
     Exhibit 9........................................   49
17        Photographs of inside of vehicle
     Exhibit 10.......................................   49
18        Photograph of gun
     Exhibit 11.......................................   51
19        Photograph of bullets
     Exhibit 12.......................................   52
20        Photograph of case, bullets and cash

21

22

23

24

25
```

COD & Tolerton MSJ Appx. 023

Damon Luster

```
 1                    (On the record at 4:17 p.m.)

 2                    THE VIDEOGRAPHER:  On the record,

 3   4:17 p.m., November 17th, 2017, for the deposition of

 4   Damon Luster in the matter of Cassandra Luster, et al

 5   versus City of Dallas, et al.

 6                    Counsel, please state your appearances,

 7   and the court reporter will then administer the oath.

 8                    MR. JONES:  Michael Jones, I'm sorry, on

 9   behalf of Defendant Pilot Travel Centers, LLC.

10                    MR. SCHUETTE:  Jason Schuette, Dallas

11   City Attorney's Office on behalf of the Defendants City

12   of Dallas and Aaron Tolerton.

13                    MR. BENNETT:  Charles Bennett for the

14   plaintiffs.

15                    MS. WILLIAMS:  Stefani Williams also for

16   the City of Dallas and Aaron Tolerton.

17                    DAMON LUSTER,

18   having been duly sworn, testified as follows:

19                    EXAMINATION

20   BY MR. SCHUETTE:

21        Q.   Good afternoon, Mr. Luster.

22        A.   Afternoon.

23        Q.   I know I said hello to you when you walked

24   through the door a few minutes ago, but on the record,

25   I'll introduce myself.  I'm Jason Schuette and with me
```

COD & Tolerton MSJ Appx. 024

1   is Stefani Williams.  We are assistant city attorneys

2   for the City of Dallas, and we represent the City of

3   Dallas and Aaron Tolerton, who are defendants who you

4   have sued in this litigation.

5                  Do you understand who I am and who I

6   represent?

7        A.   Yes.

8        Q.   Okay.  Nice strong voice, want to keep on

9   doing that so that the court reporter can hear you and

10   so that that man's electronics can pick you up.

11                  You also have with you in the room

12   Mr. Charles Bennett who represents you.  Of course you

13   know Mr. Bennett?

14        A.   Yes.

15        Q.   Mr. Luster, you understand that the purpose

16   of this gathering today is to take your deposition in

17   the lawsuit that you have brought against the Flying J,

18   the City of Dallas and Officer Tolerton?

19        A.   Yes, I do.

20                  (Exhibit No. 1 marked.)

21        Q    (BY MR. SCHUETTE) Okay.  In front of you is

22   what's been marked as Deposition Exhibit No. 1.  Have

23   you seen that before?

24        A.   Yes, I have.

25        Q.   So you understand that that is the piece of

COD & Tolerton MSJ Appx. 025

1   paper that brings us all here today?

2          A.   Yes, I do.

3          Q.   All right.  Have you ever given a deposition

4   before, Mr. Luster?

5          A.   No, I hadn't.

6          Q.   So this is your first one?

7          A.   This is my first one.

8          Q.   All right.  Have you ever given sworn

9   testimony in a courtroom before?

10         A.   Yes, I have.

11         Q.   On how many occasion haves you done that,

12  sir?

13         A.   A couple of times.

14         Q.   Was it in a criminal proceeding or a civil

15  proceeding?

16         A.   It was in a criminal proceeding.

17         Q.   As a witness or as a defendant?

18         A.   As a defendant.

19         Q.   What offense were you charged with?

20         A.   DWI.

21         Q.   Okay.  Here in Texas?

22         A.   Here in Texas, Dallas.

23         Q.   In Dallas, Dallas County?

24         A.   Yes.

25         Q.   Very good.  How many times have you been a

COD & Tolerton MSJ Appx. 026

```
 1    criminal defendant?

 2         A.    I have been arrested about three, four times.

 3         Q.    Okay.  How many times were you actually

 4    charged with offenses?

 5         A.    I have been charged only one time.

 6         Q.    For the DWI?

 7         A.    For the DWI.

 8         Q.    All right.  Very well.  We kind of got off

 9    track, but since you have testified in court before,

10    you know the testimony in a courtroom is given under

11    oath?

12         A.    Yes, I do.

13         Q.    Okay.  And you understand that in this room,

14    even though we're not in a courtroom, it is sworn

15    testimony and it carries with it the same requirements

16    of truthfulness and the same penalty for perjury?

17         A.    Yes.

18         Q.    Very good.  And I promise you I asked these

19    questions of everyone.  Do you read, write and speak

20    the English language?

21         A.    Yes, I do.

22         Q.    Do you have any medical conditions that might

23    limit your ability to testify here today truthfully and

24    fully?

25         A.    No, I don't.
```

COD & Tolerton MSJ Appx. 027

Demoor/Luster

1          Q.    Are you taking any medications that --

2          A.    Yes, I do.

3          Q.    Okay.  And I appreciate your exuberance, but

4    that lady there can only take down one of us talking at

5    a time.  You're stepping on me a little bit.  I'm

6    trying not to step on you.  If you could wait until I

7    finish the question before you answer she will be so

8    much happier.  Okay?

9          A.    No problem.

10         Q.    All right.  You're taking some medications.

11   Would those medications affect your ability to testify

12   today?

13         A.    No.

14         Q.    All right.  And you said you had a DWI.  Were

15   you convicted of DWI?

16         A.    I was convicted.

17         Q.    A few other ground rules, you may take a

18   break whenever you would like to take a break,

19   Mr. Luster, for whatever reason, to use the restroom,

20   to smoke a cigarette, to consult with your attorney or

21   just because you feel like you want to take a break.

22   You just let us know and we'll be happy to do that.

23   All right?

24         A.    Okay.

25         Q.    If you don't understand a question I ask, and

COD & Tolerton MSJ Appx. 028

1    I promise you I will ask you at least one question you

2    will not understand, that's my fault, it's not yours,

3    but let me know that you don't understand my question.

4    Will you do that?

5         A.   Yes, I will.

6         Q.   Okay.  You agree that it's fair that if you

7    don't tell us that you don't understand the question

8    that we can all assume that you understood it and

9    answered appropriately?

10        A.   Yes, I understand.

11        Q.   Okay.  Also, it is perfectly acceptable to

12   tell me that you do not know the answer to my question,

13   or that you don't remember the answer to my question.

14   All right?

15        A.   Yes, I understand.

16        Q.   Okay.  Good.  Did you look at any anything to

17   prepare for the deposition today?

18        A.   No, not -- nothing today.

19        Q.   Okay.  Well, perhaps I asked the question

20   badly.  Did you look at anything to get ready for the

21   deposition?

22        A.   As far as today is concerned?

23        Q.   Yes, whether you looked at it last week or

24   yesterday or whenever to get ready for today.

25        A.   It's been over two months.

COD & Tolerton MSJ Appx. 029

Demond Luster

1    Q.   Okay.  What did you look at?

2    A.   Sat with my lawyers.

3    Q.   Okay.  And I don't want you to tell me what

4  your lawyers and you discussed.

5    A.   I didn't say -- no, sir.

6    Q.   I just want to cut you off before you do

7  that.

8    A.   No.

9    Q.   Okay.  But you did discuss with your lawyer

10  to get ready for today?

11    A.   Yes, I did.

12    Q.   Okay.  Is there anyone else you spoke to

13  other than your lawyers?

14    A.   No I hadn't.

15    Q.   Okay.  I want to go through some names to

16  make sure I have everything correct.  You're obviously

17  the brother of Desmond Luster?

18    A.   I am.

19    Q.   And for convenience sake, is it all right

20  with you if I refer to Desmond Luster just as Desmond?

21    A.   Yes.

22    Q.   Okay.  I understand that your mother is

23  Beverly Diana Luster?

24    A.   Yes.

25    Q.   She's your natural mother, your birth mother?

COD & Tolerton MSJ Appx. 030

Demond Luster

1    A.   Yes.

2    Q.   Cassandra Luster is -- was your

3 sister-in-law?

4    A.   Yes.

5    Q.   Maybe you still consider her to be your

6 sister-in-law.

7    A.   Yes.

8    Q.   D'Andra Luster would be your niece?

9    A.   Yes, it is.

10    Q.   And Desmond Luster, Jr. would be your nephew?

11    A.   Yes, he is.

12    Q.   And those are the only children of Desmond

13 Luster?

14    A.   Yes.

15    Q.   You have a daughter.

16    A.   Desiree Luster.

17    Q.   Desiree.  Thank you.  I lost that.

18    A.   Uh-huh.

19    Q.   Desiree.  Do you have any other children?

20    A.   No, I do not.

21    Q.   Prior to the 9th of February of 2015, had you

22 ever met Aaron Tolerton before?

23    A.   No, I hadn't.

24    Q.   Okay.  Do you remember -- and I'm -- in the

25 interest of time, I'm just cutting right towards some

COD & Tolerton MSJ Appx. 031

```
 1    things.

 2              After your brother was shot, you were

 3    taken to the Dallas Police Department headquarters.  Do

 4    you recall that?

 5         A.   Yes.

 6         Q.   And do you remember being interviewed at the

 7    police department headquarters?

 8         A.   Yes.

 9         Q.   Do you remember being placed in a -- in an

10    interview room and various times detectives coming in

11    to talk with you and at one point someone came in and

12    took samples, swabbings from your hands?  Do you

13    remember that?

14         A.   Yes.

15         Q.   Okay.  Do you remember the Miranda warnings

16    were given to you in that interview?

17         A.   No, I don't.

18         Q.   Okay.  I will tell you it is on the video

19    that you were given Miranda warnings.

20         A.   Okay.

21         Q.   Okay.  So if it's on the video, you wouldn't

22    dispute that it happened?

