**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CASSANDRA LUSTER et al.** | § | |
| | § | **CIVIL ACTION NO.** |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **3:16-CV-0396-B** |
| | § | |
| **CITY OF DALLAS, ET AL.** | § | |
| | § | |
| **Defendants.** | § | |

**APPENDIX FOR BRIEF FOR PLAINTIFFS' MOTION FOR LEAVE TO AMEND
PLAINTIFFS' EXPERT DESIGNATION OF SCOTT BELSHAW**

Respectfully submitted,

**TED B. LYON & ASSOCIATES, P.C.**

By:     /s/ Charles A. Bennett
          Charles A. Bennett
          State Bar No. 24086454
          cbennett@tedlyon.com
          Town East Tower, Suite 525
          18601 LBJ Freeway
          Mesquite, Texas 75150
          Telephone:  (972) 279-6571
          Facsimile:  (972) 279-3021

          **DON N. HIGH**
          State Bar No. 09605050
          lawyerdonhigh@gmail.com
          816 Greylyn Dr.
          Plano, TX 75075
          Telephone: (972) 424-5512

          **ATTORNEY FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing document was duly served pursuant to the Texas Rules of Civil Procedure via Electronic Mail/eServe on the following counsel of record on this 12th day of December 2017.

*/s/ Charles A. Bennett* _____
CHARLES A. BENNETT

**INDEX**

<u>Item</u>                                                                                                      <u>Pages</u>

Videotaped Deposition of Brandon Davis, dated 18 October 2017 ......................................1-5

Deposition of Brandon Davis

Case 3:16-cv-00396-B   Document 78   Filed 12/12/17   Page 4 of 8   PageID 1117

Cassandra Luster, et al vs. City of Dallas, et al

Page 3

VIDEOTAPED DEPOSITION OF BRANDON DAVIS

October 18, 2017
11:40 a.m. - 1:22 p.m.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

------------------------------
CASSANDRA LUSTER, et al,      )
                             )
    Plaintiffs,               )
                             )
vs.                           ) NO.
                             ) 3:16-cv-00396-G
CITY OF DALLAS, et al,        )
                             )
    Defendants.               )
------------------------------

APPEARANCES:

    FOR THE PLAINTIFFS:

        CHARLES A. BENNETT, ESQ.
        Attorney at Law
        Ted B. Lyons & Associates
        Town East Tower, Suite 525
        18601 LBJ Freeway
        Dallas, Texas 75150

    FOR THE DEFENDANTS:

        MICHAEL B. JONES, ESQ.
        Attorney at Law
        Canterbury, Gooch, Surratt, Shapiro,
        Stein & Gaswirth
        5005 LBJ Freeway, Suite 1000
        Dallas, Texas 75244

ALSO PRESENT: Matt Poplin, Videographer

---

Page 4

S T I P U L A T I O N

    The videotaped deposition of BRANDON DAVIS,
called as a witness at the instance of the Plaintiffs,
taken pursuant to all rules applicable to the Federal
Rules of Civil Procedure by Notice on the 18th day of
October, 2017, at Regus, 200 Prosperity Drive,
Knoxville, Tennessee, before David L. Kelly, Licensed
Court Reporter, pursuant to stipulation of counsel.

    It being agreed that David L. Kelly, Licensed
Court Reporter, may report the videotaped deposition in
machine shorthand, afterwards reducing the same to
typewriting.

    All objections except as to the form of the
questions are reserved to on or before the hearing.

    It being further agreed that all formalities
as to notice, caption, certificate, transmission,
etcetera, including the reading of the completed
videotaped deposition by the witness and the signature
of the witness, are expressly waived.

---

Page 2

I N D E X

Examinations                          Page

BRANDON DAVIS

EXAMINATION BY MR. BENNETT              4

E X H I B I T S

No.         Description             Page

Exhibit 1 - Drawing                  90

---

Page 4

    MR. BENNETT:  The parties have agreed to
objection form only and to waive reading, right?
    MR. JONES:  No.  We want to read and
sign.
    MR. BENNET:  No, I mean --
    MR. JONES:  Reading of the -- yeah,
sorry.  Yes, we've agreed to that.
    MR. BENNETT:  Okay.
    MR. JONES:  My bad.
    MR. BENNETT:  I was unclear.
        BRANDON DAVIS,
having first been duly sworn, was examined and deposed
as follows:
EXAMINATION BY MR. BENNETT:
    Q.    Can you state your full name for the
record, please.
    A.    Brandon Davis.
    Q.    My name is Charles Bennett.  I represent
the family of Desmond Luster, who was -- and Damon
Luster.  Desmond was the guy who was shot and killed
February 9, 2015 at the Flying J in Dallas, and Damon
was his brother who was arrested and there at the time.
Do you understand who I am and who I represent?
    A.    Yes, sir.
    Q.    Have you ever given a deposition like