23         A.   No, I'm not.

24         Q.   Okay.  Since you don't remember being given

25    Miranda warnings, I suppose you don't remember waiving
```

COD & Tolerton MSJ Appx. 032

Demond Luster

```
 1    your rights to remain silent and going ahead and
 2    talking with the detective?
 3         A.   No, I don't recall that.
 4         Q.   Okay.  But you do recall talking with the
 5    detective?
 6         A.   I remember talking to him.
 7         Q.   Okay.  When you talked with detective -- and
 8    his name is Doug Duggan -- did you tell the complete
 9    truth?
10         A.   Yes, at...
11         Q.   Okay.  I'd like to talk with you, then,
12    directly about the burglary, Mr. Luster.  And I rely
13    partially on the complaint that your attorneys have
14    filed for you on some of this and some of it is based
15    on the interview.
16              If I say something that is not correct,
17    please correct me, okay?
18         A.   I will.
19         Q.   I want to get it right.  My understanding is
20    that there was a phone call that was given to Desmond
21    alerting him to the burglary.  Is that your
22    understanding of what happened?
23         A.   Yes.
24         Q.   Okay.  And how do -- how do you know that
25    happened?
```

COD & Tolerton MSJ Appx. 033

1      A.    Desmond and I was at my mom's house sitting

2   down trying to see who was going to eat the last piece

3   of the bacon.

4      Q.    Okay.  And that's when your brother, Desmond,

5   received a phone call on his cell phone from the alarm

6   company?

7      A.    Yes.

8      Q.    Okay.  Do you remember anything that your

9   brother, Desmond, said when he received the phone call?

10      A.    Okay.  Thank you.

11            Mom, they broke into my house again.  I

12   gotta go.

13            While he was saying that, the phone

14   rung, it was my daughter calling from the school,

15   Desiree --

16      Q.    Desiree?

17      A.    -- telling me that I need to come get her.

18            Well, I put that responsibility on my

19   mom and followed my brother, Desmond, to his residence

20   just for support and hopefully the police would have

21   got there in time.

22      Q.    Was -- what was Desmond's demeanor when he

23   got this phone call informing him that the house had

24   been burglarized again?

25      A.    Upset and disgusted.

COD & Tolerton MSJ Appx. 034

1          Q.    Kind of mad?

2          A.    Not mad, just disgusted that less than two

3     days in difference, they're back.

4          Q.    They're back.  Okay.  Kind of how you felt,

5     too?

6          A.    High-crime area, yeah.

7          Q.    My understanding is that Desmond left in his

8     truck, which was a blue pickup?

9          A.    Blue Dodge 1500.

10         Q.    And that you drove separately in your Dodge

11    Ram.  It's a Hemi, wasn't it?

12         A.    Hemi Sport, yes, it is.

13         Q.    Okay.  Do you recall anything specific that

14    your brother, Desmond, said when he got that call?  You

15    kind of told us generally.  Do you remember any

16    specific language used?

17         A.    No specific language.

18         Q.    Do you remember about what time it was he got

19    the call?

20         A.    It was about noontime, lunchtime.

21         Q.    Okay.  How long would you say -- and I -- I

22    know you weren't looking at your watch timing things,

23    but as an estimate, how long would you say it was that

24    Desmond left your mother's home after he got the call?

25         A.    Right away.

COD & Tolerton MSJ Appx. 035

Demopoulos

1    Q.    Immediately?

2    A.    Right away.

3    Q.    Okay.  Did you also leave right behind him?

4    A.    Sort of.  I actually left like a couple

5  minutes after he did.

6    Q.    Okay.  And I assume you're driving the same

7  pickup truck that you were in when you were arrested at

8  the scene?

9    A.    Same pickup truck that I got the DWI in.  It

10  had a camera in there with a Breathalyzer.

11    Q.    Right.  We'll -- we'll get to that.

12    A.    Uh-huh.

13    Q.    I'm going to show you what's been marked as

14  Deposition Exhibit No. 2.

15              (Exhibit No. 2 marked.)

16    Q    (BY MR. SCHUETTE) I ask you if you recognize

17  what is shown in Deposition Exhibit 2.

18    A.    Yes.

19    Q.    What is that?

20    A.    My black and orange customized Dodge Hemi

21  Sport with my Masonic emblem up in the window.

22    Q.    Okay.

23    A.    With a camera in the window.

24    Q.    I can kind of see that camera.  Okay.  Very

25  good.  So that's -- that's the truck we've been talking

COD & Tolerton MSJ Appx. 036

1   about, right?

2        A.    Right.

3        Q.    Okay.  Do you have an estimate of how long it

4   took you to drive from your mother, Beverly's house to

5   Desmond's house on Shadow Creek?

6        A.    I was speeding.  I don't recall.

7        Q.    Okay.  Speed limits were not the issue that

8   day?

9        A.    No.  No.

10       Q.    Do you remember what route you may have

11  taken?

12       A.    I came down Loop 12 to I-45 to Simpson

13  Stuart.  From Simpson Stuart, I turn on Bonnie View,

14  to -- down Bonnie View, I turn on Tioga, right, down

15  Tioga to Shadow Creek to his place.

16       Q.    Okay.  So what, maybe five, ten minutes?

17       A.    Give or take.

18       Q.    Okay.  Were you at all in contact with your

19  brother, Desmond, while he was driving in his truck and

20  you were driving in your truck to his house?

21       A.    Yes.

22       Q.    All right.  How did you stay in contact?

23  Cell phone?

24       A.    Cell phone.

25       Q.    Was it a constant contact on the cell phone,

1   or were you talking and then hanging up and talking and

2   then hanging up?

3        A.   No, I don't recall.

4        Q.   You don't remember.  All right.  Do you

5   remember anything of what you and he might have said to

6   each other as you were driving to his house?

7        A.   That he was going one way, and I -- I was

8   going a different way, that was last -- when he was

9   headed to his house, he went up 45 to J.J. Lemmon, that

10  way, down the service road --

11       Q.   Okay.

12       A.   -- to turn into his neighborhood.

13       Q.   Point of confusion for me, perhaps, so you

14  were definitely at your mother's house at the same time

15  that Desmond was there and got the phone call from the

16  alarm company, right?

17       A.   Yes.

18       Q.   Okay.  It wasn't that Desmond had -- excuse

19  me.

20            It wasn't that you had already left and

21  then you found out later about the alarm call?

22       A.   No.

23       Q.   Okay.  Did you and Desmond have a plan for

24  what you were going to do when you got to Desmond's

25  house?

Demoruster

```
 1            A.    Make sure everything was okay and hopefully

 2      the guys were there and wait for the police.   My mother

 3      called.

 4            Q.    All right.   Your mother had called 911?

 5            A.    911, yes.

 6            Q.    You didn't call 911?

 7            A.    I didn't call 911.   My mother called 911.

 8            Q.    You know that because she told you or because

 9      you saw her do it?

10            A.    Because she told me and plus when I was

11      walking out the house she was on the phone when I was

12      walking out.

13            Q.    All right.   Had you discussed what you were

14      going to do when you got to the house with Desmond, or

15      was what you just told me your personal plan?

16            A.    That was my personal plan.

17            Q.    So you hadn't discussed with Desmond what was

18      going to happen?

19            A.    No, I didn't.

20            Q.    When you left for Desmond's home, did you

21      have a weapon?