---

Deposition of Brandon Davis

Case 3:16-cv-00396-B   Document 78   Filed 12/12/17   Page 5 of 8   PageID 1118

Cassandra Luster, et al vs. City of Dallas, et al

Page 29

1  turn it out, they clip the pump.
2      You know, so it's either going to
3  do -- it's probably going to do damage both ways:
4  Their RV, our pump.  So we do a property incident
5  report.  We get their information.  We put everything
6  down.  It comes into our home office.  They handle it
7  from there.
8      Q.   All right.  And by "pumps", you mean like
9  one of those gas pumps, right?
10     A.   Yeah, gas pump.
11     Q.   So you've have got -- I guess in that
12 situation there's two types of property damage.  One is
13 to the customer's property, right?
14     A.   Correct.
15     Q.   And the second one would be to Pilot's
16 property, right?
17     A.   Correct.
18     Q.   Okay.  And let's say -- I guess, Pilot
19 would become aware of that property damage in a couple
20 of different ways, and one is the customer comes in and
21 says, "Hey, I just hit the pump."  Is that fair?
22     A.   That's fair.
23     Q.   And then the second one would be maybe
24 some other customer comes by and says, "Hey, it looks
25 like somebody hit the pump."  Is that fair?

Page 30

1      A.   That's fair.
2      Q.   And then other way would be an employee
3  comes by and notices it; is that right?
4      A.   Correct.
5      Q.   Can you think of any other ways that you
6  guys may become aware of the property damage?
7      A.   No.  Those are the -- those are probably
8  the main three:  We see it, somebody sees it, or they
9  tell us.
10     Q.   Okay.  All right.  And then let's talk
11 about customer incident reports.  When -- when is it
12 that a GM like you knows that I've got a situation
13 where I need to pull up this customer incident report
14 and fill it out?
15     A.   Those would be your slip and falls, your
16 trips.  Basically any time somebody is injured on the
17 property we fill out a report.
18     Q.   Now, we mentioned earlier a little bit
19 about how -- I think this Dallas one I've heard some
20 stories about having some people that come on that
21 aren't really customers, and you don't really want them
22 on there.  They're kind of trespassers, right?
23     A.   Correct.
24     Q.   And that happens from time to time in any
25 business, fair?

Page 31

1      A.   Fair.
2      Q.   Okay.  So let's say somebody is
3  trespassing or you don't really want them on there or
4  just two customers get in a fight and
5  somebody -- somebody gets injured, is that something we
6  fill out a customer incident report for?
7      A.   We would.
8      Q.   Okay.  And that's because somebody was
9  injured, correct?
10     A.   Right.
11     Q.   And let's say -- and this is -- were you
12 ever on the property when there was an arrest made in
13 Dallas on the Pilot property?
14     A.   I'm sure I was.
15     Q.   Is that something we'd fill out a report
16 for?
17     A.   For arrests?
18     Q.   Yeah.
19     A.   Yeah.  That would be something that
20 normally we would fill out a report for, yes.
21     Q.   Is that -- which one of these reports
22 would that be, customer report, employee incident or a
23 property damage report?
24     A.   We'd probably put it under customer
25 report.

Page 32

1      Q.   All right.  So I've give got slip and
2  fall, trip and fall, assault, and arrest.  Can you
3  think of anything else that we would fill out a
4  customer incident report for?
5      Maybe we can do it this way:  Is it any
6  time a customer gets injured?  That is that fair?
7      A.   It doesn't have to be just for injury,
8  though, I don't think.
9      Q.   Okay.  Explain that.
10     A.   I know that's one reason to fill it out,
11 but you may fill it out for -- I'm trying to remember
12 the report, exactly how it looks whenever I used to do
13 it, but the main reason you did it is normally for
14 injury, yes.
15     Q.   Okay.  One, you might have a situation
16 where a customer comes in and claims they were injured,
17 and you don't really know that at that point, right?
18     A.   Right.
19     Q.   And so would you fill out a report then
20 even if you're not really sure if it happened or not;
21 is that fair?
22     A.   Yeah.  You still should fill out the
23 report, yes, sir.
24     Q.   Okay.  So for injuries and claimed
25 injuries; is that fair?