22            A.    Yes, I did.

23            Q.    All right.   Did you have that on you --

24            A.    No, I didn't.

25            Q.    Where was it?
```

COD & Tolerton MSJ Appx. 039

Depo of Luster

1        A.    My gun was in the middle console part of the

2    truck.

3        Q.    Okay.

4        A.    It was a .40 caliber pistol.

5        Q.    In or on?

6        A.    In the truck, inside of the truck cab, on the

7    middle console part.

8        Q.    Sitting on the console?

9        A.    Sitting on the console.

10       Q.    My understanding is that was a .40 caliber

11   Taurus?

12       A.    Yes, it is.

13       Q.    Okay.  Do you still have that weapon?

14       A.    Yes, I do.

15             (Exhibit No. 3 marked.)

16       Q    (BY MR. SCHUETTE) Mr. Luster, I'm going to

17   show you what's been marked as Deposition Exhibit

18   No. 3, so we can turn that.  Do you recognize what is

19   shown in Deposition Exhibit 3?

20       A.    Yes.

21       Q.    What is that?

22       A.    My gun.

23       Q.    That is the Taurus Model PT140 Pro, P-R-O,

24   .40 caliber semiautomatic pistol?

25       A.    Yes, it is.

COD & Tolerton MSJ Appx. 040

1      Q.   Owned by you?

2      A.   Yes.

3      Q.   All right.  And if you know, was that photo

4   taken on the 15th of February, 2015, after you were

5   arrested?

6      A.   Yes.

7      Q.   Okay.  I'm sure I already asked you the

8   question, that is the same pistol that you had with you

9   that evening?

10     A.   Yes, it is.

11     Q.   And -- and more specifically, the same pistol

12  you had with you as you headed towards your brother's

13  home?

14     A.   Yes.

15          (Exhibit No. 4 marked.)

16     Q   (BY MR. SCHUETTE) Okay.  This is somewhat

17  repetitive, but I'll show you Deposition Exhibit No. 4.

18  Do you recognize what's shown in Deposition Exhibit 4?

19     A.   Yes, I do.

20     Q.   Is that also a photograph of the same pistol

21  shown in Deposition Exhibit No. 3, but with the

22  magazine removed?

23     A.   Yes.

24     Q.   And it shows that there are live cartridges

25  in the magazine.  Would there have been live cartridges

COD & Tolerton MSJ Appx. 041

1    in the magazine when you had the weapon?

2         A.   Yes, it was a live magazine.

3                   (Exhibit No. 5 marked.)

4         Q    (BY MR. SCHUETTE) Okay.  Now I'm going to

5    show you what has been marked as Deposition Exhibit

6    No. 5.  Do you recognize what is shown in Deposition

7    Exhibit 5, Mr. Luster?

8         A.   The same .40 caliber pistol.

9         Q.   And, in fact, this is -- this shot has a

10   closeup of the serial number of the weapon; is that

11   right?

12        A.   Yes.

13        Q.   Do you recall from memory the serial number

14   of your weapon?

15        A.   No, I do not.

16        Q.   Okay.  But it does show the serial number of

17   the weapon, SDR, that's Sam David Roger, 52805?

18        A.   Yes.

19        Q.   Okay.  And this would be, of course, again,

20   the same pistol that was resting on the center console

21   of your truck at the time you were arrested?

22        A.   Yes.

23        Q.   And it's there on that console because you

24   had, at some point, placed it there; is that right?

25        A.   Correct.

COD & Tolerton MSJ Appx. 042

1      Q.    So you didn't have to retrieve that pistol

2   before you left for Desmond's house, it was already

3   sitting there?

4      A.    Yes.

5      Q.    Okay.  At some point, my understanding is

6   that you were searching the wooded area near Desmond's

7   house; is that correct?

8      A.    Correct.

9      Q.    And you had with you a pistol?

10      A.    I had that pistol in the woods, yes.

11      Q.    All right.  Could you tell the jury why you

12   decided to arm yourself as you were going through the

13   woods?

14      A.    Bad neighborhood, and in the woods.

15      Q.    Okay.  I know these will sound like stupid

16   questions, but you were not at the time, that being

17   February 2015, a law enforcement officer; is that

18   right?

19      A.    No, I wasn't.

20      Q.    You didn't hold any peace officer

21   certification?

22      A.    Not at all.

23      Q.    You were not an active duty member of the

24   armed services?

25      A.    No, I wasn't.

1        Q.   Were you licensed at that time to carry a

2   firearm under Texas law?

3        A.   Yes, I was.  I had a firearm license.

4        Q.   Okay.  You're saying you had a permit to

5   carry?

6        A.   I had a permit that I went with Desmond and

7   got, yes.  I had a permit, yes.  It was my gun, yes.

8        Q.   Well -- okay.  Perhaps we're talking about

9   two different things.  Are you familiar with the --

10        A.   Open carry law.

11        Q.   I'm not getting there yet.  About the

12   provisions in Texas law that allows someone to carry a

13   concealed weapon?

14        A.   Yes, if it belong to you, registered to you,

15   you can have it in your glove compartment, unmagazined,

16   as long as everything matches and you're not a

17   criminal.

18        Q.   I'm a little curious, then, because in your

19   interview you said that you never finished getting your

20   concealed permit because you got into some things.  Do

21   you remember saying that?

22        A.   Got the DWI.

23        Q.   Right.

24        A.   That's what stopped me.

25        Q.   Okay.  So you didn't actually have a

COD & Tolerton MSJ Appx. 044

Demond Luster

1   concealed carry permit on the day you were arrested,

2   did you?

3        A.   Not fully, no, I did not.  I had a DWI.

4        Q.   Right.  Okay.  And you said it was because

5   you got into some things.  The things would be the DWI?

6        A.   DWI, that's what I was referring to.

7        Q.   Nothing else?

8        A.   Nothing else.

9        Q.   Okay.  Did you, yourself, ever call to report

10  the burglary to 911?

11       A.   No, I didn't.

12       Q.   Now, you arrived at Desmond's home about how

13  long after Desmond got there?

14       A.   I can't even remember, man, being honest.

15  It's been two and a half years.

16       Q.   Two and a half years.  Would five to ten

17  minutes sound about right?

18       A.   Not 5 to 10, probably 15 to 20.

19       Q.   Okay.  Did you, yourself, encounter any of

20  the suspected burglars in the home?

21       A.   No, I didn't.

22       Q.   When you got there, what did you see?

23       A.   My sibling's belongings in the backyard and

24  in the woods.

25       Q.   Okay.  What kind of belongings are we talking

COD & Tolerton MSJ Appx. 045

1    about?

2         A.   His kids' clothes, gym bags, personal items.

3         Q.   Okay.  Just general personal belongings?

4         A.   Personal belongings.

5         Q.   But you didn't see the burglars carrying

6    anything?

7         A.   Did not see them carrying.

8         Q.   I know this is asking somewhat for

9    speculation, but did it appear to you that these things

10   had just been dropped?

11             MR. BENNETT:  Objection, speculation.

12        A.   No comment.

13             MR. BENNETT:  Answer the question.

14        A.   Next question.

15             MR. BENNETT:  You can answer the

16   question.

17        Q    (BY MR. SCHUETTE) You can answer.  The way it

18   works, I should have told you this, is that I ask the

19   question, if Mr. Bennett believes that there is an

20   objection, he makes the objection as he did, you go

21   ahead and answer and the judge figures out later

22   whether the question is permissible.

23        A.   Can you repeat it?

24        Q.   Sure.

25             Did it look to you, from what you saw,

1    as if the belongings, your brother's belongings, had

2    been dropped on the ground?

3              MR. BENNETT:  Objection, speculation.

4        A.    Not that I can tell as far as my memory.

5        Q    (BY MR. SCHUETTE) All right.  So once you got

6    there, what's the first thing that you did?

7        A.    First thing that I did, pulled up in his

8    driveway.

9        Q.    And after that?

10       A.    I got out my truck.  He told me that things

11   were -- they went out the back door of his home.

12       Q.    Okay.  Desmond told you this?

13       A.    Desmond told me this, yes.

14       Q.    All right.  What else did Desmond tell you?

15       A.    I walked in the house, saw where they had

16   kicked in the French doors and took out through the

17   wood area where his belonging -- his kids' stuff was,

18   gym bags, clothes, drawers.

19       Q.    How did you know that they had taken through

20   the woods as opposed to going some other way?

21       A.    Because you could see where they were running

22   through there.  The grass was kind of high and where

23   you run through woods you leave a trail, and you could

24   see they were dropping things as they were running.

25       Q.    Okay.  Very good.  Did Desmond tell you that

COD & Tolerton MSJ Appx. 047

1   they had run off into the woods?

2       A.   Desmond didn't tell me that, that they had

3   run off into the woods, you could see they ran into the

4   woods.

5       Q.   So Desmond never said that to you?

6       A.   No.  He's like, you see where they go.  Yeah,

7   that's saying, don't you see.  Yeah, I can see.

8       Q.   What -- what did you and Desmond do after

9   that?

10      A.   Well, what we done was picked up the stuff

11  that was close near his house, but as we went to

12  walking through there, we found more of his belongings

13  where they were running.

14      Q.   Through the woods?

15      A.   Through the woods.

16      Q.   Okay.

17      A.   So no, I'm not going up in no woods in

18  Highland Hills or nowhere without having armed, be it a

19  pistol, knife or whatever, I'm not going bare-handed.

20      Q.   All right.  So you went into the woods?

21      A.   I went up in the woods, that's how I knew

22  which way they ran.

23      Q.   Did you have your pistol already with you, or

24  did you have to go back to the vehicle, your truck, to

25  retrieve the pistol?

COD & Tolerton MSJ Appx. 048

Demond/uster

1     A.   So when I went in the woods, I had to go get

2   my gun to go up in the woods.

3     Q.   That's what I'm asking.

4     A.   Yes.

5     Q.   Let me ask it a different way.  When you

6   first got out of your truck at Desmond's house, did you

7   leave the pistol in the truck?

8     A.   I left my pistol in the truck.

9     Q.   So you had to go back to the truck --

10     A.   Back to get my pistol.

11         MR. BENNETT:  Let him finish the

12   question and then --

13     Q   (BY MR. SCHUETTE) Yeah.  We're getting

14   conversational, and she's going to throw something at

15   somebody, and she's probably going to pick me.

16         Okay.  So were you present when Desmond

17   had any conversation with his wife or had she not

18   arrived yet?

19     A.   Cassandra hadn't arrived at first.  She was

20   still at work on her way home.

21     Q.   All right.  So you and Desmond both went

22   through the woods?

23     A.   Yes, we did.  We both were walking through

24   the woods.

25     Q.   Did you see whether Desmond had a weapon with

COD & Tolerton MSJ Appx. 049

1    him?

2         A.   Desmond had his .40 caliber pistol with him.

3         Q.   And -- and you knew that because you saw it?

4         A.   Yes.

5         Q.   Did he have a holster, or was he just

6    carrying it around?

7         A.   He had it in his hand.

8         Q.   How about you?  Did you have a holster, or

9    did you --

10         A.   I didn't have a holster.  It was in my hand.

11         Q.   So you wander through the woods for a while.

12    Do you know if any shots were fired in the woods?

13         A.   No shots fired in the woods.

14         Q.   That you saw?

15         A.   No shots fired in the woods.

16         Q.   Okay.  Do you have any idea how long you and

17    Desmond stayed in the woods?

18         A.   We were in the woods long enough for

19    Cassandra to get home.  Went back to his house once she

20    made it.  Picking up the stuff that we could pick up.

21         Q.   All right.

22         A.   She made it from City Hall, say she had

23    called 911, asked us had the police arrived yet.  No

24    police officers.

25         Q.   Do you remember at some point Desmond being

1    on the phone before you got there telling you to hurry

2    up because he saw the guys?

3            A.    I don't really recall.

4            Q.    All right.  At some point, did you and

5    Desmond then separate?

6            A.    Yes, we did.

7            Q.    Okay.  How did that come about?

8            A.    We separated once Cassandra got to the house,

9    and we picked up the belongings that we could that was

10   close to the house, put them in the house, he told

11   Cassandra -- I told Desmond, at that time, the way I

12   was going, I could hear footsteps further up by me that

13   they were running towards Bonnie View.

14           Q.    All right.

15           A.    Because where Shadow Creek sits, it's a --

16   it's not a trail, it's a utility pole drive through

17   there where the utility trucks have to go check the

18   power surgers.

19           Q.    Okay.  Utility easement?

20           A.    Yeah.

21           Q.    All right.

22           A.    So that part of the grass was low, but then

23   right over on the -- well, if you looking at it, if

24   you're going this way, it would be to your left-hand

25   side going towards Flying J and -- well, I call it the

Demoruster

1    gym.  The old Highland Hills gym, they changed the name

2    of it, but they were running that way through the

3    woods.

4         Q.   Okay.  Did you give chase on foot?

5         A.   Man, I stopped.  I wasn't going all the way

6    too far up into those woods.  I had enough sense to

7    turn around.

8         Q.   All right.  Where was Desmond?

9         A.   When I came back out, he was walking back

10   towards -- up the little trail picking up some other

11   stuff.  I picked up a hat one of the kids had dropped

12   off their heads.  It was a winter hat, looked like one

13   of those -- like Elmer Fudd's hat, and it had sweat in

14   it.

15        Q.   That's a great description.  Everybody knows

16   what Elmer Fudd's hat looks like.  It's great.

17        A.   Exactly.

18        Q.   Okay.  So at this point y'all are picking

19   stuff up and all three of you are together momentarily?

20        A.   Cassandra stayed at the house the whole

21   while.  So we got back to his house, he gave the stuff,

22   put the stuff in their house, spoke with Cassandra.  I

23   had said what I said, they're running towards Bonnie

24   View and the Flying J area through the woods going

25   towards the gym.

Demond/uster

1      And he's, like, you sure?  I said, man,

2    when I stop I could still hear the truckling going

3    through there.  He's like, you know what, I guess I'm

4    going to drive around there, saying, and, Duke, I'm

5    going to go, it's my house, that way if the police

6    come, I can explain to the police what -- what has

7    happened at my house, and it won't put you in the

8    middle of this burglary at my house because you're on

9    probation -- well, not probation, you got a DWI, and

10    you -- you don't need any trouble.

11        Q.   Okay.  So you weren't on DWI probation, you

12    just -- you just took the straight conviction and went

13    on?

14        A.   Yeah.

15        Q.   Okay.  So Desmond gets in his truck and

16    starts driving?

17        A.   Desmond got in his blue Dodge going up Shadow

18    Creek.

19        Q.   All right.  And you stayed back?

20        A.   I stayed with Cassandra.

21        Q.   What's the next thing that happened?

22        A.   We were on the porch and me and Cassandra was

23    like, the police still ain't come yet?  I'm like, no,

24    we been here and you done made it, they still ain't

25    showed up.  Momma done called.  They still ain't come,

COD & Tolerton MSJ Appx. 053

1   and you got a police station right down the street.

2          And she's like, yeah, Duke, I don't know

3   what's taking them so long.  She's like, Lord,

4   hopefully D will spot them kids and can have the police

5   arrest them.  I said, I hope so, too.

6          And meanwhile, while I was talking to my

7   sister-in-law, my phone ring.

8     Q.   And who called you?

9     A.   It was Desmond.

10     Q.   What did Desmond have to say?

11     A.   Desmond told me, Duke, you're right, they are

12   running out of the woods, coming the way that you said

13   they were running, straight through from Shadow Creek

14   up behind the gym in the baseball diamond that's in the

15   back of the gym.

16          I say, I told you that's the way they --

17   man, I don't -- don't know for a fact, but that --

18   that's the only cut across, if not, people going to see

19   them if they done broke into your house and running.

20          He say, man, I see them.  I said, I'm on

21   my way.  I'm on my way.  Have the police showed up?

22   Nah, the law still hasn't showed.

23          I'm like, you still ain't seen the

24   police.  He say, no.  I'm still on the phone with him.

25   He's driving.  I said, well, I'm on my way up there.

COD & Tolerton MSJ Appx. 054

Demonjuster

```
 1    I -- I see them, Duke.  I see them.  I'm like, okay,

 2    maybe we can stop them and let the police get them.

 3                    Next thing I know, oh, shit, the laws

 4    are shooting at me.  I'm like, the laws?  It's the law

 5    shooting at me.

 6                    Duck, fool.  Don't get hit.  Don't let

 7    him hit you.  I'm on my way.  I'm on my way.

 8                    Dropped my cell phone, and I was

 9    driving.  The whole while I'm driving and talking to

10    Desmond he's telling me Officer Tolerton is opening

11    fire on him.

12        Q.   So he's on the cell phone with you while he's

13    being shot at by Officer Tolerton?

14        A.   Yes.

15        Q.   Okay.

16        A.   Yes.

17        Q.   Do you remember being on the phone at all

18    with -- with your daughter while you're -- while you're

19    going toward where you thought Desmond was?

20        A.   No, I wasn't.  I was on the phone with

21    Desmond the whole while.

22        Q.   Okay.

23        A.   My phone never hung up.

24        Q.   So you're heading how, then, to get to

25    Desmond?
```

Demond Luster

```
 1        A.   I left Shadow Creek, up to Tioga, down Tioga

 2   to the red light, turn right, come down the hill,

 3   swimming pool, there's the gym, as soon as you pass the

 4   gym, there used to be a little street right there they

 5   cut off, and as soon as you get to the curb there's

 6   Flying J's.  That's where I saw Desmond truck into the

 7   gate there.