Appendix002

Deposition of Brandon Davis                                      Cassandra Luster, et al vs. City of Dallas, et al

Page 57

1    Q.   Now, we talked about when and kind of why
2  you do these incident reports, and we talked about kind
3  of the minimum requirements for like if somebody's
4  injured or they claim they're injured.
5        Do you agree with me that the reasons
6  we're doing these incident reports is so that, you
7  know, the GM knows what's going on in the store, and
8  the regional manager knows what's going on in the
9  store, and Pilot itself knows so there's something in
10 writing about the incident?  Is that fair?
11   A.   That's fair.
12   Q.   And if there's a problem that we can fix,
13 whether it comes from the GM or the regional manager or
14 Pilot above that, right?
15   A.   Correct.
16   Q.   And so if there's something happening
17 that there should be an incident report and an incident
18 report isn't done, that that's a -- that's a failure of
19 whoever was supposed to fill out that report.  Do you
20 agree with that?
21   A.   I agree with that.
22        MR. JONES:  Objection to form.
23 BY MR. BENNETT:
24   Q.   Because if there's -- if that report is
25 not done and it should have been done, and, you know,

Page 58

1  Pilot doesn't have any knowledge of it, they can't fix
2  it, right?
3    A.   Correct.
4    Q.   And that can cause a safety problem or,
5  you know, something that could be fixed and not be
6  fixed and can cause it to be less safe, right?
7        MR. JONES:  Objection.  Form.
8        THE DEPONENT:  Let's say if it's just
9    people aren't in the know and should be in the
10   know.
11 BY MR. BENNETT:
12   Q.   And they can't -- they can't say, "Hey,
13 there's a problem down in that -- in that Dallas Flying
14 J," or whatever it is.  "We need to go and fix that,"
15 right?  Because they don't know, right?
16   A.   Yeah, depending on what the -- depending
17 on what the issue is.
18        MR. JONES:  Objection form.
19 BY MR. BENNETT:
20   Q.   Well, if it's an issue that arises above
21 like we talked about earlier where an incident report
22 should be done and it's not done, you know, that's why
23 you do the reports, right?
24   A.   Yeah, to make those people aware.
25   Q.   Okay.  And -- and that's something that

Page 59

1  Pilots depends on and relies on their GMs to do, right?
2    A.   Correct.
3    Q.   And if the GM isn't doing something,
4  isn't filling out an incident report when they should,
5  then that's a failure on the GM's part to do something
6  that's important to their job, right?
7    A.   Yes, sir.
8    Q.   Do you agree that the -- I think you kind
9  of mentioned this earlier, is that the -- keeping those
10 panhandlers in check in the back part of the lot and
11 making sure that things are safe for these truck
12 drivers, that's obviously a part of the off-duty
13 security guard's job, right?
14   A.   Correct.
15   Q.   And that's -- that is a part of Pilot's
16 success as a company.  Do you agree with that?
17        MR. JONES:  Objection.  Form.
18        THE DEPONENT:  No, I don't think it has
19   anything to do with Pilot's success.  I think it's
20   more of a store-by-store basis on -- like, that
21   store has off-duty police officers --
22 BY MR. BENNETT:
23   Q.   Right.
24   A.   -- for that reason, to keep the
25 panhandlers off the back lot.  I don't think that has

Page 60

1  anything to do with Pilot's success as a company.
2    Q.   Okay.  I may have made it too broad
3  there.  Let's talk about just the Flying J in Dallas.
4  It's part of that Flying J's success.  Would you agree
5  with that?
6        MR. JONES:  Objection.  Form.
7        THE DEPONENT:  Again, I don't think it
8    has anything to do with their success.  I think it
9    has to do more with making sure that the building
10   and customers and the people that work there are
11   safe.
12 BY MR. BENNETT:
13   Q.   Well, if -- if the word gets out that
14 it's not safe to go to that Flying J in Dallas and
15 truck drivers and customers stop showing up, then you'd
16 agree that that could affect the success of that Flying
17 J in Dallas; is that fair?
18   A.   That's fair.
19   Q.   Okay.  Do you agree that the job that
20 that officer is doing for Flying J is different than
21 their job as a police officer, if you know?
22        MR. JONES:  Objection.  Form.
23        THE DEPONENT:  Do I think the job is
24   different?
25 BY MR. BENNETT:

Appendix003

Deposition of Brandon Davis                                         Cassandra Luster, et al vs. City of Dallas, et al

Page 69

1    Q.   Did anybody ever complain that Officer
2  Tolerton was coming across the street and roughing
3  people up over there?
4    A.   No.
5    Q.   Did you ever see Tolerton rough anybody
6  up on the Flying J property?
7         MR. JONES:  Objection.  Form.
8         THE DEPONENT:  Did I ever see him?  No.
9  BY MR. BENNETT:
10   Q.   Did you ever hear about it?
11   A.   There was one incident where another one
12 of my managers -- I think Tolerton had tackled somebody
13 in the front on the parking lot.  I didn't see it.
14 So --
15   Q.   Okay.  Do you know if Tolerton was hurt
16 in that incident?
17   A.   His hip was hurt, yes, sir.
18   Q.   Okay.  Do you know about when this
19 incident was?
20   A.   No.  I don't remember the date.
21   Q.   Do you know if the person that either
22 tackled him or was tackled, do you know if that person
23 was injured?
24   A.   He was not.
25   Q.   Okay.  If there was -- we talked earlier

Page 70

1  about when to do those incident reports.  If there was
2  a situation where there was an altercation between an
3  off-duty police officer and somebody on Flying J's
4  property and either the officer or the other person was
5  hurt, is that an instance we would need to do a report?
6    A.   Yes, sir.
7    Q.   Do you know if a report was done in that
8  incident?
9    A.   There was not.
10   Q.   Okay.  Do you know why?
11   A.   Just didn't do one.
12   Q.   Who was the GM on duty at that time?
13   A.   I was.
14   Q.   At the time of the tackling?
15   A.   I believe so, yes, sir.
16   Q.   Oh, I thought you heard about the
17 tackling from somebody else?
18   A.   I didn't see it.  I was at the store.
19   Q.   I'm sorry.  Okay.  I misunderstood.  So
20 you were on duty at the time of this -- this tackling
21 incident?
22   A.   Yes, sir.
23   Q.   And if I told you that we think it
24 happened in November of 2014, does that -- do you have
25 any reason to argue about that?

Page 71

1    A.   I wouldn't know.
2         MR. JONES:  Objection.  Form.
3  BY MR. BENNETT:
4    Q.   Okay.  All right.  So what did you hear
5  about this incident?  What happened?
6    A.   I don't even remember -- I don't even
7  remember what the incident was.  I just remember -- I
8  can remember Tolerton's hip being hurt, him getting
9  into other car.
10        I know Agence Smith was the other manager
11 that was involved, and I can remember him telling me
12 that he went out there and helped hold the guy down so
13 that Tolerton could get out from under him.
14   Q.   Okay.  Agent Smith?
15   A.   Agence.  A-g-e-n-c-e, Agence.
16   Q.   Okay.  And that's his first name?
17   A.   Yes, sir.
18        MR. JONES:  Deceased.
19        THE DEPONENT:  He passed away.
20 BY MR. BENNETT:
21   Q.   What happened?  Do you know?
22   A.   I got a call a few months ago from a guy
23 that worked at the store and asked me if I was going to
24 be able to make it down for the funeral, and I told
25 him, you know, I can't.  It's too far, and I've got a

Page 72

1  bunch of stuff going on.  But I think they said he had
2  a heart attack and passed away.
3    Q.   Was he older or how old was he?
4    A.   No.  He was a big old dude, healthy, from
5  what I thought.
6    Q.   Like --
7    A.   It's crazy, just a shot -- just one of
8  those freak things that --
9    Q.   And this was this year earlier?
10   A.   Yes, sir, since I've been in Chattanooga,
11 and I got to Chattanooga last year.  So --
12   Q.   Okay.  So Mr. Smith came to you
13 and -- oh, Mr. Smith held the guy down that he tackled
14 or was tackled by Tolerton, and let's clear that up.
15 Do you know which it was that --
16   A.   I don't know.
17   Q.   Okay.  So Agence -- Agence Smith,
18 Mr. Smith, held the guy down while Tolerton got up; is
19 that your understanding?
20   A.   That's my understanding.
21   Q.   Do you know -- did Mr. Smith explain what
22 the incident was about?
23   A.   Huh-uh, not that I can remember.  I'm
24 sure he did, but that's -- I just don't remember.
25   Q.   Did you ever talk to Tolerton about it?