 8        Q.   Mr. Luster, just a second.  Make sure -- you

 9   did not see Desmond actually chasing any of the

10   burglars in your truck -- in his truck, right?

11        A.   No, I didn't.

12        Q.   Okay.  All right.  So you see Desmond's truck

13   crashed into the gate?

14        A.   Yes.

15        Q.   Into the fence, rather?

16        A.   Into the fence, yes.

17        Q.   So you -- you hadn't discussed with Desmond

18   any particular plan?  You were just getting there

19   because he told you he was being shot at?

20        A.   Yes.  I'm trying to figure out what police

21   was shooting.  Why would they be shooting at him?

22        Q.   You don't know one way or the other, then,

23   whether Desmond had fired his weapon at these

24   juveniles?

25        A.   No.
```

COD & Tolerton MSJ Appx. 056

Demon Luster

1   Q.   Okay.  Not from what you saw or heard?

2   A.   No.

3   Q.   Okay.  Did you hear gunshots at all when you

4  were on the phone?

5   A.   No, I didn't.  Not while I was on the phone,

6  no, I didn't.

7   Q.   Do you remember being at Desmond's house and

8  hearing gunshots --

9   A.   I heard one shot when I was on...

10        MR. BENNETT:  (Indicating).  Let him

11  answer.

12   Q   (BY MR. SCHUETTE) That's okay.  No, you heard

13  one shot when?

14   A.   When I was at Desmond's residence.

15   Q.   Okay.  Did you hear it on the phone, or did

16  you just hear it with your ears?

17   A.   I heard it with my ears, but, of course, it's

18  a bad neighborhood, ain't no telling who shooting.

19   Q.   Okay.  But you heard one gunshot?

20   A.   One shot.

21   Q.   And my understanding is it takes you a few

22  minutes -- not a few minutes -- a little longer to

23  start your vehicle because you have a --

24   A.   Blow in it.

25   Q.   -- a breath alcohol --

COD & Tolerton MSJ Appx. 057

1     A.    Yeah.

2     Q.   -- lock, interlock?

3     A.    Yeah, a blower.  A blower.  A blower.

4     Q.    Right.  I'm not yelling at you, but we're

5  doing it again.  It happens all the time.  We're

6  getting conversational.  She's going to hurt us.

7              My understanding is that Desmond had

8  three weapons, at least.  He had a .40 caliber

9  semiautomatic, right?

10     A.    Correct.

11     Q.    And he had a .22 or a .25 caliber pistol?

12     A.    Correct.

13     Q.    And another .22 or .25?

14     A.    My mother's, correct.

15     Q.    Okay.  So three pistols at least?

16     A.    Yes.

17     Q.    The only one you're sure about is the .40

18  caliber Springfield that he had in his truck, right?

19     A.    Say --

20     Q.    The only one you're sure he had with him that

21  day was the .40 caliber?

22     A.    He had all three that day.

23     Q.    Oh, he had all three.  On him?

24     A.    Had them -- had it in his truck.  He was

25  going to clean my mother's and his, and we were

Deposition/Luster

1    supposed to go shoot that day.

2        Q.   Do you remember saying during your interview

3    at the police department that you heard gunshots and

4    dropped the phone in your truck?  Do you remember that

5    at all?

6        A.   I heard gunshots, but I didn't drop my phone

7    in the truck, no.

8        Q.   Okay.  And you were driving as fast as you

9    reasonably could to get to Desmond, right?

10       A.   Correct.

11       Q.   And you went toward the Flying J instead of

12   toward the gym, right?

13       A.   Came straight up Bonnie View past the

14   swimming pool and the gym to the Flying J, the same way

15   the truck is parked.

16                 (Exhibit No. 6 marked.)

17       Q    (BY MR. SCHUETTE) All right.  Mr. Luster, I'm

18   going to show you what's been marked as Deposition

19   Exhibit No. 6 and ask you if you recognize what's shown

20   in that exhibit.

21       A.   Uh-huh.

22       Q.   What is that?

23       A.   Desmond truck into the Flying J's gate into

24   their bushes, a 53-footer trailer with a rig hooked to

25   it.

COD & Tolerton MSJ Appx. 059

Demorrivister

1    Q.   Is -- is that the way that his truck appeared

2    to you as you came up on it?

3    A.   When I pulled up, that's what I saw.

4    Q.   So it truly and accurately depicts the

5    position and arrangement of the truck into the fence?

6    A.   Yes.

7    Q.   Okay.  My understanding is that you saw

8    Desmond as well?

9    A.   Yes, I did.  I talked to him until he passed

10   away.

11   Q.   What -- what was Desmond's physical position?

12   How was he situated?

13   A.   Physical, we was look -- like, I'm looking at

14   you, we were staring at one another.

15   Q.   I asked the question badly.  Was he -- was he

16   standing, or was he on the ground?

17   A.   We were laying down on the ground, face down.

18   Q.   And your brother was handcuffed?

19   A.   Handcuffed.

20   Q.   Was he already handcuffed, or did you watch

21   him get handcuffed?

22   A.   Watched him get handcuffed.  Officer Tolerton

23   put him -- put him on the ground and put me on the

24   ground, leaned on his body across his back pointing his

25   gun talking about he's going to shoot me next.  Tell

1    him I -- I'm going to shoot, I'm going to shoot.

2              My brother said, I done been hit.

3              Well, get him some damn help, that was

4    my words.  Officer Tolerton never -- he zoned out.

5         Q.   Okay.  So you saw Officer Tolerton handcuff

6    your brother, Desmond?

7         A.   Handcuffed Desmond, Desmond and I, facing one

8    another.

9         Q.   Did Officer Tolerton tell you to get out of

10   the truck, or did you get out by yourself?

11        A.   I jumped out of my own truck.

12        Q.   You just got out?

13        A.   I jumped out when I saw my brother and

14   Officer Tolerton.

15        Q.   And that's -- it was after you got out of

16   your truck on your own is when Officer Tolerton told

17   you to get on the ground?

18        A.   Get on the ground.  I'm like, what am I

19   getting on the damn ground for?  The kids are still

20   running.

21        Q.   I assume that Officer Tolerton did not tell

22   you in a calm and quiet voice to get on the ground?

23        A.   Not at all.

24        Q.   Okay.  What did he tell you?  How did he tell

25   you?

1      A.   Get on -- get on the damn ground, get on the

2    ground, get on the ground.

3      Q.   And he was yelling it, I assume?

4      A.   Get on the ground.

5      Q.   Did you --

6      A.   It was forceful.

7      Q.   Forceful?  Command voice?

8      A.   Command voice, but at that point, I didn't --

9    I couldn't care less about his command.

10     Q.   Well, did you -- did you do what he told you?

11     A.   Finally I did.

12     Q.   Is that because Officer Tolerton was telling

13   you to do it, or is it because your brother was telling

14   you to do it?

15     A.   I'm going to be honest with you, it was

16   because of my brother.

17     Q.   Okay.

18     A.   But then once I realized my brother was hit,

19   I didn't care about being on the ground.

20     Q.   Did you get back up?

21     A.   I -- I motioned to get up and I would only

22   stay because my brother begged me to stay, that

23   Tolerton had shot him.

24     Q.   So --

25     A.   But while all that's going on, Tolerton never

COD & Tolerton MSJ Appx. 062

```
1    tried to get any help.
2         Q.   What do you mean by didn't try to get any
3    help?
4         A.   Get any -- if -- if you shoot someone, are
5    you going to sit there and just let them bleed?
6         Q.   Well, that's what I'm asking you.  You're
7    saying he didn't -- he didn't call for an ambulance?
8         A.   No, he did not call for an ambulance.
9         Q.   What was he doing?
10        A.   Leaning his torso on top of Des -- on top of
11   Desmond's back, pointing the gun directly at my
12   freaking forehead.
13        Q.   Is he, Tolerton -- you're saying he's laying
14   his torso, is he lying across --
15        A.   Laying across Desmond back, pointing the gun
16   towards my forehead.
17        Q.   So -- so like Desmond's like this
18   (indicating), and he's lying across --
19        A.   Across Desmond's back, pointing the gun at my
20   forehead.
21        Q.   Okay, I understand.
22             MR. HIGH:  Hey, take your time.  Let him
23   ask the question.
24             MR. SCHUETTE:  Do you need to take a
25   break?
```

COD & Tolerton MSJ Appx. 063

1          MR. BENNETT:  Yeah.  Let's take a break.

2          MR. SCHUETTE:  Sure.  We can.

3          THE VIDEOGRAPHER:  Off the record,

4     4:58 p.m.

5          (Break taken from 4:58 p.m to 5:06 p.m.)

6          THE VIDEOGRAPHER:  Back on the record,

7     5:06 p.m.

8     Q    (BY MR. SCHUETTE) Thank you.  Mr. Luster,

9     we've had a short break.  Are you ready to proceed?

10    A.    Yes.

11    Q.    Fantastic.  All right.  My understanding is,

12    then, that when you drove up and got out of your pickup

13    truck, Officer Tolerton had not yet handcuffed your

14    brother, but he proceeded to handcuff him after you got

15    there?

16    A.    Correct.

17    Q.    All right.  Do you remember Officer Tolerton

18    keying his microphone and saying he needed backup?

19    A.    Yes, he did.  He need backup.  I have the

20    suspects.

21    Q.    Am I correct that you, yourself, did not

22    actually see your brother get shot?

23    A.    I did not actually see Tolerton shoot him.

24    Q.    When you drove up towards Desmond, was -- did

25    your pickup jump the curb?

COD & Tolerton MSJ Appx. 064

Depo of Luster

```
 1        A.   No, I -- I didn't jump the curb, I have

 2   two-inch -- two-and-a-half inch bumper, I couldn't --

 3             MR. BENNETT:  Objection, vague.

 4        A.   I couldn't jump the curb.

 5        Q    (BY MR. SCHUETTE) Okay.

 6        A.   I eased up on the curb.

 7        Q.   All right.  So you're saying you came up to

 8   the curb slowly --

 9        A.   Yes, to get my truck up there.

10        Q.   -- and then pushed over; is that right?

11        A.   Yes.

12             (Exhibit No. 7 marked.)

13        Q    (BY MR. SCHUETTE) Okay.  Mr. Luster, I'm

14   going to show you what's been marked as Deposition

15   Exhibit No. 7 and ask you if you recognize what is

16   shown in that photograph.

17        A.   Yes, I recognize it.

18        Q.   Okay.  What is shown in Deposition Exhibit 7?

19        A.   Desmond's truck full of bullet holes.

20        Q.   Does it also show your truck to the right of

21   his truck and some bit behind it?

22        A.   Yes.

23        Q.   Is that where your Dodge Ram truck came to a

24   stop?