Appendix004

Deposition of Brandon Davis

Case 3:16-cv-00396-B   Document 78   Filed 12/12/17   Page 8 of 8   PageID 1121

Cassandra Luster, et al vs. City of Dallas, et al

Page 73

```
 1    A.    No.
 2    Q.    Do you know who the person was, the other
 3  person that was involved?
 4    A.    I don't know.
 5    Q.    Had you ever seen him before?
 6    A.    No.
 7    Q.    Was he one of the panhandlers?
 8    A.    Yeah, I don't know.
 9    Q.    Okay.  Did Tolerton get taken away by
10  ambulance?
11    A.    No.
12    Q.    You said another car came and picked him
13  up.  Do you know --
14    A.    I think it was another police car.
15    Q.    So he -- he left by police car?
16    A.    Correct.
17    Q.    Did you know -- did Mr. Smith know that
18  Tolerton was hurt?
19    A.    I don't -- I don't know.  I think after
20  he got up he radioed to a partner, and that's who come
21  and got him.
22    Q.    Oh, called --
23    A.    Yeah, Tolerton radioed to somebody else
24  to come get him, to the best of my recollection.
25    Q.    So you think Tolerton may have gotten on
```

Page 74

```
 1  his police radio.  It wouldn't have been a
 2  walkie-talkie?
 3    A.    It wouldn't have been ours.
 4    Q.    So you think Tolerton got on the police
 5  radio and called in some help, and somebody picked him
 6  up, right?
 7    A.    Correct.
 8    Q.    And do you know what Mr. Smith did with
 9  the guy that he held down?
10    A.    I don't remember.  I'm sure he went to
11  jail.
12    Q.    Okay.  So you think that guy was probably
13  arrested?
14    A.    Correct.
15    Q.    Did any of your employees see that
16  incident, that you recall?
17    A.    No.
18    Q.    Do you know -- besides that tackling
19  incident, do you know of any other incidents that
20  Tolerton was involved in where he either was in an
21  altercation with somebody or he had somebody arrested
22  while he was working for the Flying J?
23    A.    No.
24    Q.    And I think we agreed earlier that this
25  is the type of incident, this tackling thing, where one
```

Page 75

```
 1  guy is taken away and another guy is arrested that an
 2  incident report should probably be done, right?
 3    A.    Should have been done.
 4    Q.    Okay.  And was that going to be -- should
 5  that have been your responsibility or Mr. Smith's?
 6    A.    It should have been mine.
 7    Q.    Okay.  Do you know why you didn't do it
 8  that day?
 9    A.    No.
10    Q.    Was it just a --
11    A.    Just a failure on my part.
12    Q.    Fair enough.  Did you -- were you ever
13  reprimanded for that by the regional manager or anybody
14  else?
15    A.    No.
16    Q.    Were you ever talked to about, "Hey, this
17  is something we need -- we need to do the incident
18  report in the future?"
19    A.    Have I had those conversations in my
20  career?  Yes, but that one in particular, no.
21    Q.    How many times have -- have you had the
22  conversations with other people about, "Hey, you know,
23  Mr. Davis, you need to do an incident report in the
24  future on something like this?"
25    A.    Normally it's not them having the
```

Page 76

```
 1  conversation.  It's me calling and asking if I need to
 2  do one.
 3    Q.    About how many times do you think you
 4  called and asked somebody for advice on whether you
 5  should do a report on an incident?
 6    A.    Probably two or three times that I have
 7  called that I wasn't sure or it was a new situation for
 8  me.
 9    Q.    And are you calling your regional manager
10  at this point or somebody else?
11    A.    Yes, I called my regional.
12    Q.    All right.  And were these -- any of
13  these two or three times while you're working at the
14  Dallas Flying J?
15    A.    No.
16    Q.    When were they, if you can remember?
17    A.    Let me think.  It probably would have
18  been early in my career, like, at one of my early
19  stores, Sulfur Springs maybe.  I probably would have
20  called, you know, Brad or somebody and asked, but by
21  the time I got -- I didn't have to call in Dallas at
22  all.
23    Q.    And you're a regional manager now.  So is
24  this something that you -- you get calls like this from
25  your GMs on occasion?
```