25        A.   That's where I stopped my truck.
```

COD & Tolerton MSJ Appx. 065

1      Q.   And that's where you stopped it, not where

2   somebody else moved it?

3      A.   I stopped my truck myself right there on the

4   first picture.  I don't -- no.  My truck was here

5   (indicating).

6      Q.   You're pointing to Deposition Exhibit No. 2?

7      A.   At 2, yes.  My truck wasn't that close to his

8   truck.

9      Q.   Okay.  Of course, it's a little hard to tell

10  from perspective of distance here, but are you saying

11  that your truck would have been further away or closer?

12     A.   Further behind his.  It wouldn't have been

13  that close.

14     Q.   How fast do you think you drove up on the

15  scene?

16     A.   How fast?  Once I got to the scene, I slowed

17  down and eased up on the curve.  I couldn't -- I don't

18  recall exactly how fast.  I was coming to the scene.

19     Q.   Would you say that you were -- before you had

20  to slow down to go over the curb, that you were driving

21  more quickly than the speed limit?

22     A.   More than the speed limit.

23     Q.   Okay.  You just couldn't give us an accurate

24  number as to how fast?

25     A.   Can't give accurate.

COD & Tolerton MSJ Appx. 066

1       Q.   So your brother is telling you to follow

2  Officer Tolerton's instructions and do what he's

3  telling you to do, right?

4       A.   Yes.

5       Q.   And Tolerton has his pistol pointed at you?

6       A.   Yes.

7       Q.   You're saying that he wasn't telling you to

8  get out of the truck, you got out of the truck on your

9  own?

10      A.   I was out of -- yeah.  I got out of my own

11  truck, yes.

12      Q.   And you've told us that you obeyed the

13  officer because your brother was telling you to?

14      A.   Yes.

15      Q.   And your pistol, your Taurus, was in -- still

16  in your truck, right?

17      A.   Yes, my gun was.

18      Q.   And you had that weapon on the center console

19  between the driver and passenger seats; is that

20  correct?

21      A.   Correct.

22      Q.   You would agree that your gun was in a place

23  where you had immediate access to it, right?

24      A.   Yes.

25      Q.   Would you agree that where you had that

COD & Tolerton MSJ Appx. 067

Depo of Luster

1    pistol was in a place other than the premises where you

2    lived?

3         A.   Yes.

4         Q.   You'd agree that it was in a public place,

5    wouldn't you?

6         A.   Yes, it is.

7         Q.   Okay.

8              MR. BENNETT:  Objection,

9    mischaracterized evidence.

10             MR. SCHUETTE:  I'm sorry?

11             MR. BENNETT:  Mischaracterizes the

12   evidence.

13             (Exhibit No. 8 marked.)

14        Q    (BY MR. SCHUETTE) Mr. Luster, I'm going to

15   show you what's been marked as Deposition Exhibit No. 8

16   and ask you if you recognize what's shown in Deposition

17   Exhibit No. 8.

18        A.   The inside of my Dodge.

19        Q.   Do you see your weapon there?

20        A.   Yes, I do.

21        Q.   Do you see that the magazine has been removed

22   from the pistol?

23        A.   Yes.

24        Q.   Did you do that?

25        A.   I don't recall.

COD & Tolerton MSJ Appx. 068

49

1       Q.   Without -- without worrying about the

2   magazine itself, is the pistol where you had it when

3   you were driving?

4       A.   Yes.

5       Q.   So no one other than you put that pistol

6   there, right?

7       A.   Yes, that's where I kept it in that

8   compartment, right there.

9       Q.   Right.  But it was actually sitting on top of

10   the compartment?

11       A.   It was sitting on top.

12       Q.   So this photograph, Deposition Exhibit 8,

13   truly and accurately shows how your pistol would have

14   appeared to someone who looked inside your truck?

15       A.   Yes.

16            (Exhibit Nos. 9 and 10 marked.)

17       Q   (BY MR. SCHUETTE) Mr. Luster, I'm going to

18   show you what has been marked as Deposition Exhibit --

19   I can't talk.  Deposition Exhibits 9 and 10 and ask you

20   if you recognize what is shown in those two exhibits.

21       A.   What's shown?

22       Q.   Yes.

23       A.   First one is the bag that my .40 caliber

24   pistol, that I keep in -- keep it in.

25       Q.   You're referring to Deposition Exhibit No. 9?

1      A.   9.

2      Q.   All right.

3      A.   That's the bag I keep the gun in.

4      Q.   And it also shows the closer-up view of the

5  pistol sitting on the console, doesn't it?

6      A.   Yes.

7      Q.   Does Deposition Exhibit No. 9 truly and

8  accurately show how your pistol and the bag would have

9  appeared to someone who looked inside your truck?

10      A.   Yes.

11      Q.   And what about Deposition Exhibit No. 10.  Do

12  you recognize that as being a closer shot of your

13  pistol as it appeared on the console?

14      A.   Yes.

15      Q.   Would that also truly and accurately show how

16  your pistol would have appeared to someone who looked

17  inside your truck?

18      A.   Yes.

19      Q.   Your pistol magazine had six cartridges in

20  it, didn't it?

21      A.   I don't recall.

22      Q.   You do recall that there were cartridges in

23  the magazine, right?

24      A.   Yes.

25      Q.   And I think we've covered that the pistol was

COD & Tolerton MSJ Appx. 070

1   in plain view on the console of the truck, right?

2        A.   Yes.

3        Q.   And you were in Dallas County at the time

4   that your pistol was where it was found in your truck;

5   is that right?

6        A.   Yes.

7        Q.   And you were in Dallas County while you had

8   your pistol walking through the woods, right?

9        A.   Yes.

10       Q.   And the woods are, obviously, not your

11  premises; is that right?

12       A.   It's City property.

13       Q.   But it's not where you live?

14       A.   No.

15       Q.   Am I also correct that you had three .40

16  caliber cartridges in your right pant pocket the night

17  you were arrested?

18       A.   I don't recall.

19            (Exhibit No. 11 marked.)

20       Q   (BY MR. SCHUETTE) I'll show you what's been

21  marked as Deposition Exhibit No. 11, ask you if those

22  appear to be the cartridges that you would have had for

23  your .40 caliber weapon?

24       A.   Yes, they are.

25       Q.   Okay.  That exhibit would truly and

1    accurately show what those cartridges look like, right?

2         A.    Uh-huh.

3         Q.    My understanding is that you had

4    approximately eleven .40 caliber cartridges and a $100

5    bill in the pouch that was inside of your truck shown

6    in Deposition Exhibit 9 as sitting on the seat.

7         A.    A $100 bill?

8         Q.    Yes.

9         A.    I don't remember having any money.

10                  (Exhibit No. 12 marked.)

11        Q     Okay.  Let me show you Deposition Exhibit

12   No. 12 and ask you if you recognize that as being your

13   pouch first?

14        A.    That is my pouch.

15        Q.    And do you recognize those cartridges as

16   being .40 caliber cartridges for your weapon?

17        A.    Yes, it is.

18        Q.    And you're saying you just don't remember

19   having the $100 bill in the pouch?

20        A.    No, I do not.

21        Q.    Okay.

22        A.    I got -- I didn't have any money.  Just a

23   gun.  Sticky fingers.

24        Q.    I guess so.

25                  In your interview, Mr. Luster, I'm sure

COD & Tolerton MSJ Appx. 072

```
1    you recall that at one point Detective Duggan informed

2    you that your brother did not make it.

3         A.   Correct.

4         Q.   Do you recall that?  Okay.

5              You agree with me that you became a

6    little upset?

7         A.   Yes, but before Detective Duggan told me

8    that, when I was sitting in Officer Blanchard car --

9         Q.   Right.

10        A.   -- handcuffed, it popped up on the computer

11   screen, before he left Bonnie View, that he was

12   deceased.

13        Q.   Okay.  So you're saying that when you were --

14   before you were taken to the Dallas Police Department

15   to give --

16        A.   Not the police -- I was at headquarters.  I

17   didn't go to Frank Crowley.

18        Q.   No, I don't mean to say Frank Crowley.  I'm

19   talking about the Dallas Police Department

20   headquarters.

21        A.   Okay.  Yes.

22        Q.   Before you were interviewed, before you were

23   taken there, you're saying that you were in a police

24   car handcuffed?

25        A.   Yes.
```

1       Q.   And you could see the -- what's called the

2   mobile data terminal screen in the police car?

3       A.   Yes, as they typing in his information.

4       Q.   All right.  And you're saying that you saw on

5   the MDT, the mobile data terminal, screen that your

6   brother had died?

7       A.   And Officer Blanchard, after he came in,

8   Officer Blanchard had the computer up as all the

9   information came in, and she said it -- closed it

10  somewhat, not all the way, and said, I'm sorry.

11          That was probably the only nicest thing

12  that I had heard all that day.

13      Q.   You're saying this happened before you were

14  taken to headquarters?

15      A.   Before I was even taken to headquarters.

16  They didn't even try to work on him in the EMT, in the

17  back of the ambulance.  They just had him, didn't cover

18  him up, left him there like he was just heat exhausted.

19      Q.   Okay.  In your interview you said, "I told

20  that bastard to run his ass over."  Do you remember

21  saying that?

22      A.   I don't -- at that point, I was all over the

23  place.  I probably said that, I don't recall, though.

24      Q.   Okay.  Would that mean that sitting here

25  today you don't know who the -- the bastard would refer

COD & Tolerton MSJ Appx. 074

Demor/Luster

1    to?  When you say, "I told that bastard," you don't

2    know who "that bastard" is?

3         A.   I don't know what exactly what bastard,

4    probably the bastard kids.

5         Q.   And that -- okay.  So "I told that bastard to

6    run his ass over," you think the bastard referred to

7    the kids?

8         A.   Run his ass down.  I probably did say it, but

9    I wasn't referring to Officer Tolerton.

10        Q.   No?  Okay.  That's all you remember about

11   that?

12        A.   That's all I remember about that.

13        Q.   Okay.  Mr. Luster, I'd like to ask you about

14   a couple of things that are in the complaint that has

15   been filed on your behalf by your attorneys, and one of

16   them is in paragraph 75 of the complaint.

17              MR. SCHUETTE:  Do you gentlemen have a

18   copy of your complaint handy?

19              MR. HIGH:  No.

20              MR. SCHUETTE:  All right.  Let me pass

21   that to you, Don.

22              MR. HIGH:  Thank you.

23        Q    (BY MR. SCHUETTE) I'm going to -- I'm going

24   to read paragraph 75 to you, Mr. Luster, and then I'm

25   going to have some questions for you about it.  All

```
 1    right?

 2         A.    Uh-huh.

 3         Q.    "75, purposeful discrimination.  Defendant's

 4    actions demonstrate that before his death, Decedent

 5    Desmond Luster and Damon Luster, were victims of

 6    purposeful discrimination either because of their race

 7    and gender or due to an irrational or arbitrary state

 8    classification unrelated to a legitimate state

 9    objective."

10              Okay.

11         A.    Uh-huh.

12         Q.    Now, I'm not asking you to digest all that, I

13    want to take it in small bites.  Do you believe that

14    you were subjected to discrimination because of your

15    race?

16         A.    I don't feel that I was discriminated because

17    of my race.

18         Q.    Okay.

19         A.    No.

20         Q.    Okay.  Do you feel that you were subjected to

21    discrimination because of your gender?  And I -- maybe

22    that interchanges for sex, your being male?

23         A.    I believe, you know, if you're a large male,

24    that, yeah, it's kind of intimidating to one that's not

25    as large.
```

1     Q.   Right.  But what I'm asking you is do -- do

2 you -- do you believe that anyone involved in this

3 debacle discriminated against you because you are a

4 man?

5     A.   Discriminated against me as a man?

6     Q.   Yeah, because you're a man.

7     A.   As I just said, a minute ago, sir.

8     Q.   Is that no?

9     A.   I gave the answer that I could give.

10     Q.   Do you think that you were classified in any

11 particular way that resulted in you being treated

12 unfairly, that you were put into some pigeonhole?

13     A.   Yes, I do.

14     Q.   And what is -- what would that be?

15     A.   Police officers just doing whatever they want

16 to do and hiding behind the badge.

17     Q.   Okay.  So you're saying that the police --

18 it's not that you were categorized as something, but

19 just the police officers do whatever it is they want to

20 do?

21     A.   Police officers do whatever they want to do

22 and hide behind their badge, sir.

23     Q.   Okay.

24          MR. SCHUETTE:  If I could have just a

25 minute with Stefani, I think I'm about done.

1          MR. BENNETT:  Sure.

2              THE VIDEOGRAPHER:  Off the record,

3    5:22 p.m.

4              (Break taken from 5:22 p.m. to 5:26 p.m.)

5              THE VIDEOGRAPHER:  Back on the record,

6    5:26 p.m.

7        Q   (BY MR. SCHUETTE) Mr. Luster, we've taken a

8    short break.  Are you ready to proceed?

9        A.   Yes, I am.

10       Q.   Fantastic.  Do you recall seeing Officer

11   Tolerton performing life saving measures on your

12   brother?

13       A.   No, sir, Officer Tolerton didn't.

14       Q.   You're saying he never did any --

15       A.   No.

16       Q.   -- CPR or anything?

17       A.   No, sir, he didn't.

18       Q.   Okay.  When you were in the interview room

19   the night that you were placed under arrest, do you

20   remember being told that you were going to be charged

21   with the crime of unlawful carrying of a weapon?

22       A.   I don't even recall, man.  I -- to be honest

23   with you, I lost it once I knew my brother was gone.

24       Q.   Okay.

25       A.   That was my -- my brother, my friend, my

COD & Tolerton MSJ Appx. 078

1   father once my father left, helped a lot of different

2   kids in the neighborhood, always doing the right thing.

3               And quite frankly, I feel like if things

4   were different, and we could replay the whole scene,

5   maybe Officer Tolerton would have probably proceeded to

6   try to do CPR or render the aid instead of just being

7   irate and out of control and saying I have the

8   suspects.

9               I had a -- I had Officer Tolerton

10  pointing his .40 caliber pistol at my forehead.  When

11  the other officers showed up, I got a 12 gauge shotgun

12  put at the back of my head, watching my brother die,

13  not just my brother, my -- my everything.  We done

14  everything together.  As you can tell by the pictures,

15  we worked at the same place, we drove the same type

16  vehicles, you know, it's just, hey...

17       Q.   So -- so you, sitting here today, you don't

18  remember the sequence where you're told that you were

19  going to be charged with unlawfully carrying a

20  weapon --

21       A.   No, I do not.

22       Q.   -- and then later told that you weren't going

23  to be charged?

24       A.   No, I do not.  I do not recall.

25       Q.   All right.  So you don't remember being --

COD & Tolerton MSJ Appx. 079

Demon Luster

1    no, never mind.

2         A.   I just wanted to call my family and wasn't

3    able to.

4         Q.   Okay.  Do you -- do you know why it was that

5    officers pointed weapons at you in this scene?

6              MR. BENNETT:  Objection, calls for

7    speculation.

8         Q    (BY MR. SCHUETTE) It's a yes or no.  Do you

9    know?

10        A.   No, I do not.

11        Q.   Okay.  Mr. Luster, thank you very much for

12   being here.  You've been very patient with my

13   poorly-worded questions, and I'd like to ask you,

14   finally, if there's anything as you sit here right now

15   that you would like to correct or explain something

16   about your testimony you think maybe you didn't say

17   very well, I'd like to give you the opportunity to do

18   that.

19        A.   All I would like to say is my brother asked

20   me to tell the story and tell it to my best ability of

21   what happened with his situation.

22              I just want closure for my family.  I

23   just want closure.

24        Q.   Okay.

25        A.   I want closure.  And, unfortunately, I -- I

1    hate it that it actually happened, but life goes on,

2    but I just want closure for my brother's death.

3                    MR. BENNETT:  Objection, vague.

4                    MR. SCHUETTE:  Okay.  I pass the

5    witness.

6                    MR. JONES:  Reserve.

7                    MR. BENNETT:  Reserve.

8                    MR. SCHUETTE:  Okay.  Mr. Luster, thank

9    you.

10                    THE VIDEOGRAPHER:  Concluding the

11   deposition at 5:30.  Off the record.

12                    (Deposition concluded at 5:30 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

COD & Tolerton MSJ Appx. 081

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3  CASSANDRA LUSTER,           )
    INDIVIDUALLY AND A/N/F      )
 4  OF _____, A MINOR CHILD;)
    DAMON LUSTER; DESMOND       )
 5  LUSTER, JR., BEVERLY DIANA)
    LUSTER, INDIVIDUALLY AND    )
 6  AS ADMINISTRATOR OF THE     )
    ESTATE OF DESMOND           )
 7  LUSTER, SR.,                )  CASE NO.:  3:16-cv-00396-B
                                )
 8        Plaintiffs,           )
                                )
 9  VS.                         )
                                )
10  CITY OF DALLAS, et al,      )
                                )
11        Defendants.           )

12                    REPORTER'S CERTIFICATION

13                  DEPOSITION OF DAMON LUSTER

14                      NOVEMBER 17, 2017

15

16       I, Ashley Gattenby, Certified Shorthand Reporter

17  in and for the State of Texas, hereby certify to the

18  following:

19       That the witness, DAMON LUSTER, was duly sworn by

20  the officer and that the transcript of the oral

21  deposition is a true record of the testimony given by

22  the witness;

23       I further certify that pursuant to the FRCP Rule

24  30(f)(1) that the signature of the deponent:

25       __X__ was requested by the deponent or a party
```

1    before the completion of the deposition and returned

2    within 30 days from date of receipt of the transcript.

3    If returned, the attached Changes and Signature Page

4    contains any changes and the reasons therefor;

5        ____ was not requested by the deponent or a party

6    before the completion of the deposition.

7        I further certify that I am neither attorney nor

8    counsel for, related to, nor employed by any of the

9    parties to the action in which this testimony was

10   taken.

11       Further, I am not relative or employee of any

12   attorney of record in this case, nor do I have a

13   financial interest in the action.

14       Subscribed and sworn to on this 4th day of

15   December, 2017.

16

17   _____
     Ashley Gattenby, CSR, RPR
18   Texas CSR #8347
     Expiration Date:  12/31/2018
19   Lexitas - Dallas
     Firm Registration No. 459
20   6500 Greenville Avenue, Suite 445
     Dallas, Texas 75206
21   (214)373-4977

22

23

24

25

COD & Tolerton MSJ Appx. 083

**PLACEHOLDER:  ENVELOPE  FOR**

**COMPUTER  VIDEO  DISC**



United States District Court
Northern District of Texas
Dallas Division
Cassandra Luster et al. v. City of Dallas et al.
No. 3:16-cv-0396-B

L16-0172

City & Tolerton
MSJ Appx.  085

Beverly Diana Luster-Brown

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION
 3
    CASSANDRA LUSTER,            )
 4  INDIVIDUALLY AND A/N/F       )
    OF _____, A MINOR CHILD;  )
 5  DAMON LUSTER; DESMOND        )
    LUSTER, JR., BEVERLY DIANA   )
 6  LUSTER, INDIVIDUALLY AND     )
    AS ADMINISTRATOR OF THE      )
 7  ESTATE OF DESMOND            )
    LUSTER, SR.,                 )  CASE NO.:  3:16-cv-00396-B
 8                               )
        Plaintiffs,              )
 9                               )
    VS.                          )
10                               )
    CITY OF DALLAS, et al,       )
11                               )
        Defendants.              )
12        _____
13             ORAL AND VIDEOTAPED DEPOSITION OF
14                 BEVERLY DIANA LUSTER-BROWN
15                     NOVEMBER 17, 2017
16        _____
17             ORAL DEPOSITION OF BEVERLY DIANA
18  LUSTER-BROWN, produced as a witness at the instance of
19  the Defendant, and duly sworn, was taken in the
20  above-styled and numbered cause on November 17, 2017,
21  from 1:52 p.m. to 4:11 p.m., before Ashley Gattenby,
22  CSR, RPR in and for the State of Texas, reported by
23  machine shorthand, at Ted B. Lyon & Associates, P.C.,
24  18601 LBJ Freeway, Suite 525, Mesquite, Texas 75150,
25  pursuant to the Federal Rules of Civil Procedure.
```

COD & Tolerton MSJ Appx. 086

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3        Mr. Charles Bennett
          TED B. LYON & ASSOCIATES, P.C.
 4        18601 LBJ Freeway, Suite 525
          Mesquite, Texas 75150
 5        (972)279-6571
          (972)279-3021 Fax
 6        cbennett@tedlyon.com

 7   and

 8        Mr. Don High
          ATTORNEY AT LAW
 9        816 Greylyn Drive
          Plano, Texas 75075
10        (214)499-5677

11   FOR THE DEFENDANT, PILOT TRAVEL CENTERS, LLC:

12        Mr. Michael B. Jones
          CANTERBURY, GOOCH, SURRATT, SHAPIRO, STEIN,
13        GASWIRTH & JONES
          4851 LBJ Freeway, Suite 301
14        Dallas, Texas 75244
          (972)239-7493
15        (972)490-7739 Fax
          mjones@canterburylaw.com
16
     FOR THE DEFENDANTS, CITY OF DALLAS AND AARON TOLERTON:
17
          Mr. Jason G. Schuette
18        Ms. Stefani Williams
          DALLAS CITY ATTORNEY'S OFFICE
19        1500 Marilla Street, Suite 7DN
          Dallas, Texas 75201
20        (214)670-1236
          (214)670-0622 Fax
21        jason.schuette@dallascityhall.com
          stefani.williams@dallascityhall.com
22
     ALSO PRESENT:
23
          David Guerra, Videographer
24

25
```

COD & Tolerton MSJ Appx. 087

Beverly Diana Luster-Brown                                    3

```
 1                          INDEX

 2                                                    PAGE

 3   Appearances                                         2

 4   BEVERLY DIANA LUSTER-BROWN
          Examination by Mr. Jones                       4
 5        Examination by Mr. Schuette                    44

 6   Reporter's Certificate                             94

 7
                          EXHIBITS
 8   NO.           DESCRIPTION                        PAGE

 9   Exhibit 1....................................... 4
          Notice of Deposition
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COD & Tolerton MSJ Appx. 088

Beverly Diana Luster-Brown

```
 1                    (On the record at 1:52 p.m.)

 2                    (Exhibit No. 1 marked.)

 3                    THE VIDEOGRAPHER:  On the record,

 4      1:52 p.m., November 17th, 2017, for the deposition of

 5      Beverly Diana Luster in the matter of Cassandra Luster

 6      et al versus The City of Dallas, et al.

 7                    Counsel, please state your appearances,

 8      and the court reporter will then administer the oath.

 9                    MR. JONES:  Michael Jones on behalf of

10      the defendant, Pilot Travel Centers, LLC.

11                    MR. SCHUETTE:  Jason Schuette, Dallas

12      City Attorney's Office for the defendants, City of

13      Dallas and Aaron Tolerton.

14                    MS. WILLIAMS:  And Stefani Williams,

15      also for the City of Dallas and Aaron Tolerton.

16                    MR. HIGH:  And Don High for the

17      plaintiffs, and Chuck Bennett is outside the room.  He

18      may come in from time to time, but for the most part

19      he'll be outside the room.

20                    BEVERLY DIANA LUSTER-BROWN,

21      having been duly sworn, testified as follows:

22                         EXAMINATION

23      BY MR. JONES:

24          Q.   Good morning, Ms. Luster.

25          A.   Good morning.
```

```
 1    some scratch-offs, because I scratch tickets.  And --

 2         Q.   You're talking about lottery scratch-offs?

 3         A.   The lottery scratch-offs.

 4         Q.   All right.

 5         A.   And he said, momma, look at these.  And I

 6    said, those are my tickets.  I knew I had some tickets.

 7                   No, I bought these.

 8                   And so he -- I said, you don't even know

 9    how to play the tickets, but he's scratching the

10    tickets.

11                   Oh, this one is a winner.

12                   I said, D, those are my tickets from

13    last night.  No, they're not, momma.  And he was just

14    laughing, and we were having a good time.  Then his

15    phone rings.

16                   Duke's been gone now maybe two or three

17    minutes and his phone ring.  What?  And I'm like, oh,

18    my God.  I'm just thinking Duke's had a wreck,

19    something's awry, you know, because he's screaming.

20    Duke just left.

21                   He jumps up and he starts grabbing and,

22    momma, I got to go.

23         Q.   Let me stop you for just a moment.  First, I

24    assume when you say the phone rang, you're referring to

25    your son, Desmond's cell phone?
```

Beverly Diane Juster-Brown

```
 1        A.   His cell.

 2        Q.   All right.  And the attitude that you saw

 3   him, was it -- and I'm not trying to put words in your

 4   mouth, I'm going to give you examples.  Was it shock,

 5   was it surprise, was it anger, what -- what were you

 6   sensing from him when he got this phone call?

 7        A.   Probably a combination of all.  He was

 8   frustrated.  He could not believe it.  He was in awe.

 9   He pushed the chair back, and he jumped up and he's

10   still talking on the phone.  And I'm saying, D, what,

11   what, what, D.

12             So when he hangs up the phone, he's

13   headed toward the door.  And I said, D, what is it?  He

14   said, momma, they done went right back in my house.

15             I said, oh, my God, son.  Let me put my

16   britches on.  And he's like, momma, I ain't got time to

17   wait on you.  I said, okay, okay, D, wait.  And he --

18   I'm trying to go down the hall to get some pants to put

19   on, he's going out the door.  I hear the door shut,

20   then I hear the truck, and he's gone.

21             I'm still trying to put my clothes on,

22   then my cell phone rings.

23        Q.   Let me stop you for just a moment.  What I'm

24   hearing from what you just described is that you knew

25   what your son Desmond was talking about when he said
```

Beverly Diane Luster-Brown

```
 1    actually leaving the house because Sand had to go to
 2    work, Cassandra.  The kids had to go to school.  He was
 3    supposed to have some kind of meeting that morning
 4    with -- to do a warrant or something, but it was
 5    canceled.  That's how he ended up coming to my house,
 6    and he had a doctor's appointment that day at 1:00.
 7         Q.   The day of the burglary?
 8         A.   The day --
 9         Q.   The second burglary?
10         A.   The day of the second burglary.
11         Q.   All right, ma'am.  Thank you.
12         A.   Yeah.
13         Q.   So going back, then, to -- we kind of
14    diverted and that's fine.  So your son, Desmond, got
15    the call from the alarm company about the second
16    break-in, he left, you heard the door close and you
17    were getting some clothing on.
18         A.   Yes.
19         Q.   I think that's where we left.
20         A.   Yes.
21         Q.   What's the next thing that happened?
22         A.   My cell phone rings, it's Duke.  Momma, where
23    my brother going?  He just shot past me like a crazy
24    man.  I said, they broke in his house again, D'Shaun.
25    He said, I knew something was up.
```

1          I'm going to follow my brother because

2   I'm not letting him go over there by himself, momma.  I

3   said, well, I thought you were going to the school to

4   get Desiree.  He said when you get your britches on,

5   you go get Desiree.  I'm going with my brother.  I'm

6   not letting him go out there by himself.

7          I said, cool, as soon as momma get the

8   baby, I'll be there.

9      Q.   And going there would have been the house on

10  Shadow Creek?

11     A.   Yes.

12     Q.   All right.  So you had that cell phone

13  conversation with your brother, Damon?

14     A.   Yes.

15     Q.   What happened then?

16     A.   I go to Skyline.  I get Desiree.  I get back

17  in the car.  My cell phone rings, it's DD.

18     Q.   Your son, Desmond?

19     A.   Yes.  Mom, these boys ran out my back door,

20  they got these sacks full of my shit.

21     Q.   It's all right.

22     A.   And they running out the back of my house.

23  And I was like what, what, because I'm driving and the

24  reception is bad.  And then he's talking, and I said, I

25  didn't hear.  And so he comes back in and he said shot.

```
 1              I said, oh, my god, DD, you didn't shoot
 2   those children, did you?  He said, no, momma, I ain't
 3   shoot nobody.  You know, the kids dropped the stuff and
 4   run off into the woods or something, the wilderness
 5   stuff over here behind his house.
 6              And I said, okay, momma's on the way.
 7   And we're on the phone talking and we're talking.  Then
 8   he says, momma, I got to let you go.
 9              And I said, well, D, hold on, hold on,
10   hold on.  He said, momma, I'm going to call you back.
11              So I'm driving with Damon's daughter,
12   Duke, and I said, call your daddy.
13       Q.   You said that to Desiree?
14       A.   Desiree.  Desi, call your daddy.  So she
15   calls her dad.  By now, we're probably on Simpson
16   Stuart and 45.  And he answers, and I said, Duke, where
17   is your brother?  He said, momma, they had -- I said,
18   he told me about the stuff, and he was talking about
19   they had the four bags of the stuff and ran out the
20   house and they ran through these woods, and it's a
21   trail, and they got to be running up toward Bonnie
22   View.
23              Did you call the police?  Yeah, we
24   called the police already.  I said, the police haven't
25   got there yet.  He said, no, momma.  I said, well,
```

Beverly Diane Luster-Brown

1    Q.   Okay.

2    A.   No, I didn't look for a badge.  I was just

3    trying to get his attention, which he never

4    acknowledged me, so...

5    Q.   I would have been shocked beyond belief if

6    you'd been able to identify --

7    A.   Yeah.

8    Q.   -- his number.

9    A.   No.  No, I didn't.

10   Q.   Okay.  So you continued onward, then, to your

11   son, Desmond's house?

12   A.   Home, yes.

13   Q.   Yes.

14   A.   When I got there, Cassandra was on the porch,

15   D'Shaun was gone and D was gone.

16        I said, Sand, where are the boys?  She

17   said, after they -- the boys dropped the stuff in the

18   ally, Di.  D picked it up, he set it in the house, then

19   he got in his truck and he drove around here, and him

20   and Duke was talking, and they was saying that the boys

21   probably were going through that trail and that trail

22   leads to that rec center on Bonnie View.

23        And I said, where are the police?  She

24   said, the police has not gotten here.  I said, well,

25   okay, call them again.  Di, I've -- I said, okay, call

Beverly Diane Luster-Brown

1   them again.  She didn't want to, so I called.

2         Q.   You made a 911 call?

3         A.   Yes.  And so when she answered, I was trying

4   to explain that my son's home was burglarized.  He came

5   to the house and the intruders were still inside.  They

6   ran out.  They broke through the woods running.  He was

7   trying to keep up with where they are.

8              I don't know anything.  No police have

9   shown up.  I have come from across town.  There's a

10  police station at the end of the street.  I've come

11  from Pleasant Grove to Highland Hills, or whatever this

12  is called, the police is down there on Simpson Stuart

13  and there was still no police there.  I don't know

14  where my sons are.

15             Well, ma'am, what kind of truck?  So I

16  explained the truck.  Well, ma'am, do you -- I said,

17  no, ma'am, I don't know the license plate.

18             Well, what are their names?  I gave her

19  Desmond Luster, Sr.  Well, which truck is he in?  The

20  blue Dodge Ram.  Well, ma'am, do he have a gun?  He's a

21  process server.  He has a license.  I don't know if his

22  gun is in the truck with him or not, but it's a

23  possibility.  He serve warrants every day.

24        Q.   Let me stop you for just a moment.  So when

25  your son, Desmond, was at your home just prior to this,

school, and by now the house is full of family. Most of the police are gone. Eventually they all left. D'Shaun's wife shows up.

Q. I'm sorry. What's her name?

A. Angela.

Q. Angela. Thank you.

A. And she wants to know where D'Shaun is, and I can't tell her. I don't know. She said, oh, God, momma, what if they've done something to him, too.

And, of course, I tried to reassure her that they wouldn't, but it's hard to reassure someone of something you don't believe.

Q. Of course, you now know that he was just being questioned?

A. What I do know is when they brought him home, he called, he said, momma, where are you? Are you-all at the dollhouse -- which is my house -- or are you still at my brother's house?

I said, we're at your brother's house. He said, okay, the police are going to bring me. I said, where are you? He said, momma, I'll talk to you when I get there.

MR. HIGH: I can't hear you. I can't hear you.

A. I asked him where was he. He said, momma,

```
 1    I'll talk to you when I get there.  I said, okay.

 2               So I go outside, and I tell all of his

 3    cousins, which he had been mentor -- a mentor to,

 4    because they're huge and they're big and they're tall,

 5    and I didn't want to create any other situation where

 6    somebody may be afraid and do something unnecessary.

 7    So I asked them to all go up to the house, get off the

 8    curb, police are bringing D'Shaun home.  They're

 9    bringing us to -- him to here.

10               So they were all sitting back.  I was

11    pacing outside.  I finally saw the police car coming

12    down the street.  And so when I saw the police car, it

13    came and it passed D's house, and it U-turned and it

14    stopped at the end of the street at the corner.

15               And I'm like, okay, do they not know

16    where the house is?  So all my little nephews and great

17    nephews jump up, and they're going to follow me.  I

18    said, no, don't come out of that yard, auntie will be

19    back.  I'm going down here by myself.

20               And so I start down the street to try to

21    see if my baby boy was okay, and as I'm walking down

22    the street, an officer gets out of the car, stop right

23    there, we'll bring him to you.  I'm like, what?  Dear

24    God.  So I stopped.

25        Q.   So you're out in the street at this point?
```

1      A.    In the street.  When they take my son off,

2   he's got on some kind of paper shirt.  I'm like, Duke,

3   where is your clothes?  They walk him down there where

4   I -- and then they unhandcuff him.  By now he's just in

5   a state of shock.  He's not half talking.

6                 I don't know.  It was like -- I don't

7   know.  He was like -- like it lost his mind -- he

8   just -- he was out of it.  And it was just tears and

9   tears and more tears.  And then he said, they

10  handcuffed my brother after they shot him and they laid

11  him on the ground and didn't try to give him any help,

12  momma.

13     Q.    I'm sorry, ma'am.  I couldn't understand you.

14     A.    They handcuffed my brother, and they laid him

15  on the ground, and I kept telling him he needed help.

16  They didn't get him any help, momma.  And then they

17  pulled the guns on me, momma.  And my brother laid

18  there and died, momma.

19                He still to this day has nightmares, and

20  I've sought counseling for all of my family.

21     Q.    I want to try and pick up -- I appreciate

22  what you're saying, but I want to try and follow where

23  we were.

24                MR. HIGH:  Can we take a five-minute

25  break?

COD & Tolerton MSJ Appx. 099

Beverly Diana Luster-Brown

1                MR. SCHUETTE:  Absolutely.

2                MR. HIGH:  Let's take a five-minute

3  break.

4                THE VIDEOGRAPHER:  End of file 2.  Off

5  the record, 3:39 p.m.

6              (Break taken from 3:39 p.m. to 3:54 p.m.)

7                THE VIDEOGRAPHER:  Start of file 3.

8  Back on the record, 3:54 p.m.

9     Q   (BY MR. SCHUETTE) Ms. Luster, we've had a

10  short break.  Are you ready to go forward?

11     A.   Yes.

12     Q.   Okay.  If you need another break, you let us

13  know.

14           Before we broke, I was asking you about

15  when you were meeting your son, Damon, in the street.

16  And if you could tell us, then what happened after your

17  son, Damon, got out of the police car and approached

18  you.  You said he was crying.

19     A.   He was crying, and he walked to me and I

20  hugged him, and I just hugged him and kissed him.  And

21  we walked to D's house and his wife and his daughter

22  was there waiting and other family members and our

23  minister and his family.

24     Q.   That's the Reverend Parish --

25     A.   Yes.

COD & Tolerton MSJ Appx. 100

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3   CASSANDRA LUSTER,          )
     INDIVIDUALLY AND A/N/F     )
 4   OF _____, A MINOR CHILD;)
     DAMON LUSTER; DESMOND      )
 5   LUSTER, JR., BEVERLY DIANA )
     LUSTER, INDIVIDUALLY AND   )
 6   AS ADMINISTRATOR OF THE    )
     ESTATE OF DESMOND          )
 7   LUSTER, SR.,               )  CASE NO.:  3:16-cv-00396-B
                                )
 8        Plaintiffs,           )
                                )
 9   VS.                        )
                                )
10   CITY OF DALLAS, et al,     )
                                )
11        Defendants.           )

12                     REPORTER'S CERTIFICATION

13          DEPOSITION OF BEVERLY DIANA LUSTER-BROWN

14                      NOVEMBER 17, 2017

15

16        I, Ashley Gattenby, Certified Shorthand Reporter

17   in and for the State of Texas, hereby certify to the

18   following:

19        That the witness, BEVERLY DIANA LUSTER-BROWN, was

20   duly sworn by the officer and that the transcript of

21   the oral deposition is a true record of the testimony

22   given by the witness;

23        I further certify that pursuant to the FRCP Rule

24   30(f)(1) that the signature of the deponent:

25        _____ was requested by the deponent or a party
```

COD & Tolerton MSJ Appx. 101

1    before the completion of the deposition and returned

2    within 30 days from date of receipt of the transcript.

3    If returned, the attached Changes and Signature Page

4    contains any changes and the reasons therefor;

5        __X__ was not requested by the deponent or a party

6    before the completion of the deposition.

7        I further certify that I am neither attorney nor

8    counsel for, related to, nor employed by any of the

9    parties to the action in which this testimony was

10   taken.

11       Further, I am not relative or employee of any

12   attorney of record in this case, nor do I have a

13   financial interest in the action.

14       Subscribed and sworn to on this 4th day of

15   December, 2017.

16

17   _____
                    Ashley Gattenby, CSR, RPR
18                  Texas CSR #8347
                    Expiration Date:  12/31/2018
19                  Lexitas - Dallas
                    Firm Registration No. 459
20                  6500 Greenville Avenue, Suite 445
                    Dallas, Texas 75206
21                  (214)373-4977

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CASSANDRA LUSTER,                    )
INDIVIDUALLY and A/N/F OF            )
_____ A MINOR CHILD,           )
DAMON LUSTER, DESMOND                )
LUSTER JR.; and BEVERLY              ) CIVIL ACTION NO.
LUSTER, INDIVIDUALLY AND             ) 3:16-CV-0396-B
AS ADMINISTRATOR OF THE              )
ESTATE OF DESMOND LUSTER,            )
SR.,                                 )
          Plaintiffs,                )
                                     )
v.                                   )
                                     )
THE CITY OF DALLAS, ET               )
AL,                                  )
          Defendants.                )
                                     )

**********************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
CRAIG RIGTRUP
NOVEMBER 21, 2017
**********************************************************

          ORAL AND VIDEOTAPED DEPOSITION OF CRAIG RIGTRUP
produced as a witness at the instance of the DEFENDANTS,
and duly sworn, was taken in the above-styled and
numbered cause on the 21st of November, 2017, from 10:07
a.m. to 12:47 p.m., before Leslie McDonald Wilkins,
registered professional reporter, reported by machine
shorthand, at Ted B. Lyon & Associates, P.C., Town East
Tower, Suite 525, 18601 Lyndon B. Johnson Freeway,
Mesquite, Texas, 75150, pursuant to the Federal Rules of

COD & Tolerton MSJ Appx. 103

CRAIG RIGTRUP  11/21/17

Page 2

1    Civil Procedure and the provisions stated on the record

2    or attached hereto.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COD & Tolerton MSJ Appx. 104

CRAIG RIGTRUP  11/21/17

Page 3

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4        Charles A. Bennett
         TED B. LYON & ASSOCIATES

5        18601 Lyndon B. Johnson Freeway, Suite 525
         Mesquite, Texas 75150

6

7    FOR THE DEFENDANTS:

8        Jason G. Schuette
         SENIOR ASSISTANT CITY ATTORNEY

9        City Attorney's Office
         City of Dallas

10       1500 Marilla, 7DN
         Dallas, Texas 75201

11

12   ALSO PRESENT:

13       Mr. Logan R. Adcock, Attorney for Defendant Pilot
                 Travel Centers, LLC

14       Mr. Don N. High, Attorney for the Plaintiffs
         Ms. Stefani Williams, Assistant City Attorney

15       Mr. Thad Strobach, Videographer

16

17

18

19

20

21

22

23

24

25

COD & Tolerton MSJ Appx. 105

CRAIG RIGTRUP  11/21/17

Page 4

1                          **INDEX**
                                                    **PAGE**
2
   Appearances................................    3
3
WITNESS:   CRAIG RIGTRUP
4
      Examination by Mr. Schuette..............    6
5
6  Signature and
   Changes.....................................  116
7
   Reporter's Certificate......................  119
8
9

                    **DEFENDANT'S EXHIBITS**
10
   NO.                  DESCRIPTION              **PAGE**
11
   1      Defendants' Notice of Deposition......    8
12
   2      C. Rigtrup's report, 6/7/2017.........   16
13
   3      Color photo of Officer A. Tolerton....   41
14
   4      Color photo of gun...................   48
15
   5      Color photo of gun...................   49
16
   6      Incident report 2/9/2015; reporting
17         officer, David Paul England..........   50
18  7      Color photo of gun and two ammunition
           clips................................   53
19
   8      Color photo of two ammunition clips...   55
20
   9      Color photo of gun and one ammunition
21         clip.................................   59
22  10     Color photo of blue pickup truck......   61
23  11     Incident report 2/9/2015; reporting
           officer, Seth Nathaniel Rosenberg.....   62
24
   12     Color photo of blue pickup truck and
25         white evidence markers...............   64

COD & Tolerton MSJ Appx. 106

Page 5

1                    DEFENDANT'S EXHIBITS

2    NO.                  DESCRIPTION                  PAGE

3

     13       Diagram of evidence markers, mapped

4             by J. Massey.........................   65

5    14       Color photo of driver's side interior

              of pickup truck.....................  104

6

     15       Color photo of driver's seat, gun on

7             console of pickup truck.............  104

8    16       Color photo of gun and clip inside

              vehicle.............................  104

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COD & Tolerton MSJ Appx. 107

Page 6

1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  On the record,

3    November the 21st, 2017, for the deposition of Craig

4    Rigtrup.  It's 10:07 a.m.

5              Counsel, please state their appearances and

6    agreements.

7              MR. SCHUETTE:  Jason Schuette and Stefani

8    Williams, Assistant City Attorneys for the Defendants

9    City of Dallas and Aaron Tolerton.

10             MR. ADCOCK:  Logan Adcock for Pilot.

11             MR. BENNETT:  Charles Bennett for the

12   Plaintiffs.

13             MR. HIGH:  And Don High for the Plaintiffs.

14   And my address is a little different than his.  It's 816

15   Greylyn, G-R-E-Y-L-Y-N, Drive, Plano 75075.  And I won't

16   be here the whole time.

17             (Witness was sworn)

18                  CRAIG RIGTRUP,

19   having first been duly sworn, testified as follows:

20                  EXAMINATION

21   BY MR. SCHUETTE:

22     Q.  Good morning, Mr. Rigtrup.

23     A.  Yes.

24     Q.  Mr. Rigtrup, I can tell already when I ask you to

25   speak up because, maybe I'm getting old, but I could

Page 103

1      A.   Yes, sir.

2      Q.   Do you see where it says "Opinions, Cont'd"?

3      A.   Uh-huh.

4      Q.   Now, this is a section of your report, as I

5  understand it, that you supplemented after your initial

6  report; is that right?

7      A.   Yes, sir.

8      Q.   Okay.  Do you see -- I have to find exactly where

9  it is.

10         Okay.  Do you see the second sentence of that

11  first paragraph after opinions that begins "upon doing

12  so"?

13      A.   Yes, sir.

14      Q.   Why don't you go ahead and read that first and

15  second sentence.

16      A.   "Upon doing so, Damon Luster exited his vehicle

17  and in the process of which, in the moment apparently

18  there was a question as to Damon Luster's role and

19  intent in the matter and was initially detained at

20  approximately 1335 hours due to reasonable suspicion

21  that Damon was possibly a suspect in the incident."

22      Q.   Okay.  You would agree that there was a

23  legitimate reason for Officer Tolerton to detain Da'Mon

24  Luster at the scene of the shooting and to place Da'Mon

25  Luster into submission?

CRAIG RIGTRUP  11/21/17

Page 104

1      A.   In the moment, yes.

2      Q.   And why would that have been reasonable in your

3  view?

4      A.   Because of all the unknowns in the moment.

5      Q.   And those unknowns would include that while

6  Officer Tolerton is dealing with Desmond Luster who he

7  had just shot at, you have another man who drives up in

8  a truck unknown?

9      A.   Right.  You don't know what his role is in the

10  situation.

11     Q.   You don't know what his role is, right?

12     A.   Yeah.

13     Q.   You don't know whether he's armed, right?  Right?

14     A.   Of course, yeah.

15     Q.   Officer Tolerton doesn't know what Da'Mon's

16  intentions are, does he?

17     A.   No.

18     Q.   So it would have been very reasonable and proper

19  for Officer Tolerton to insist that Da'Mon Luster get on

20  the ground and place himself in a position where he

21  would be a more minimal threat to anyone present, right?

22     A.   Right.

23     Q.   In fact, you know that Da'Mon was armed with a

24  pistol, correct?

25     A.   He had one in his vehicle.

Effective: September 1, 2003

V.T.C.A., Civil Practice & Remedies Code § 101.106

### § 101.106. Election of Remedies

(a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

(b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.

(c) The settlement of a claim arising under this chapter shall immediately and forever bar the claimant from any suit against or recovery from any employee of the same governmental unit regarding the same subject matter.

(d) A judgment against an employee of a governmental unit shall immediately and forever bar the party obtaining the judgment from any suit against or recovery from the governmental unit.

(e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.

(f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

**Credits**

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 2003, 78th Leg., ch. 204, § 11.05, eff. Sept. 1, 2003.

Tex. Civ. Prac. & Rem. Code Ann. § 101.106 (West)